UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
_____
                                              :
YOEL WEISSHAUS,                               :
                                              :
              Plaintiff,                       :
                                              :        Before: Richard K. Eaton, Judge*
       v.                                     :
                                              :        Court No. 11 Civ. 06616 (RKE)
PORT AUTHORITY OF NEW YORK                    :
AND NEW JERSEY,                               :
                                              :
              Defendant.                       :
_____:

## <u>OPINION</u>

Eaton, Judge: Before the court is defendant Port Authority of New York and New Jersey's ("defendant" or "Port Authority") motion to dismiss plaintiff Yoel Weisshaus' ("plaintiff" or "Weisshaus") December 20, 2013 amended complaint ("Amended Complaint"), *see* Def.'s Mem. Supp. Mot. Dismiss, ECF No. 37 ("Def.'s Br."); Def.'s Mem. Opp'n Pl.'s Mot. Leave to Am., ECF No. 66 ("Def.'s Suppl. Br."); *see also* Am. Compl., ECF No. 26, and plaintiff's cross-motion asking the court to grant him leave to file a second amended complaint ("Proposed Second Amended Complaint"). *See* Pl.'s Combined Mem. Suppl. Opp'n Mot. Dismiss and in Supp. Mot. Leave to Am., ECF No. 64 ("Pl.'s Suppl. Br."); Pl.'s Cross-Mot. Ex. 1, ECF No. 65-3 ("Proposed Second Am. Compl.").

Plaintiff opposes defendant's motion to dismiss, and defendant opposes plaintiff's motion to amend his complaint a second time. *See* Pl.'s Mem. Opp'n Mot. Dismiss, ECF No. 44 ("Pl.'s Br."); *see also* Pl.'s Suppl. Br. 1; Def.'s Suppl. Br. 1. Because in both the Amended Complaint,

---

*      Richard K. Eaton, Judge of the United States Court of International Trade, sitting by designation.

and the Proposed Second Amended Complaint, plaintiff fails to state a claim upon which relief can be granted, the court grants defendant's motion to dismiss, and denies plaintiff's cross-motion for leave to amend.[1]

## BACKGROUND

### I. FACTS

This case arises out of the same facts as those that gave rise to the court's opinion in *AAA Northeast v. Port Authority of New York & New Jersey*, 221 F. Supp. 3d 374 (S.D.N.Y. 2016) ("*AAA Northeast*").

The Port Authority is a bi-state governmental agency created by compact between New York and New Jersey with consent of the United States Congress, and is responsible for construction, maintenance, operation, and control of all vehicular bridges and tunnels connecting New York and New Jersey, including the Bayonne Bridge, the Outerbridge Crossing, the Goethals Bridge, the George Washington Bridge, the Holland Tunnel, and the Lincoln Tunnel. *See* N.Y. UNCONSOL. LAWS § 6401, *et seq.* (McKinney 2018); N.J. STAT. ANN. § 32:1-118 (West 2018). In addition, the Port Authority operates "the interstate Port Authority Trans–Hudson ("PATH") Rail System; three bus terminals (the Port Authority Bus Terminal, George Washington Bridge Bus Station, and Journal Square Transportation Center); two truck terminals; seven marine terminals; four airports; two heliports; and the sixteen-acre World Trade Center site." *AAA Northeast*, 221 F. Supp. 3d at 376. The Tunnels, Bridges & Terminals Line Department, the PATH Rail System Line

---

[1]       Previously, the court notified the parties that it was considering partially converting defendant's motion to dismiss into a motion for summary judgment, and invited the parties to submit their views. *See* Order dated Aug. 31, 2018, ECF No. 67. Upon consideration of the submissions, defendant's motion will not be partially converted into one for summary judgment.

Department, and the ferries program collectively comprise the "Interstate Transportation Network"

(the "ITN").[2] *Id.*

The Port Authority is governed by a board of twelve commissioners, six from each state.

N.Y. UNCONSOL. LAW § 6405. The bi-state statutes allow the Port Authority to collect tolls at the

bridge and tunnel facilities. *See id.* § 6501; N.J. STAT. ANN. § 32:1-118.

On August 5, 2011, the Port Authority announced, in a press release, a proposal to increase

the tolls on its tunnels and bridges. Among other things, the press release stated:

> Following direction by [the governors of New York and New Jersey], the Port
> Authority of New York and New Jersey Board of Commissioners today approved
> a two-part plan to restore fiscal health to the agency by increasing toll and fare rates
> at a lower level than originally proposed and demanding accountability through a
> stringent agency-wide review. . . .
>
> The $25.1 billion immediate 10-year capital plan will generate more than 131,000
> jobs and was achieved by giving critical attention to safety, security and state-of-
> good-repair projects, including completion of the World Trade Center, while and
> phasing in other less immediate projects over more than 10 years. Approximately
> 60 percent of the plan, $15 billion, will be invested in the next four years supporting
> a much needed boost to the regional economy. The immediate projects funded in
> the plan include:
>
> • George Washington Bridge suspender ropes
> • Lincoln Tunnel Helix rehabilitation
> • Bayonne Bridge roadway raising
> • New Goethals Bridge with both Port Authority and private investment
> • PATH Car, signal, and station modernizations
> • Airport runway and taxiway modernizations

---

[2]      As discussed in detail by the court in *AAA Northeast*:

> While the concept of the ITN is rooted in the state laws implementing the compact
> that created the Port Authority, the term was first used in Judge Pollack's opinion
> in *Automobile Club of New York, Inc. v. Port Authority of New York & New Jersey
> (AAA 1989 I)*, 706 F. Supp. 264 (S.D.N.Y. 1989), which was affirmed by Chief
> Judge Oakes' opinion in *Automobile Club of New York, Inc. v. Port Authority of
> New York & New Jersey (AAA 1989 II)*, 887 F.2d 417 (2d Cir. 1989).

*AAA Northeast*, 221 F. Supp. 3d at 376. Moreover, "[a]lthough the concept of the ITN is a fixture
in case law and the Port Authority may take it into account in its capital plan, it does not otherwise
account for it separately on its books and records." *Id.* at 377.

    • Security enhancements at all facilities
    • Port infrastructure improvements to rail and roads in the port
    • Completion of the World Trade Center

    The revised toll and fare rates recognize the severe financial constraints facing the
    agency and the financial limitations on regional commuters and businesses
    dependent on the Port Authority's transportation network each day.

Am. Compl. Ex. A, ECF No. 26-1.

On August 19, 2011, the Port Authority Board of Commissioners met and approved a toll

increase that began on September 18, 2011 (the "2011 Toll Increase"). Am. Compl. Ex. A; *see*

*also AAA Northeast*, 221 F. Supp. 3d at 376-77 (detailing the facts surrounding the toll increase).

The 2011 Toll Increase included a $1.50 increase for all users, and an additional $2 penalty for

users paying with cash (instead of with E-ZPass), rounded up to the nearest dollar. From December

2012 through December 2015, the tolls increased an additional $0.75 each year. In addition, fares

on the PATH train increased $0.25 per year from 2011 to 2014. *See* Am. Compl. Ex. A.

## II.    PROCEEDINGS

On September 19, 2011, Weisshaus, a New Jersey resident who has used the Port

Authority's surface river crossings to commute to New York City, proceeding *pro se*, filed his

original Complaint against the Port Authority, challenging the constitutionality of the Port

Authority's 2011 Toll Increase. *See generally* Compl., ECF No. 2. On October 24, 2011, Judge

Deborah A. Batts[3] dismissed the Complaint *sua sponte*. *See* Order dated Oct. 24, 2011, ECF No.

4. On December 8, 2011, by order of Judge Loretta A. Preska, this Court denied plaintiff's motion

for reconsideration. *See* Order dated Dec. 8, 2011, ECF No. 9. Plaintiff appealed Judge Batts'

---

        [3]        This case was first assigned to Judge Deborah A. Batts. On October 24, 2011, Judge
Batts directed the Clerk of Court to assign the case to Judge Loretta A. Preska. On June 10, 2013,
following remand, this case was reassigned to Judge George B. Daniels until June 18, 2013, when
the case was reassigned to the court.

dismissal, and, on September 20, 2012, the Second Circuit affirmed in part and remanded. *See Weisshaus v. Port Auth. of New York & New Jersey*, 497 F. App'x 102 (2d Cir. 2012). On remand, the court was directed to "determine in the first instance whether Weisshaus has adequately pleaded [a dormant Commerce Clause claim] or should be granted leave to amend the claim." *Id.* at 105. The Second Circuit also indicated that "the district court may, in its discretion, consider staying the action pending a decision in *Automobile Club of New York, Inc. v. Port Authority of New York & New Jersey*, No. 11–CV–6746 (S.D.N.Y. filed Sept. 27, 2011)." *Id.*

Following the remand, the case was reopened on February 15, 2013. Thereafter, on August 21, 2013, plaintiff filed a letter with the court asking for leave to file an amended complaint in accordance with the Second Circuit decision. Letter from Yoel Weisshaus (Aug. 21, 2013), ECF No. 19. The court granted plaintiff's request, and plaintiff filed his Amended Complaint on December 20, 2013. *See* Order dated Oct. 30, 2013, ECF No. 23; Am. Compl. Subsequently, defendant filed a motion to dismiss, which included an application to stay proceedings pending the decision in *AAA Northeast*, because of the substantial similarities between the cases.[4] *See* Def.'s Br. 1. On June 8, 2015, the court stayed the case pending the results of *AAA Northeast*. Order dated June 8, 2015, ECF No. 56 ("June 8, 2015 Order"). On November 18, 2016, the court issued its decision granting the Port Authority's motion for summary judgment in *AAA Northeast*. *AAA Northeast*, 221 F. Supp. 3d at 392 (finding that plaintiffs "failed to create a triable issue of fact as to whether the toll and fare increases are not a 'fair approximation of use of the facilities' and are 'excessive in relation to the benefits conferred' to users of the ITN.").

---

[4]       Like Weisshaus, the *AAA Northeast* plaintiffs claimed that the 2011 Toll Increase was unconstitutional, alleging that the Port Authority diverted toll revenue to fund non-ITN projects.

Following the *AAA Northeast* decision, on March 20, 2017, the court held a status and scheduling conference with the parties, lifted the stay, and granted the parties an opportunity to submit supplemental briefing. Order dated Mar. 20, 2017, ECF No. 62. In the supplemental briefing, plaintiff asks the court to deny defendant's motion to dismiss for failure to state a claim, and further seeks to amend his complaint for a second time "to flesh out further the facts that would aid in reviewing this case on its merits." Pl.'s Suppl. Br. ¶ 24. Defendant opposes as futile plaintiff's motion for leave to amend, and claims that, under *AAA Northeast*, this case should be dismissed in its entirety for failure to state a claim. *See* Def.'s Suppl. Br. 3. For the reasons stated below, the court denies as futile plaintiff's motion to amend his complaint a second time, and dismisses this case in its entirety.

## STANDARD OF REVIEW

When reviewing a motion to dismiss under Federal Rule of Civil Procedure 12(b)(6), the court's role "is 'merely to assess the legal feasibility of the complaint, not to assay the weight of the evidence which might be offered in support thereof.'" *Sims v. Farrelly*, No. 7:10–CV–4765 (VB), 2011 WL 4454942, at *1 (S.D.N.Y. Sept. 26, 2011) (quoting *Ryder Energy Distrib. Corp. v. Merrill Lynch Commodities, Inc.*, 748 F.2d 774, 779 (2d Cir. 1984)). All factual allegations in the complaint must be accepted as true, and the complaint must be viewed in the light most favorable to the plaintiff. *Gibbons v. Malone*, 703 F.3d 595, 599 (2d Cir. 2013). Threadbare assertions and mere legal conclusions, however, are insufficient to state a claim. *See Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (citing *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007)). Although *pro se* complaints must contain sufficient factual allegations to meet the plausibility standard, the court reads *pro se* complaints with special liberality, and interprets them to raise the "strongest arguments that they *suggest*." *Alroy v. City of New York Law Dep't*, 69 F. Supp. 3d 393,

397-98 (S.D.N.Y. 2014) (quoting *Triestman v. Fed. Bureau of Prisons*, 470 F.3d 471, 474 (2d Cir. 2006)); *see Erickson v. Pardus*, 551 U.S. 89, 94 (2007).

Meeting the plausibility standard is a "context-specific" analysis, wherein the court must "draw on its judicial experience and common sense." *Harris v. Mills*, 572 F.3d 66, 72 (2d Cir. 2009) (quoting *Iqbal*, 556 U.S. at 679). Where the defendant has set forth an "obvious alternative explanation" for the plaintiff's alleged facts, the plaintiff must show "something more" to achieve plausibility. *See Twombly*, 550 U.S. at 554, 560, 567; *N.J. Carpenters Health Fund v. Royal Bank of Scotland Grp., PLC*, 709 F.3d 109, 121 (2d Cir. 2013). Specifically, the plaintiff may need to provide facts that "tend[] to exclude the possibility that the [defendant's] alternative explanation is true." *In re Century Aluminum Co. Sec. Litig.*, 729 F.3d 1104, 1108 (9th Cir. 2013) (citation omitted).

Federal Rule of Civil Procedure 15(a) declares that leave to amend shall be given "when justice so requires." FED. R. CIV. P. 15(a)(2). Leave to amend should be granted when the court "cannot conclude that amendment would be futile." *Absolute Activist Value Master Fund Ltd. v. Ficeto*, 677 F.3d 60, 71 (2d Cir. 2012). "[I]t is within the sound discretion of the district court to grant or deny leave to amend." *McCarthy v. Dun & Bradstreet Corp.*, 482 F.3d 184, 200 (2d Cir. 2007). The adequacy of the proposed amended complaint is judged by the same standard as that applied to a motion to dismiss for failure to state a claim, under Rule 12(b)(6). *See Gen. Elec. Capital Fin. Inc. v. Bank Leumi Tr. Co. of New York*, No. 95 Civ. 9224, 1999 WL 33029, at *5 (S.D.N.Y. Jan. 21, 1999). Therefore, the allegations must "state a claim to relief that is plausible on its face." *Twombly*, 550 U.S. at 570. Moreover, the claim must contain enough facts such that it is possible to show that the pleader is entitled to relief. *Id.* at 555. The complainant's right to relief cannot be merely speculative. *Id.*

## DISCUSSION

### I.  WEISSHAUS' AMENDED COMPLAINT

In *Weisshaus v. Port Auth. of New York & New Jersey*, the Second Circuit affirmed the dismissal of all of plaintiff's claims, except the claim relating to the dormant Commerce Clause. On remand, the Second Circuit directed the court to "analyze the adequacy of Weisshaus's pleadings with respect to a dormant Commerce Clause claim by applying the standard the Supreme Court set out in [*Northwest Airlines*] for analyzing the reasonableness of fees charged for use of state-provided facilities." *Weisshaus*, 497 F. App'x at 105. The Commerce Clause gives Congress the power "[t]o regulate Commerce with foreign Nations, and among the several States." U.S. CONST. art. I, § 8, cl. 3. "From this federal grant of regulatory power flows '[t]he negative or dormant implication of the Commerce Clause[, which] prohibits state taxation or regulation that discriminates against or unduly burdens interstate commerce and thereby impedes free private trade in the national marketplace.'" *AAA Northeast*, 221 F. Supp. 3d at 382 (quoting *Selevan v. N.Y. Thruway Auth.*, 584 F.3d 82, 90 (2d Cir. 2009)).

To determine whether the imposition of fees for the use of state-provided facilities violates the dormant Commerce Clause, the three-pronged test of *Northwest Airlines, Inc. v. County of Kent*, 510 U.S. 355 (1994), is used. Pursuant to the *Northwest Airlines* test, a fee is reasonable, and thus constitutionally permissible, "if it (1) is based on some fair approximation of use of the facilities, (2) is not excessive in relation to the benefits conferred, and (3) does not discriminate against interstate commerce." *Id.* at 369 (citation omitted).

In his Amended Complaint, plaintiff asserts that the 2011 Toll Increase violates the dormant Commerce Clause because (1) the Port Authority's "purpose of the *penalty per [axle]* for

payment in cash[5] is not based on the fair approximate use of facilities because the penalty is on the mode of payment," and imposing a penalty for payment in cash "exceeds the benefit conferred" to users; (2) a "charge for *future* construction is for a *future* purpose that has yet to mature as service fruition for the user" and therefore "exceeds the approximation of facilities and exceeds the benefit conferred"; (3) the toll is being used to fund projects that plaintiff claims are not functionally related to the ITN, including the raising of the Bayonne Bridge, airport runway and taxiway modernization, security enhancements, Port Authority infrastructure rail and roads in the port, and the World Trade Center rebuilding; and (4) it outweighs the benefit of earning local hourly wages in New York City.[6] Am. Compl. ¶¶ 69, 70, 90-95, 101. For the following reasons, the court finds that plaintiff's Amended Complaint fails to state a claim on which relief can be granted.

### A. Penalty for Payment in Cash

Plaintiff first argues that the 2011 Toll Increase's penalty for payment in cash "imposes an undue burden on interstate commerce and punishes those without a transponder from E-ZPass; exceeds the fair approximation of costs to collect a toll; and exceeds the benefits conferred." Pl.'s Br. 14.  Plaintiff also claims that "the purpose of the *penalty* is to compel plaintiff or similar

---

[5]        Among plaintiff's concerns is that those drivers who pay in cash are charged more than those who pay using E-ZPass.

[6]        Although plaintiff's Amended Complaint makes other claims—including, *inter alia*, claims under the Coinage Clause, Tonnage Clause, Due Process Clause, and Freedom of Information Code—the Second Circuit specifically limited the court's review to the plausibility of Weisshaus' claims under the dormant Commerce Clause. Therefore, notwithstanding plaintiff's arguments that these claims are still related to his dormant Commerce Clause claim, the court will not address them here. *See Weisshaus*, 497 F. App'x at 105. Moreover, the court notes that while plaintiff asserts that various capital projects which received toll proceeds did not, according to plaintiff, get the required legislative approval, this claim was not in plaintiff's original Complaint, and therefore, is not properly before the court. Even if it were, however, such a claim does not arise under the dormant Commerce Clause, and therefore, in accordance with the remand order, is not for review here.

situated individuals to purchase a transponder from E-ZPass before entering the City of New York." Am. Compl. ¶ 70. Thus, plaintiff argues that the penalty for users paying in cash violates the dormant Commerce Clause.

The court disagrees. For plaintiff to succeed on this claim, he must allege facts which, if taken as true, show that he could be entitled to relief. *See Twombly*, 550 U.S. at 555, 570; *Iqbal*, 556 U.S. at 678. This Court has previously found that "discounts realized by frequent drivers are offset because in passing through the tolls more often, [E-ZPass] drivers are paying higher total amounts in tolls." *Saunders v. Port Auth. of New York & New Jersey*, No. 02 Civ. 9768 (RLC), 2004 WL 1077964, at *4 (S.D.N.Y. May 13, 2004). Indeed, the *Saunders* Court went on to find that the E-ZPass discount program and other frequency-of-use discount programs are constitutional and do not discriminate against interstate commerce. *See id.* at *5 (emphasis added) ("The plaintiff['s] argument fails on several grounds. Because the E–ZPass program is used in at least 5 other states in the region and eligibility is not contingent on residency, the burden [on interstate commerce] has not been demonstrated even if all facts are taken as true. *Also noteworthy are the benefits to local traffic flow. The electronic toll system facilitates traffic flow because drivers may pass through toll plazas without stopping to pay. The E–ZPass customer benefits from the expedited process of collection and is able to travel without interruption. The [E-ZPass program] also benefits drivers who are not [E-ZPass] customers because [E-ZPass] drivers are removed from the lines intended for drivers paying in cash*."). Accordingly, because the court agrees with this Court's decision in *Saunders*, plaintiff's first claim fails to state a claim on which relief can be granted.

### B. Future Construction

Next, plaintiff argues that the 2011 Toll Increase "did not reflect a fair approximation *of use of facilities*" because the "price exceeded the benefit conferred by charging commuters for a service that has yet to mature." Pl.'s Br. 21. For plaintiff, because the "Toll Rate increased in 2011, but most investments of the 10-Year Capital Plan will not take place before 2018," the toll increase does not reflect a fair approximation of use, and violates the dormant Commerce Clause. Pl.'s Br. 20-21.

The court finds that this argument also fails to state a claim under the dormant Commerce Clause. This Circuit has held that a "user fee," such as the toll increase at issue here, "may reasonably support the budget of a governmental unit that operates facilities that bear at least a 'functional relationship' to facilities used by the fee payers." *Bridgeport & Port Jefferson Steamboat Co. v. Bridgeport Port Auth.*, 567 F.3d 79, 87 (2d Cir. 2009). An obvious part of that budget are capital projects required to improve infrastructure and keep facilities in a state of good repair. Thus, as the *Bridgeport* Court made clear, if facilities or projects in a governmental unit's capital plan are "functionally related" to the facilities used by toll payers, allocating portions of a toll to construct or improve such projects is constitutional. *See id.* at 87-88. Simply because certain projects may not have begun at the time the toll increase went into effect does not make the toll inherently "excessive." *Cf. AAA Northeast*, 221 F. Supp. 3d at 392 ("At bottom, plaintiffs have simply failed to create a triable issue of fact as to whether the toll and fare increases are not a 'fair approximation of use of the facilities' and are 'excessive in relation to the benefits conferred' to users of the ITN.").[7]

---

[7]     The *AAA Northeast* court also found that certain contested projects, such as the Bayonne Bridge and the Lincoln Tunnel Access Project (also contested here), were "functionally related" to the ITN. *AAA Northeast*, 221 F. Supp. 3d at 389. Moreover, as noted above, the court

Plaintiff points to no authority tending to suggest that the dormant Commerce Clause demands that newly built projects or repairs be operational at the time increased tolls are imposed. Therefore, the court finds that plaintiff's argument regarding the 2011 Toll Increase being applied to future construction fails to state a claim under the dormant Commerce Clause.

### C.  Functional Relationship to the ITN of Projects Funded by 2011 Toll Increase

Next, plaintiff claims that the 2011 Toll Increase violates the dormant Commerce Clause because it is being applied to projects that are not functionally related to the ITN. Specifically, plaintiff claims that, based on a Port Authority press release, "[t]he Port Authority gave to the public the impression that the Toll Rate increase[ was] to subsidize the World Trade Center, aviation, port commerce, and the security of non-ITN facilities," and therefore, "[d]iscovery is necessary to verify whether the Port Authority designates any toll revenues for these non-ITN purposes." Pl.'s Br. 24.

This claim is almost identical to the claim in *AAA Northeast*.[8] In *AAA Northeast*, the plaintiffs argued that "the toll and fare increases were unlawful because a portion of the proceeds would be diverted for reconstruction of the World Trade Center site which[] would cause an apparent, but sham, deficit for the ITN."[9] *AAA Northeast*, 221 F. Supp. 3d at 378. The court found,

---

found that even "after improperly eliminating the expense of [these] contested ITN projects," the ITN would be operating at a deficit. *See id.* at 386.

[8]      Indeed, as discussed above, the court stayed this case pending resolution of *AAA Northeast* because of the "substantial similarities" between the two cases. *See* Order dated Mar. 27, 2015, ECF No. 55; *see also* June 8, 2015 Order.

[9]      Specifically, the claim alleged "that the increases were unreasonable under the Dormant Commerce Clause because the inclusion of the World Trade Center . . . improperly distorts the Port Authority's rate of return, creating the illusion that a toll increase is justified when in fact the Port Authority's integrated, interdependent transportation system is providing a significant surplus." *AAA Northeast*, 221 F. Supp. 3d at 378.

however, that the ITN was not generating excess funds that the Port Authority could divert for projects outside of the ITN. *See id.* at 386 ("[T]he ITN would show a deficit in 2010 leading up to the [2011] toll increase—and that deficit exists [even] after improperly eliminating the expense of [the] contested ITN projects."); *see also id.* ("[I]t was made clear repeatedly that the revenue . . . being raised at the crossings, the PATH, the bus terminals, [and the] bus stations . . . was growing a deficit when compared to the growing expenditure need[s] of those very facilities. [Thus, the ITN] had a deficit of those facilities upon [the Port Authority Deputy Executive Director's] arrival, . . . a deficit prior to the August 5th memorandum [concerning the toll and fare increases], . . . a deficit after the toll and fare increase went into effect, and . . . ha[s] a deficit today."). Because the ITN had been operating at a deficit, even with the 2011 Toll Increase in effect, and because the plaintiffs did not produce any evidence tending to suggest that funds were being diverted toward non-ITN projects, the court dismissed the plaintiffs' claim that the 2011 Toll Increase violated the dormant Commerce Clause. *See id.* at 386-87 ("'[T]here would have been negative cash flows from the ITN during the period [from 2007–2010].' . . . In the absence of evidence that the tolls have or will produce a surplus in the ITN, AAA's rate of return arguments fail.").

A well-pleaded complaint "calls for enough fact[s] to raise a reasonable expectation that discovery will reveal evidence" supporting the plaintiff's claim. *Twombly*, 550 U.S. at 556. When the defendant has established an "obvious alternative explanation" to the plaintiff's allegations of fact, plaintiff's claim will fail unless he can "nudge[ his claim] across the line from conceivable to plausible." *Id.* at 567, 570. Here, Weisshaus claims that portions of the 2011 Toll Increase were being diverted toward certain non-ITN projects, including the World Trade Center. As the Port Authority emphasizes, the court has previously addressed the question of whether the Port Authority was using the 2011 Toll Increase proceeds for non-ITN purposes, and found that there

was no money left over, after capital expenditures and reserve requirements for ITN projects had

been allocated, that could be diverted toward such projects. *AAA Northeast*, 221 F. Supp. 3d at 383

n.6, 387 ("Based on the testimony of its officers, the Port Authority claims that its version of a

cash flow analysis shows there was no surplus resulting from the toll and fare increases, and

therefore no funds are available to be used on projects outside of the ITN."); *see* Def.'s Suppl. Br.

4-6. Indeed, the court found that there was no evidence indicating that the toll monies were being

used for non-ITN projects. *See AAA Northeast*, 221 F. Supp. 3d. at 391 ("[I]t is apparent that

plaintiffs have presented no evidence tending to show that revenue from the toll and fare increases

was, or would be, used in a manner that violated the Dormant Commerce Clause."). The Port

Authority presents the *AAA Northeast* finding as an established and plausible explanation of their

conduct, and Weisshaus has not meaningfully distinguished his allegations of fact from those that

failed to expose the Port Authority to liability in *AAA Northeast*. The court agrees that the opinion

in *AAA Northeast* establishes an obvious alternative explanation to plaintiff's factual allegations,

and thus, to his claims.

In further support of the Port Authority's alternative explanation, AAA, in its case,

conducted extensive discovery into the Port Authority's finances and presented its findings to the

court. Based on this discovery, the court concluded that there was simply no money, obtained from

the increased tolls, to subsidize any non-ITN project. *AAA Northeast*, 221 F. Supp. 3d at 386 ("[I]t

is apparent that AAA's other arguments are without merit. First, as the Port Authority points out,

and as revealed by the Navigant and Rothschild Reports, even under the flawed rate of return

analysis that the AAA sponsors, the ITN would show a deficit in 2010 leading up to the toll

increase—and that deficit exists after improperly eliminating the expense of [the] contested ITN

projects."). Indeed, the court stayed this case pending resolution of any and all motions for

summary judgment in *AAA Northeast*. The clear reason for the court's specific provision for a stay was so that the decision in *AAA Northeast* would influence the findings here. Faced by the full weight of these facts, Weisshaus has not shown that his allegations of fact could lead the court to reasonably find the Port Authority liable on facts that have already been determined to foreclose liability. Thus, plaintiff's claim that portions of the 2011 Toll Increase are being diverted to projects not functionally related to the ITN fails to state a claim under the dormant Commerce Clause. Because the court previously decided that there were no toll revenues that could have been diverted to projects outside of the ITN, plaintiff's claim that the 2011 Toll Increase is being used to fund non-ITN projects, such as the "airport runway" or "taxiway modernization," necessarily fails to allege facts sufficient to satisfy the pleading standard. *See, e.g.*, *Twombly*, 550 U.S. at 554.

### D. Minimum Wage Workers

Next, plaintiff claims that the 2011 Toll Increase violates the dormant Commerce Clause because it "burdens the benefit that someone from New Jersey earns in the City of New York on a day's local hourly earnings in wages," by "outweighing the benefit of earnings under the local hourly wage," *i.e.*, the minimum wage. Am. Compl. ¶¶ 109, 115.

To the extent that Weisshaus is asserting that the 2011 Toll Increase discriminates against interstate commerce because New Jersey residents working minimum wage jobs in New York are less inclined to commute for work because of the tolls, his claim fails as a matter of law. "[A] state regulation discriminates against interstate commerce only if it impose[s] commercial barriers or discriminate[s] against an article of commerce by reason of its origin or destination out of State." *Angus Partners LLC v. Walder*, 52 F. Supp. 3d 546, 560-61 (S.D.N.Y. 2014) (quoting *Selevan*, 584 F.3d at 95). Moreover, "in order to state a claim for discrimination in violation of the Commerce Clause, a plaintiff must identify an[] in-state commercial interest that is favored,

directly or indirectly, by the challenged statutes at the expense of out-of-state competitors." *Selevan*, 584 F.3d at 95 (citation omitted). The "critical consideration" in determining whether a toll discriminates against interstate commerce "is the overall effect of the [regulation] on both local and interstate activity." *Brown-Forman Distillers Corp. v. N.Y. State Liquor Auth.*, 476 U.S. 573, 579 (1986). Here, plaintiff's complaint fails to allege any facts that there is an in-state interest favored to the detriment of an out-of-state interest. Indeed, although a toll may be collected from a traveler going in one direction, the toll itself is for a roundtrip. Accordingly, plaintiff fails to state a claim that the toll discriminates against interstate commerce.

Even under the so-called *Pike* test, where a nondiscriminatory regulation that "regulates even-handedly to effectuate a legitimate local public interest" is nevertheless unconstitutional if "the burden imposed on [interstate] commerce is clearly excessive in relation to the putative local benefits," plaintiff's claim fails as a matter of law. *See Pike v. Bruce Church, Inc.*, 397 U.S. 137, 142 (1970) (citation omitted). Put simply, plaintiff fails to allege any facts that there is a local public interest that, presumably, New York seeks to effectuate by way of the Port Authority's 2011 Toll Increase.[10] *See United Haulers Ass'n, Inc. v. Oneida-Herkimer Solid Waste Mgmt. Auth.*, 550 U.S. 330, 346 (2007) ("[The *Pike* test] is reserved for laws directed to legitimate local concerns, with effects upon interstate commerce that are only incidental.") (citation omitted). Accordingly, plaintiff's claim regarding the burden on minimum wage workers fails under the dormant Commerce Clause.

---

[10]     It is not entirely clear what the "local" interest would be here as the Port Authority is a bi-state governmental agency created by compact between New York and New Jersey, and the 2011 Toll Increase applies equally to both New York residents and out-of-state residents.

## II.   WEISSHAUS' PROPOSED SECOND AMENDED COMPLAINT

Finally, in an attempt to get around *AAA Northeast*, plaintiff asks the court to grant him leave to amend his complaint a second time, claiming that "[t]he proposed second amended complaint has the exact same legal theories as the amended complaint" and that "[t]he basis for amending is to flesh out further the facts that would aid in reviewing this case on its merits." Pl.'s Suppl. Br. ¶ 24.

Even a liberal reading of both the Amended Complaint and the Proposed Second Amended Complaint, however, demonstrates that plaintiff's proposed complaint creates an entirely new legal theory of the case. In particular, plaintiff asserts that defendant "first concocted an affordability envelope,[11] a figure that sets the maximum price of tolls the public can be asked to bear," and "later . . . went digging for capital projects that would overshadow the need for the [2011] increase in the toll price."[12] Pl.'s Aff. Supp. Leave to Am. ¶ 18, ECF No. 65-1. In other words, by way of his Proposed Second Amended Complaint, plaintiff now claims that the 2011 Toll Increase was enacted not to cover various capital expenditures, but rather, to charge commuters as much as possible. Thus, for plaintiff, the 2011 Toll Increase is not "based on some fair approximation of use of the facilities," and is "excessive in relation to the benefits conferred." *See* Pl.'s Suppl. Br. ¶ 8 ("The invention of an affordability envelope came after the Port Authority concluded that the

---

[11]       In his Proposed Second Amended Complaint, plaintiff defines an "affordability envelope" as "an accounting term-of-art defining the maximum balloon of the price a constituent or consumer can be pushed to pay under affordable constraints." Proposed Second Am. Compl. ¶ 38 n.1.

[12]       Plaintiff claims that documents produced by the Port Authority on November 5, 2015, form the basis for his request to amend. The documents attached to plaintiff's Proposed Second Amended Complaint, however, appear to have been either publicly available at the time plaintiff filed his Amended Complaint or were previously a part of the record in the *AAA Northeast* case.

2008-Toll Rate is too low compared to other agenc[ies] that charge toll[s] and must be increased. The push for a toll rate increase was not based to compensate costs because the Port Authority was already operating on a positive net income.").

Taken as a whole, plaintiff's Proposed Second Amended Complaint claims that the "affordability envelope" theory "will show the reasons to raise [the] toll prices [were] motivated by an ulterior motive of setting the tolls at its highest level and then inventing an excessive capital plan to excuse the excessive increase in the toll rate," and will "[aid] in showing that the Toll Rate is not a compensation for service conferred on commuter[s] and is the product of an ulterior motive." Pl.'s Suppl. Br. ¶ 26. In other words, plaintiff would have the court assess the Port Authority's motive for the 2011 Toll Increase rather than look to standards already set out in *AAA Northeast*.

The court finds that plaintiff's Proposed Second Amended Complaint fails to state a claim on which relief can be granted. Moreover, the court further finds that Weisshaus' attempt to add a new theory is futile. *See Cuoco v. Moritsugu*, 222 F.3d 99, 112 (2d Cir. 2000) (citations omitted) ("[W]e do not find that the [*pro se*] complaint liberal[ly] read . . . suggests that the plaintiff has a claim that she has inadequately or inartfully pleaded and that she should therefore be given a chance to reframe. . . . The problem with [the plaintiff's] causes of action is substantive; better pleading will not cure it. Repleading would thus be futile. Such a futile request to replead should be denied."); *see also AEP Energy Servs. Gas Holding Co. v. Bank of Am., N.A.*, 626 F.3d 699, 726 (2d Cir. 2010) (citation omitted) ("Leave to amend may be denied on grounds of futility if the proposed amendment fails to state a legally cognizable claim or fails to raise triable issues of fact.").

In particular, even accepting plaintiff's alleged facts as true, Weishauss' Proposed Second Amended Complaint would nevertheless fail to state a claim for relief under the dormant Commerce Clause. This is because "[t]he law of this Circuit following *Northwest Airlines* demonstrates . . . that fair approximation and excessiveness are evaluated by objective factors-how a toll operates in practice-and not the internally stated reasons for its enactment." *Auto. Club of New York, Inc. v. Port Auth. of New York & New Jersey*, No. 11 Civ. 6746 (RKE/HBP), 2014 WL 2518959, at *10 (S.D.N.Y. June 4, 2014). In other words, motive does not matter. The *Northwest Airlines* test is entirely objective, *i.e.*, it is concerned with whether the governmental unit is using its toll proceeds on facilities or projects that are functionally related to facilities used by toll payers, or whether any profit realized is too high.[13] Indeed, as this Court has found:

> Applying the "fair approximation" prong of the *Northwest Airlines* test requires the Court to look at one thing only: the toll payers' use (or potential for use) of the facilities for which the toll is paid. . . . The "excessiveness" prong compares the amount paid by the payer to the benefits conferred on him *in his capacity as a consumer of those benefits*. . . . [T]o the extent a user fee that was spent for services [is] of no "actual or potential benefit" to fee payers, it would "exceed the bounds of what may reasonably serve as the basis for the . . . fee"—*unless* the governmental unit were using that fee to support[] facilities that bore "at least a 'functional relationship'" to facilities used by fee payers.

*Am. Trucking Ass'ns, Inc. v. N.Y. State Thruway Auth.*, 199 F. Supp. 3d 855, 878, 879, 881 (S.D.N.Y. 2016) (citations omitted), *vacated on other grounds* 238 F. Supp. 3d 527 (S.D.N.Y. 2017); *see also Auto. Club of New York*, 2014 WL 2518959, at *10 ("[The Second Circuit] did not consider the [New York Thruway] Authority's motivations for enacting the toll policy or its internal deliberations in assessing prongs (1) and (2) of the *Northwest Airlines* test. Other decisions in this Circuit and elsewhere have utilized the same objective approach and have not considered

---

[13]     In this regard, however, it is not clear how much of a profit would be too high, as "the cases indicate that tolls are permitted to generate a fair profit or rate of return." *AAA Northeast*, 221 F. Supp. 3d at 387 (citation omitted).

either the intent of the decision makers or the process by which the decision makers made their determination."); *Janes v. Triborough Bridge & Tunnel Auth.*, 977 F. Supp. 2d 320, 340 (S.D.N.Y. 2013) (emphasis added) ("[T]he requirement of a 'fair approximation' seeks reasonableness and broad proportionality. It does not require precise tailoring, *or a pre-enactment administrative record*, for toll amounts to be justified."), *aff'd*, 774 F.3d 1052 (2d Cir. 2014).

Therefore, to the extent that plaintiff's Proposed Second Amended Complaint claims that the affordability envelope theory "will show the reasons to raise . . . toll prices [were] motivated by an ulterior motive of setting the tolls at its highest level and then inventing an excessive capital plan to excuse the excessive increase in the toll rate," it fails to state a legally cognizable claim because it looks only to the subjective intention of the Port Authority, and not to how the toll operates in practice.[14] Pl.'s Suppl. Br. ¶ 26. To the extent that plaintiff's Proposed Second Amended Complaint claims that the ITN was operating at a profit, and therefore, the need for the 2011 Toll Increase was motivated by an "ulterior motive of setting the tolls at its highest level," the court notes that it has previously addressed the issue in *AAA Northeast*, and therefore, for the reasons discussed above, the Proposed Second Amended Complaint does not satisfy the pleading standard. *See AAA Northeast*, 221 F. Supp. 3d at 378 ("[T]he ITN would show a deficit in 2010 leading up to the [2011] toll increase—and that deficit exists [even] after improperly eliminating

---

[14]     It is worth repeating that "the relevant question in this case is what the revenue from the toll and fare increases was actually used for, not what potential uses were considered during preliminary planning and budgeting." *AAA Northeast*, 221 F. Supp. 3d at 394 n.14; *see also id.* at 392 (emphasis added) ("To support [its] allegations . . . [plaintiff] points to no record evidence that tends to show the increases were not a fair approximation of the use of the ITN by its users . . . . [S]uch a claim would need to include more than speculation as to particular items in the Port Authority's 2011 ITN Capital Plan or the deliberations of its Board of Commissioners.").

the expense of [the] contested ITN projects."); *see also Twombly*, 550 U.S. at 570 (discussing the need for plaintiff to "nudge" his claim "from conceivable to plausible").

Any remaining claims in plaintiff's Proposed Second Amended Complaint are identical or nearly identical to those addressed above regarding plaintiff's Amended Complaint,[15] and therefore, the court will not address them again here, as the same rationale must lead to their dismissal.

Accordingly, the court denies plaintiff's motion for leave to amend as futile because the Proposed Second Amended Complaint, like the Amended Complaint, fails to state a claim upon which relief may be granted.

## CONCLUSION

For the foregoing reasons, the court holds that the claims in both plaintiff's Amended Complaint and his Proposed Second Amended Complaint fail to state a claim upon which relief can be granted. Accordingly, the court denies plaintiff's motion for leave to amend his complaint for a second time, and grants defendant's motion to dismiss in its entirety. Judgment shall be entered accordingly.

_____/s/ Richard K. Eaton_____
Richard K. Eaton, Judge

Dated:        December 17, 2018
              New York, New York

---

[15]        Plaintiff's Proposed Second Amended Complaint also claims that "the majority of capital projects" used to justify the 2011 Toll Increase have yet to break ground, and therefore, the "benefits do not yet exist[] for commuters." Pl.'s Suppl. Br. ¶ 13. This claim, however, is similar to that in Weisshaus' Amended Complaint that "[d]efendant's charge for *future* construction is for a *future* purpose that has yet to mature as service fruition for the user, and is not for the current use a payer is levied for when passing through a surface river crossing, and exceeds the approximation of facilities and exceeds the benefit conferred." Am. Compl. ¶ 90; *see* Proposed Second Am. Compl. ¶ 174. Because the court already explained why such a claim cannot survive a motion to dismiss in the context of plaintiff's Amended Complaint, it need not address the claim again here.