# UNITED STATES DISTRICT COURT
# SOUTHERN DISTRICT OF NEW YORK

YOEL WEISSHAUS

        Plaintiff

vs.

THE PORT AUTHORITY OF NEW YORK
AND NEW JERSEY,

        Defendant.

**Case:   11-cv-6616-RKE**

## COMBINED DECLARATION, IN OPPOSITION TO CROSS MOTION FOR A PROTECTIVE ORDER, AND AS A REPLY IN FURTHERANCE OF AN ORDER COMPELLING DISCOVERY AND RELATED RELIEF

Yoel Weisshaus ("Weisshaus" or "Plaintiff") declares the following:

1.  I affirm the following as truthful to the best of my knowledge and records involved in this case.

2.  I, Yoel Weisshaus, am the plaintiff in this action and moves the Court for an order compelling discovery and related relief. (ECF 92). At the same time, I move the Court to deny the cross motion filed by Port Authority of New York and New Jersey ("Port Authority") (ECF 94, 95, 96) both for its procedural defectiveness and for lack of merit.

3.  I also provide this deceleration as a certification, to supplement to ECF 92 of the efforts I have taken in good faith, in attempt to confer with the Defendant

for failing to make the requisite disclosure and discovery, in an effort to obtain disclosure and discovery without Court action.

## RELEVANT BACKGROUND

4.   The Port Authority operates river crossings connecting New York and New Jersey, including the Bayonne Bridge, the Outerbridge Crossing, the Goethals Bridge, the George Washington Bridge, the Holland and Lincoln tunnels, PATH Rail System, and bus terminals: referred to as the Interstate Transportation Network (ECF 78 at 2-3) or Interdependent Transportation System (ECF 81 at 3) (the "ITN" in short).

5.   On September 18, 2009, the Port Authority set out to inflate its toll rates to cross the Hudson River. The scheme levies the maximum prices achievable under the Cost-Of-Living-Adjustment ("COLA") and the regional Consumer Price Index ("CPI") and encompasses inflating the toll rates every other year. (ECF 65-7).

6.   On March 21, 2011, in a memorandum, the Port Authority directed each department to bring forth whatever unconstrained projects possible, including previously deferred projects, in anticipation of a broader funding envelope (*i.e.* more toll revenues) than previously available.  (ECF 65-8).

7.   On May 10, 2011, in a Phase II memorandum, the Port Authority directed searching again and adding whatever projects possible, to exceed the

forecast scenarios of toll revenues. The goal was to show a deficit and eliminate any appearance of a surplus. (ECF 65-8).

8.   In drafting the Capital Plan, scheduled for July 15-19, 2011, the Port Authority instructed each department to compare the "capital plan submission vs. the financial affordability envelope" and close the showing of any surplus. On July 22, 2011, each department demonstrated that their capital submissions exceeded the affordability envelope targets. (ECF 65-8).

9.   To inflate the capital plan, on July 29, 2011, the Port Authority designated $1.8 billion for the Pulaski Skyway, a non-ITN facility belonging to the State of New Jersey.

10. On August 5, 2011, the Port Authority announced in a press release that it will double all toll prices to fund its capital plan. The new price included a $2 surcharge per axel for cash payers. The cover story was that 9/11 and rebuilding the World Trade Center required the new rates. (ECF 65-34).

11. On August 19, 2011, the culmination of this history resulted in the Port Authority enacting a new toll rate ("2011 rate"). This time the cover story morphed, that the toll rate increase is necessary to fund completing the World Trade Center, repairing the airport runways, rebuilding bridges and tunnels. There was no mention of funding the Pulaski Skyway. (ECF 65-6).

## RELEVANT PROCEDURAL HISTORY

12. On September 18, 2011, Weisshaus, a New Jersey resident, who travels frequently to New York City, sued.

13. In the amended complaint Weisshaus challenges the toll rates as not being a fair approximation of use of facilities as toll revenues are diverted on facilities outside the ITN. (ECF 26).

14. In its pre-answer motion to dismiss, the Port Authority moved with an alternative theory supported by alternative facts that the ITN projects an infinite deficit, when projecting financing for facilities at least ten years in advance, and a diversion of ITN funds is thus impossible. (ECF 35, 36, 37). The Court of Appeals for the Second Circuit converted this alternative facts-theory into summary ("converted motion") and directed permitting Weisshaus an opportunity to submit evidence in opposition to the converted motion. (ECF 81).

15. In its proposed second amended complaint, Weisshaus alleges further that the Port Authority used COLA and CPI as the ground for price fixing in establishing the 2011 Rate, exaggerating the price to the user's maximum affordability envelope, rather than a fair approximation of the use or privilege. The Port Authority deliberately inflated the capital plan to exaggerate their expenses and exceed that new windfall of revenues. Only then the 2011 Rate was enacted. (ECF 65-3). These facts, when established as true in discovery, that first came the price

and then the capital expenditures were artificially inflated to exceed revenues, raises fundamental questions about the accuracy of the Port Authority's "deficit" defense. The Court of Appeals for the Second Circuit directed the Court to reconsider, "To the extent that plaintiff's Proposed Second Amended Complaint claims that the ITN was operating at a profit, and therefore, the need for the 2011 Toll Increase was motivated by an 'ulterior motive of setting the tolls at its highest level." (ECF 81).

16. On June 25, 2020, the Court ordered the parties to inform whether discovery is warranted and provide a joint proposed discovery plan.  (ECF 82). The order specified that July 10, 2020 is the deadline for submitting the joint proposed discovery plan. (Id).

17. That same day, Plaintiff initiated with Defendant a Joint Proposed Discovery Plan. (ECF 84-1). On July 9, 2020, Defendant balked on a Joint Proposed Discovery Plan.

18. On July 10, 2020, Defendant unilaterally filed a proposed schedule that interrogatories and document demands be served by July 30, 2020 and fact discovery completed by September 18, 2020 emphasizing: "The Port Authority believes that since a motion for summary judgment is pending, three months is sufficient time for discovery on the single remaining issue in this 9-year old case." (ECF 83).

19. That day, Plaintiff responded proposing a discovery schedule and providing the background upon which the Defendant refused to submit a joint letter. (ECF 84).

20. On July 16, 2020, the Court ordered a three-month discovery schedule, the demands for interrogatories and document production be served by August 3, 2020 and fact discovery completed by October 15, 2020. (ECF 85).

## THE CROSS MOTION IS PROCEDURALLY DEFECTIVE

21. On August 27, 2020, Plaintiff filed a letter motion seeking a pre-motion conference in anticipation of a motion to compel discovery, due to Defendant's complete black out of discovery. (ECF 86).

22. On October 5, 2020, Plaintiff filed a letter motion to enlarge the time to complete discovery, due to Defendant's belated disclosures that its witnesses must be subpoenaed.  (ECF 90).

23. On October 8, 2020, the Court granted leave to Plaintiff to file a motion to compel and reserved decision on enlarging the discovery schedule. (ECF 91).

24. On October 15, 2020, the initial discovery deadline ran. (ECF 85). The Port Authority did not ask to extend the discovery deadline. Indeed, the Port Authority vigorously objected to Plaintiff's letter motion on extending the discovery

deadline, despite that the Defendant caused this delay in completing discovery. (ECF 89).

25. On October 16, 2020, Plaintiff filed its motion to compel. (ECF 92).

26. On October 30, 2020, Defendant filed its cross motion for a protective order combined with an opposition to Plaintiff's motion to compel. (ECF 94-96).

a. **RULE 26(c) OF THE FEDERAL RULES OF CIVIL PROCEDURE REQUIRES THAT THE COURT DENY THE PORT AUTHORITY'S CROSS MOTION FOR A PROTECTIVE ORDER DUE TO THE ABSENCE OF ANY GOOD FAITH ATTEMPT TO CONFER PRIOR TO FILING THE CROSS MOTION.**

27. FRCP Rule 26(c) states, a motion for a protective order "**<u>must</u>** include a certification that the movant has in good faith conferred or attempted to confer with other affected parties in an effort to resolve the dispute without court action." (emphasis added).

28. "The party seeking a protective order bears the burden of establishing that good cause for the order exists." *Duling v. Gristede's Operating Corp*., 266 F.R.D. 66, 71 (S.D.N.Y. 2010). "**The allegation that a deposition is unduly burdensome is not sufficient ground to grant a protective motion.**" *Cooper v. Welch Foods, Inc.*, 105 F.R.D. 4, 6 (W.D.N.Y. 1984).

29. "Rule 26 makes clear that the inclusion of the requisite certification is mandatory. The failure to include the certification makes the motion susceptible to

dismissal." *Garner v. City of New York*, No. 17-CV-843 (JGK)(KNF), 2018 WL 5818109, at *4 (S.D.N.Y. Oct. 17, 2018).

30. The Port Authority's cross motion for a protective order must be denied for the failure to include a certification demonstrating the steps that the movant has attempted to confer with Plaintiff and resolve the discovery issues in good faith. The Court cannot properly interpose itself as counsel for a party, in this case as a movant, to correct short comings of a motion for a protective order.

31. The record demonstrates that the Court cannot infer any good faith as a purported attempt by the Port Authority. To the contrary, Plaintiff has repeatedly written to Defendant attempting to resolve the discovery default and asking to meet and confer, and yet Defendant completely ignored Plaintiff's emails. *See* ECF 92. This clear absence to meet and confer is fatal to the Port Authority's request for a protective order. On this basis alone, the Court can deny the Port Authority's cross motion for a protective order. *ValveTech, Inc. v. Aerojet Rocketdyne, Inc*., No. 17-CV-6788-FPG-MJP, 2020 WL 6120348, at *3 (W.D.N.Y. Oct. 16, 2020).

### b. PORT AUTHORITY WAIVED ANY OBJECTIONS TO THE DISCOVERY DEMANDS

32. "It is the obligation of a requested party to provide discovery that is relevant to the case." *Land Ocean Logistics, Inc. v. Aqua Gulf Corp*., 181 F.R.D. 229, 237 (W.D.N.Y. 1998). "If a requested party believes any discovery request

served upon it to be irrelevant or unduly burdensome or oppressive, the requested party may file **_timely_** objections or seek a protective order upon good cause shown. Fed.R.Civ.P. 26(c), 33(b)(3), 34(b)." *Land Ocean Logistics, Inc. v. Aqua Gulf Corp.,* 181 F.R.D. 229, 237 (W.D.N.Y. 1998) (emphasis added).

33. "Rule 26(c) implicitly requires parties to request a protective order at **the time of production**, and provides that a failure to do so permanently waives the right to such an order." *Dorsett v. Cty. of Nassau*, 800 F. Supp. 2d 453, 460 (E.D.N.Y. 2011), aff'd sub nom. *Newsday LLC v. Cty. of Nassau*, 730 F.3d 156 (2d Cir. 2013) (emphasis added). The failure to "serve timely a privilege log signaling that it was withholding information based on a privilege claim, waives any objection the City had to the document demands." *Garner v. City of New York*, No. 17-CV-843 (JGK)(KNF), 2018 WL 5818109, at *2 (S.D.N.Y. Oct. 17, 2018).

34. The Port Authority waived the right to object to Plaintiff's discovery demands and thus its cross motion was not brought in good faith. The need to meet and confer is required to reduce the necessity of judicial intervention. The Port Authority has been in possession of Plaintiff's discovery demands since August 3, 2020, had notice that Plaintiff already sought a pre-motion conference since August 27, 2020. It was only months later, after the discovery deadline and after the Plaintiff filed a motion to compel, that the Port Authority brought its cross motion for a protective order. This is not a good faith of a prudent litigant but a procrastination

calling for the exercise of FRCP Rule 11(b), 16(a). This type of procrastination requires acknowledging that the Port Authority waived any objection to the discovery demands, and consequently its motion for a protective order is untimely.

35. Furthermore, as explained *supra*, the cross motion filed by the Port Authority is fatally defective, for the failure to include, and its impossibility to furnish, a "certification that the movant has in good faith conferred or attempted to confer with other affected parties in an effort to resolve the dispute without court action." (FRCP 26(c)). The need for such certification is nonnegotiable as a "must" and the Court does not have the discretion to overlook the defect. This defect is compounded by the Port Authority's failure to comply with the discovery rules timely, by failing to respond to Plaintiff's demands and failing to timely seek a protective order. Here there was no timely response and nor a timely motion for a protective order.  The protracted conduct mandates a finding that the Port Authority waived its right to objections. Indeed, the Defendant's failure to meet and confer to address its objections prior to involving the Court, confirm that the Port Authority did neither act timely nor in good faith to preserve its objections.

**c.    DEFENDANT'S UNTIMELY OBJECTIONS TO PLAINTIFF'S DISCOVERY DEMANDS AND INTERROGATORIES ARE RAISED FOR THE FIRST IN OPPOSITION TO A MOTION TO COMPEL AND SHOULD BE REJECTED FOR ITS PROCEDURAL DEFECT.**

36. For the first time, now in opposition to a motion to a compel, the Port Authority itemizes its objections to the Plaintiff's documents and interrogatories demands. These untimely objections were not made before Plaintiff moved to compel. These untimely objections to form remain completely devoid of responding to Plaintiff's demands. Thus, even if assuming that there may have been any ground for such objection, Defendant' did not provide these objections in a timely manner to allow Plaintiff to timely cure or address such objection.

**d.    THE DEFENDANT'S ATTEMPT TO LIMIT THE SCOPE OF DISCOVERY VIOLATES THE MANDATE RULE. THE SECOND CIRCUIT REJECTED MOLDING THIS CASE TO *AAA*, STATING "THAT USE OF FACTS FROM *AAA* WAS ERROR" AND THIS CASE IS NOT SUBJECT TO JUDICIAL NOTICE OF *AAA*.**

37.  The Port Authority asserts "that this case follows the case of *AAA Northeast et al. v. The Port Authority* 11 civ 6746 ("AAA"), which raised the identical issue." (ECF 95 ¶ 5). By that inference, the Port Authority looks to limit the scope of discovery in this case to what was produced in *AAA*.

38.  Neither the procedure of *AAA* nor the discovery in *AAA* has any relevance here. The Court of Appeals for the Second Circuit held, "The findings in

AAA, however, were not subject to judicial notice, and Weisshaus disputed or attempted to distinguish a number of facts drawn from those cases [*AAA*] that were material to the decision to dismiss the non-ITN projects claim in this case." (ECF 81 at \*7). The Second Circuit reversed and remanded, "Because that use of facts from *AAA* was error." (ECF 81 at \*7).

39. The key distinction between this case and *AAA* is that Plaintiff is actually disputing the projections advanced by the converted motion. The plaintiffs in *AAA* never did that, nor attempted to do it.

40. Amongst the facts alleged in the proposed second amended complaint, crucial to refuting the converted motion, which the Second Circuit remanded, Plaintiff demonstrated that the ITN has produced a surplus from 2007 and onwards. Plaintiff cited to Schedule E of the annual reports and alleged that from 2007 through 2010, the Port Authority  added $575,527,000 to the Reserve Fund.[1]   From 2011 through 2015, the ITN contributed an additional net income of $2.78 billion to the Reserve Fund.[2] The proposed second amended complaint alleges, that in 2017, the Consolidated Bonds and Other Financing Obligations (including non-transportation

---

[1] $575,527,000: $76,157,000 for 2007; $168,507,000 for 2008; $299,358,000 for 2009; $31,505,000 for 2010.

[2] $2,779,059,000: $228,416,000 for 2011; $527,406,000 for 2012; $567,532,000 for 2013; $476,583,000 for 2014; $451,755,000 for 2015; $527,367,000 for 2016.

bonds) were $28 billion ($27,976,007,000). All that was required in 2017 for the Reserve Fund, per N.J.S.A. 32:1-142; N.Y. Unconsol. Law 7002, a reserve of one-tenth (1/10) of the par value of all investment bonds; that would be $2.8 billion ($2,797,600,700). Utilizing the 2011 Rate to raise $2.8 billion for its Reserve Fund, the proposed second amended complaint alleges that the Port Authority diverts ITN surpluses of over one billion dollars to benefit non-ITN facilities through subsidizing their the reserve of non-ITN facilities. (ECF 65-3).

41. These facts alleged in the proposed second amended complaint are directed to utterly refute the converted motion. They were never raised in AAA. The Second Circuit was briefed on these facts and found them sufficient to distinguish this case from the allegations in AAA and accordingly reversed. As such, the Mandate Rule applies, which the Second Circuit cited, "The district court must follow both the specific dictates of the remand order as well as the broader spirit of the mandate." (ECF 81 at *9). The scope of discovery in *AAA* did not divulge into the actual practice of how the toll rate operates. Thus, the Port Authority may not use *AAA* as a proxy to circumvent its duty to comply with discovery in this case.

42. Furthermore, the Court held that, under the dormant Commerce Clause the "fair approximation and excessiveness are evaluated by objective factors-how a toll operates in practice-and not the internally stated reasons for its enactment." (ECF 78 p. 19). This requires discovery into how the tolls are actually spent on non ITN

facilities and this is precisely what the Mandate directs. The Court must reject the Port Authority's improper attempt to mold the discovery into what internal reasons former employees offered for the 2011 rate. The proper scope of discovery is how a toll operates in practice, including subsidizing non-ITN facilities by way of the reserve fund and must reject molding this case to *AAA*.

43. In overall, the Defendant cannot produce a certificate of good faith, demonstrating the efforts to resolve its discovery issues without judicial intervention, Defendant waived the objections by making them untimely, and Defendant's cross motion and opposition to limit the discovery is in contravention of the mandate rule. On this procedural posture alone, the Court should deny the cross motion for a protective order and reject the Defendant's opposition to relief under FRCP 37.

## PLAINTIFF'S REQUESTS ARE WITHIN THE SCOPE OF DISCOVERY

44. The Port Authority asserted in the converted motion, that (i) the ITN operates on an infinite deficit, (ii) the ITN is subsidized by non-ITN facilities, and (iii) it is impossible to use ITN revenues to subsidize non-ITN expenses. The Port Authority also admits to operating "a pooled revenue agency." (ECF 95 ¶ 19.ii).

45. Plaintiff's demands seek discovery as to what methods the Port Authority employs to distinguish ITN revenues from non-ITN expenses. This

question is elementary and asks about the most basic business practice of the Port Authority and focuses on obtaining admissible evidence as to how the Port Authority attributes an expense as belonging to the ITN.

46. The reason for this inquiry stems from the very facts that the annual financial reports, the budgets and other documents that Plaintiff has reviewed in relation to this case, have too many gaps. For example, an ordinary bond offering plan by the Port Authority does not separate ITN investments. Another example, the annual reports does not show how the administrative expenses are divided amongst the facilities. Furthermore, there are gaps in the annual reports as to the source of the capital investment, without stating what portion came from investors and what portions came from its net income.  In other words, there is no prima facie way of recognizing when the capital investments are duplicate from the revenues listed in Schedule E of the annual report.

47. The Port Authority objects, "The Port Authority should not be required to produce a witness pursuant to Rule 30 (b) (6) to bind the Port Authority when there is no one currently employed who has knowledge of the toll increase which took place 9 years ago." (See ECF 95 ¶ 15). The logic of this argument, on the one hand, the Port Authority insists that the proper scope of discovery is inquiring on the internal reasons stated by former employees who enacted the 2011 rate. On the other hand, the Port Authority insists that there is no one who can testify with knowledge

as to how the ITN revenues are protected from paying for non-ITN expenses. This objection is wrong.

48. It is respectfully submitted, that the Port Authority's treatment distorts the Court's holding. The Court held that, under the dormant Commerce Clause the "fair approximation and excessiveness are evaluated by objective factors-how a toll operates in practice-and not the internally stated reasons for its enactment." (ECF 78 p. 19). Under the Court's holding, the Plaintiff's demands are entirely proper as it seeks admissible evidence on how the toll operates in practice. The Port Authority's objections to discovery are replete with evasiveness in contravention to the Court's holding, by focusing on what former employees had in mind.

### a. PORT AUTHORITY HAS NOT COMPLIED WITH FRCP RULE 26(a).

49. FRCP Rule 26(a) requires that "without awaiting a discovery request" a party must provide to the other party "(i) the name and, if known, the address and telephone number of each individual likely to have discoverable information … (ii) a copy—or a description by category and location—of all documents, electronically stored information, and tangible things that the disclosing party has in its possession, custody, or control and may use to support its claims or defenses."

50. Dice it or slice it, the Port Authority never disclosed **all** individuals likely to have discoverable information along with their **addresses**. On September

8, 2020, the Port Authority insisted that the initial disclosure was "previously produced" and that the converted motion was the disclosure.  (ECF 92-8). While the discovery deadline was October 15, 2020 (ECF 85), it was only two weeks before that deadline (September 29, 2020) well after the Plaintiff issued deposition demands, that Defendant disclosed the address of two individuals to have discoverable information (ECF 92-11). On October 1, 2020, the Port Authority reproduced the initial disclosure provided to *AAA*, yet without the current addresses of the witnesses therein. (ECF 95-20). Then one week before the close of discovery deadline (October 7, 2020), Defendant disclosed again three more individuals likely to have discoverable information. (ECF 92-13). In addition, the Port Authority declared that it would not produce any of those disclosed witness, and instead requiring Plaintiff to chase these witnesses with subpoenas. (ECF 92-8, 92-13). To correct this belatedness of Defendant, Plaintiff sought an enlargement of time to allow sufficient time for a potential lengthy subpoena process. (ECF 90).

51. Indeed, this piecemeal initial disclosure by the Port Authority in ECF 95-8 and 95-13 does not specify the subjects of that information that each witness possess making it impossible to issue complete subpoenas.

52. However, the Defendant should not be given the leisure of profiting from their discovery violations in dragging their feet. An order is required directing the Port Authority to provide initial disclosures of **<u>all</u>** the individuals likely to have

discoverable information along with their addresses together with the subjects of that information each witness may possess.

53. Instead, the Port Authority insists that the converted motion consists of "all the key witnesses." (ECF 95 ¶ 5). But that is not true. The converted motion does not have the names and **<u>addresses</u>** of key individuals such as David Tweedy, Rosemary Chiricolo and William Baroni. Indeed, according to the deposition transcript of Michael Fabiano, belatedly reproduced from *AAA* on October 1, 2020 (ECF 92-20), Fabiano states clearly that he was not the person who made ultimate decisions regarding the tolls and what expenses would be paid from it. Thus, defeating the essence of Fabiano's affidavit on the issue of diversion of funds and the infinite deficit. There is simply no practical way, without prejudicing the Plaintiff, that the transcripts reproduced of *AAA* is capable of offering all the necessary answers that are responsive to this case.

54. Furthermore, on August 7, 2020, when the Port Authority was called to remedy the failure to provide initial disclosures, the Port Authority responded that its converted motion is in lieu of initial disclosures. (ECF 92-3). Now the Port Authority insists that "Plaintiff also had access to documents provided in connection with motions in the *AAA* case." (ECF 95). That is false. Until September 10, 2020, Plaintiff never received any documents produced in *AAA*. Until October 7, 2020, Plaintiff did not receive the addresses on key witnesses. (ECF 92-13). Admittingly,

on October 1, 2020, the Port Authority switched its story by a providing "a copy of the Port Authority's Rule 26 disclosure in the AAA case," without disclosing that those witnesses were no longer employed with the Port Authority, and without supplementing their current addresses. (ECF 92-20). This playing goose chasing is a recipe for prejudicing the adversary, not for probing the allegations in the converted motion.

55. Regardless, nothing in the documents reproduced from AAA offer any clue as to how the Port Authority insulates ITN revenues from non-ITN expenses. Ironically, on November 10, 2020, the Port Authority produced a belated summary of the documents reproduced from AAA, and nothing in that list offers any clue as to how the ITN revenues are protected from non-ITN expenses. Attached as **Exhibit A** is a true copy of the letter, dated November 10, 2020, summarizing the reproduction of *AAA*.

56. Defendant never disclosed what documents its has to support its defense.  True, that the converted motion has what the Port Authority filed as its defense, but the converted motion is only based on a projected analysis purportedly drawn from business records; these projections are not the actual documents upon which these projections were **used** as its support.

57. Instead of addressing its willful disregard to FRCP 26(a), the Defendant attempts to flag Plaintiff's Rule 26(a) disclosure. But this is error. First, Plaintiff

disclosed, for purposes of Article III, a corporation that employs Plaintiff, who can testify to the concrete injury that Plaintiff endures. Second, Plaintiff has attached to the proposed second amended complaint the actual documents upon supporting the claim that the Port Authority diverts ITN surpluses of over one billion dollars to benefit non-ITN facilities by way of the General Reserve Fund, as discussed supra in ¶ 40. Finally, the Port Authority never raised any objection, let alone timely, to Plaintiff's initial disclosure. It was not until after the motion to compel was filed, that the Port Authority is looking to belatedly litigate Plaintiff's initial disclosure.

58. Alternatively, the Port Authority argues that "this Court did not hold an initial conference or direct initial disclosure." (ECF 95 ¶ 6). This is wrong. The record revealed that the Court had directed the parties to submit a proposed discovery plan, by July 10, 2020. (ECF 82). Under FRCP 26(f) et seq. that was the initial conference.  The Court had conferred with the parties a discovery plan and set a schedule.

59. In overall, none of the documents produced by the Port Authority offer any clue as to how the ITN revenues are protected from paying for non-ITN expenses. The key question here is whether the ITN balance sheet was inflated by way of labeling non-ITN expenses as belonging to the ITN. This question can only be answered if the Port Authority would stop obfuscating the discovery process.

**b.  THE COURT HELD THAT THE DORMANT COMMERCE CLAUSE LOOKS AS TO HOW THE TOLL OPERATES IN PRACTICE: A 30(b)(6) WITNESS MUST BE ABLE TO ANSWER HOW THE TOLL RATES ARE ACCOUNTED  FOR AT THE PORT AUTHORITY.**

60. Defendant refuses to designate a 30(b)(6) witness. "The Port Authority should not be required to produce a witness pursuant to Rule 30 (b) (6) to bind the Port Authority when there is no one currently employed who has knowledge of the toll increase which took place 9 years ago." (See ECF 95 ¶ 15). This is wrong.

61. At first, the fact that the Port Authority can no longer produce Michael Fabiano, Karen Eastman and Mark Muriello as witnesses, their absence renders the affidavits to the converted motion inadmissible. Indeed, the fact that the Port Authority will not produce a 30(b)(6) witness, who can testify to the substance of the affidavits to the converted motion, confirms that the papers relied on by the converted motion are not based on actual business records.

62. However, the Court held that, under the dormant Commerce Clause the "fair approximation and excessiveness are evaluated by objective factors-how a toll operates in practice-and not the internally stated reasons for its enactment." (ECF 78 p. 19).

63. Because the proper scope of the ITN seeks to answer how the toll revenues operate in practice, it is preposterous to state that no one exists to account for the millions of dollars flowing in daily from the tolls. If no one knows what is

happening with the toll revenues, then on what basis can the Port Authority claim that the ITN revenues do not pay for non-ITN expenses? To the least, the Port Authority should concede that the toll revenues are untraceable and thus support non-ITN facilities.

64. Furthermore, the converted motion is based on affidavits of whom the Port Authority concedes are not based on its business practices but on the sole knowledge of former personnel who are not available. Thus, a question arises whether the Port Authority may maintain the converted motion, in light of its papers is not based on actual business records. Begging the question whether Defendant can show that there is no genuine dispute as to any material fact.

65. The Port Authority's inability to produce the witnesses upon which converted motion was crafted, contravenes because FRCP 56(c)(4) requires, "An affidavit or declaration used to support or oppose a motion must be made on personal knowledge, set out facts that would be admissible in evidence, and show that the affiant or declarant is competent to testify on the matters stated" and FRCP 56(c)(2) states "A party may object that the material cited to support or dispute a fact cannot be presented in a form that would be admissible in evidence."

66. At a minimum, the Defendant must be capable of furnishing testimony as to how the ITN revenues are applied in practice, and whether ITN revenues are protected from non-ITN expenses. If the Port Authority cannot support the converted

motion with a 30(b)(6) witness, then the converted motion is simply not based on admissible evidence. In order to resolve this debate, the Court should order the Port Authority to either produce a 30(b)(6) or withdraw the affidavits attached to the converted motion.

67. In order to avoid a 30(b)(6) witness, the Port Authority objects to the subjects of knowledge outlined in the amended deposition demands, which such witness should possess. The Port Authority claims that subjects knowledge are "overbroad" or "irrelevant." This is wrong. Notably, the Port Authority does not object to the second notice of deposition demands. All that the deposition demands did was to outline the subject of knowledge that the 30(b)(6) witness ought to possess.

68. Instead, the Port Authority takes these topics out of context. However, whatever objections the Port Authority had to the amended deposition demands is cured by the second notice of deposition demands. The second notice of deposition demands outlines how each topic for examination is related to the appropriation of ITN revenues. (ECF 92-12).

69. Furthermore, discovery is calculated to lead to admissible or impeaching evidence. Given that the Port Authority has presented inadmissible affidavits to their converted motion, Plaintiff must be allowed to establish the fact

that such affidavits are inadmissible and not based on actual business records or competent testimony.

70. Moreover, the Defendant claims that "the Port Authority follows statutory mandates and generally accepted accounting procedures." (ECF 95 ¶ 16.iii). While the Port Authority admits that it operates pooled revenues, it conjectures generally accepted accounting procedures but does not define what these procedures are. Only a person with knowledge can establish the methods of accounting that the Port Authority employs to protect ITN revenues.

### c.   PLAINTIFF'S DEMAND FOR INTERROGATORIES ARE APPROPRIATE AND DEFENDANT'S OBJECTIONS ARE ANOTHER ROUND OF EVASIVENESS.

71. Defendant objects that the Plaintiff's demand for interrogatories are not in harmony with Local Rule 33.3.  This is wrong. Local Rule 33.3 does not apply when the interrogatories were "ordered by the Court." Here the interrogatories were ordered on Defendant's consent. (ECF 83, 85). It is plainly a game that Defendant is playing to avoid answering simple and relevant questions and it is only in response to the motion to compel that the Port Authority is attempting to throw a bare bone of response to the Plaintiff's interrogatories.

72. Regardless, Local Rule 33.3 does not limit interrogatories when there is a short discovery schedule or when document production would be not sufficient.

Indeed, Local Rule 33.3 also does not limit the interrogatories within thirty (30) days of the discovery deadline. Given the very short discovery deadline in this case, the failure to produce responsive documents, the Port Authority's reliance on Local Rule 33.3 is plain error.

73. Take for example, the Defendant refuses to answer simple questions like to "List all the facilities that are supported from the toll revenues gathered from the Surface Hudson River Crossings." Defendant objects that such questions are not defined and irrelevant. These objections are wrong. The Court also used the term surface river crossings, as another term for the ITN. (ECF 78 at *4, 21). Indeed, Defendant's converted motion also uses that term. (ECF 37 at 9). Moreover, it is maliciously wrong for the Port Authority to refuse to identify what the facilities constitute the ITN.

74. Likewise, the Port Authority refuses to state "with particularity the methods [they] employ to separate reserves gathered from Surface Hudson River Crossings from facilities that are not Surface Hudson River Crossings." (ECF 95 ¶ 19.i-iv). This time, they refer to Fabiano's affidavit, without stating where in the Fabiano's affidavit the answer is found. This is wrong. discovery is proper to unearth what methods the Port Authority uses separate accounts to insulate ITN revenues from non-ITN expenses.

75. The Port Authority also refuses to answer what *amortization* and *depreciation reserves* are. (ECF 95 ¶ 19.v-vi). Schedule E in the annual report list ITN expenses as *amortization* and *depreciation reserves* and thus Plaintiff is entitled to an answer what these terms are. Because those classifications are traditionally used to pay for capital projects.

76. The Port Authority also refuses to answer how the final toll rate is decided and refuses to define the definition for: financial envelope, affordability envelope, capital plan submission vs the financial affordability envelope, and unconstrained capital needs. (ECF 95 ¶ 19.vii-xii). The Port Authority objects that these questions are "irrelevant to the issue in the case and the claim based on the amount of the toll was dismissed." This type of objection is plainly wrong, since the Court of Appeals for the Second Circuit directed that the Court reconsider the proposed second amended complaint, "To the extent that plaintiff's Proposed Second Amended Complaint claims that the ITN was operating at a profit, and therefore, the need for the 2011 Toll Increase was motivated by an 'ulterior motive of setting the tolls at its highest level." A plain review of the proposed second amended complaint (ECF 65-3) together with the Court's decision (ECF 78), reveals that the allegation of ulterior motive is based on the Port Authority's employment of the affordability envelope and the very terms that was objected as dismissed.

77. The Port Authority also refuses to state where in the annual financial reports it itemizes the expenses for capital projects. (ECF 95 ¶ 19.xix). This question is undoubtedly relevant, since the Port Authority insists that the audited annual financial reports defines how the Port Authority accounts for ITN expenses and revenues. (ECF 96 ¶ 16.ix).

78. The Port Authority also refuses to "State at what minimum rate should the toll price be per axel to completely satisfy all your expenses to operate the Surface Hudson River Crossings without any deficit." (ECF 95 ¶ 19.xiv). The Port Authority also refuses to answer similar related questions, such as what is preventing to accomplish a toll rate that leave no deficit. (ECF 95 ¶ 19.xv). These questions are relevant, especially since the converted motion insists that the ITN operates on an infinite deficit. These questions simply seek to inquire whether the infinite deficit is genuine or plainly deceitful.

79. The Port Authority also refuses to disclose what debt cause the deficit from 2007 and onwards, to explain the ITN's deficit. (ECF 95 ¶ 19.xvi-xix). These questions are undoubtedly relevant since the converted motion advances the argument that the non-ITN facilities are subsidizing a purported deficit of the ITN.

80. The Port Authority also refuses to answer what was the purpose of comparing its toll prices with those of other regional providers that charge tolls. (ECF 95 ¶ 19.xx). This question is relevant, since the affidavit of Mark Muriello in

the converted motion is based entirely on comparing the Port Authority rates with those of the MTA. (ECF 36-7).

81. The Port Authority also refuses to disclose what is the process for adding capital projects and disclosing how much money was actually spent on the ITN. (ECF 95 ¶ 19.xxi-xxiv). Again, these questions are relevant, since the Port Authority claims that the toll rates were increased to fund capital projects for the ITN.

82. The Port Authority's objection of irrelevance to every question it wants to avoid is part of a pattern to obfuscate all discovery. Defendant hopes that the Court will accept the converted motion as gospel truth without testing its validity. But the Court of Appeals for the Second Circuit explained that the relevant standard is that "summary judgment should only be granted 'if after discovery, the nonmoving party has failed to make a sufficient showing on an essential element of its case with respect to which it has the burden of proof." *Hellstrom v. U.S. Dep't of Veterans Affairs*, 201 F.3d 94, 97 (2d Cir. 2000). "The nonmoving party must have had the opportunity to discover information that is essential to his opposition to the motion for summary judgment." *Id*. The Port Authority's obfuscation to basic interrogatories do not show that Plaintiff had the opportunity to discover information that is essential to his opposition to the converted motion.

### d.   PLAINTIFF'S DOCUMENTS DEMAND ARE PROPER AND DEFENDANT'S OBJECTIONS ARE ANOTHER ROUND OF ITS EVASIVENESS.

83. In the same fashion of all the evasiveness outlined *supra*, the Port Authority refuses to produce documents responsive to Plaintiff's document demands. Defendant failed to respond the demand for documents production in the manner of responding to "each item or category," a prima facie disregard to FRCP 34(b)(2)(B).  Likewise, Defendant is refusing to honor all of Plaintiff's demands.

84. Defendant's refuses to introduce any documents it intends to introduce for any deposition regarding the subject matter of this case. (ECF 95 ¶ 22.i). The Court should hold that, because the Port Authority has not issued to Plaintiff any deposition demands and because the Port Authority refuses to provide the documents it intends to introduce to a deposition, the Port Authority waived the right to hold any depositions. Thus, rendering the Port Authority's objection as moot.

85. Likewise, the Port Authority refuses to produce all documents and communications it intends to introduce at trial. (ECF 95 ¶ 22.ii-iii). The objection is that "it is frivolous since no documents that haven't been produced can be listed in the pretrial order. It is unreasonably burdensome."  As such the Court should hold that Defendant waived its right to produce any documents in support of its converted motion. Thus, rendering the Port Authority's objection as moot.

86. The Port Authority also objects to produce all documents and communications responsive to the Amended Complaint and proposed Second Amended Complaint must be rejected. (ECF 95 ¶ 22.iv). The Court of Appeals for the Second Circuit remanded to review the amended complaint and the proposed second amended complaint, inasmuch that they allege that the toll revenues are spent outside the ITN and that the toll rates were artificially inflated to gouge the maximum price the Port Authority deemed as collectible when there was no deficit to begin with. As such, the documents demand is appropriate seeking those documents that are responsive to the Amended Complaint and proposed Second Amended Complaint.

87. The Port Authority also refuses to provide any documents relating to how the Port Authority manages its revenues and finances. (ECF 95 ¶ 22.v-vi). This demand is undoubtedly related to the converted motion, since the Port Authority insists that the ITN operates on an infinite deficit. There is no other way of inquiring whether the deficit argument is genuine other than by examining the procedure that the Port Authority employs to allocates revenues.

88. The Port Authority refuses to produce all documents and communications they have referencing the plaintiff. (ECF 95 ¶ 22.vii). The Port Authority is wrong. This request is relevant to extent that Defendant has impeaching documents against Plaintiff reserved for trial.

89. The Port Authority also refuses to provide the documents that were used to develop its budgets and capital plans in determining what the toll price should be. (ECF 95 ¶ 22.viii-x). This type of objection is plainly wrong, since the Court of Appeals for the Second Circuit directed that the Court reconsider the proposed second amended complaint, "To the extent that plaintiff's Proposed Second Amended Complaint claims that the ITN was operating at a profit, and therefore, the need for the 2011 Toll Increase was motivated by an 'ulterior motive of setting the tolls at its highest level." A plain review of the proposed second amended complaint (ECF 65-3) together with the Court's decision (ECF 78), reveals that the allegation of ulterior motive is based on the Port Authority's employment of the affordability envelope and the very terms that was objected as dismissed. Thus, the documents that were used to develop the budgets and capital plans, are relevant to the converted motion, in determining what the toll price should be.

90. The Port Authority also refuses to provide the records of revenues it received and paid to E-ZPass. (ECF 95 ¶ 22.xii-xii). These documents are relevant to corroborate whether the amounts of revenues proclaimed by the Port Authority is based on a genuine number or based on its own imagination.

### e.    THERE IS A NEED FOR ENLARGING THE TIME TO COMPLETE DISCOVERY

91. An order is necessary to modify the discovery order (ECF 85) to allow sufficient time of subpoena process, of former personnel of the Port Authority, to preserve testimony, about their personal knowledge of facts related to the matter pending before the Court. Currently the deadline ended October 15, 2020. Plaintiff timely moved to enlarge the discovery deadline (ECF 90), which the Court deferred pending this motion (ECF 91). The enlargement of time is necessary because the Port Authority has not complied with Rules 26(a), 30, 33, and 34 and on the eve of the discovery deadline, Port Authority revealed some of the witnesses who can testify about the converted motion, and such testimony must be obtained through a subpoena.  As such an order is requested enlarging the discovery deadline by at least two months after decision of this motion.

92. In order to obtain a subpoena, given that Plaintiff is pro se, the Clerk of the Court would have to issue the subpoena, which that in itself can take about two weeks. Then, Plaintiff must hire a process server to find Fabiano and Buchbinder, which itself can take about three weeks. Afterwards, Plaintiff is required, pursuant to FRCP 45(d)(2)(B), to allow a window of 14 days for objections or compliance. Then after obtaining the transcripts of the depositions, which in itself could take another 30 days, Plaintiff is required to allow, pursuant to FRCP 30(e), another 30

days for the deponent to review the transcript. Unfortunately, the Port Authority's refusal to produce a 30(b)(6) witness makes it necessary to use the subpoena route. As such, Plaintiff moves for an order enlarging the discovery deadline by at least two months after decision of this motion.

93. Pursuant to FRCP 30(b)(4) to allow the depositions to be held by remote means, before a court reporter, by Pirozzi & Hillman, Inc.[3], utilizing https://reporter.vtestify.com/, which mechanism is administrated by Pirozzi & Hillman, Inc. at 575 Lexington Avenue, 4th Floor, New York, NY 10022.

94. Givens this aforementioned history of discovery obstacles, with a history of Defendant frustrating the discovery process, it is only fair that the Court providing notice to the Port Authority of New York and New Jersey that the failure to comply with the Court's order is sufficient notice for sanctions under FRCP 37.

## <u>Conclusion</u>

Wherefore, Plaintiff moves the Court for an order granting:

a. Compelling the Port Authority of New York and New Jersey to comply with and provide initial disclosures as required by FRCP 26(a).

b. Compelling the Port Authority of New York and New Jersey to comply with and provide written answers to Plaintiff's demand for interrogatories as required by FRCP 33(b)(1)(B).

_____

[3] Pirozzi & Hillman, Inc. are not attorneys.

c. Compelling the Port Authority of New York and New Jersey to comply with Plaintiff's demands for document production and provide written answers corresponding with each of those demands as required pursuant FRCP 34(b)(2).

d. Compelling the Port Authority of New York and New Jersey to designate a witness under FRCP 30(b)(6) who could with knowledge, of the business records, testify about the actual allocation of toll revenues: whether the interdependent transportation system (ITN) revenues are protected from non-ITN expenses.

e. Modify the discovery order (ECF 85) to allow sufficient time of subpoena process, on former personnel of the Port Authority, to preserve testimony, about their personal knowledge of facts related to the matter pending before the Court.

f. Pursuant to FRCP 30(b)(4) to allow the depositions to be held by remote means, before a court reporter, by Pirozzi & Hillman, Inc., utilizing https://reporter.vtestify.com/, which mechanism is administrated by Pirozzi & Hillman, Inc. at 575 Lexington Avenue, 4th Floor, New York, NY 10022.

g. Enlarge the discovery deadline by at least two months after decision of this motion.

h. Providing notice to the Port Authority of New York and New Jersey that the failure to comply with the Court's order is sufficient notice for sanctions under FRCP 37.

i. Deny the Port Authority's cross motion for a protective order in its entirety.

## **VERIFICATION**

I, Yoel Weisshaus verify pursuant to Rule 11(b) of the Federal Rules of Civil Procedure, that I conducted a reasonable inquiry into the facts and laws stated in the foregoing declaration, and certify in good faith that under the circumstances:

The factual allegations stated in the foregoing deceleration related to myself are true to the best of my knowledge.

The factual allegations stated in the deceleration related to the defendant are made to the best of my knowledge by familiarity of the facts and statements defendant and/or its agents made available to the public and me, while reserving the right to verify its veracity or dispute them.

I certify the foregoing as true to the best of my knowledge.

Dated: New Milford, NJ
        November 11, 2020

Respectfully submitted,


Yoel Weisshaus