UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------x

YOEL WEISSHAUS,

Plaintiff, New York, N.Y.

v. 11 CV 6616 (RKE)

THE PORT AUTHORITY OF NEW YORK
AND NEW JERSEY,

Defendant.

------------------------------x Telephonic Oral Argument

February 25, 2020
11:00 a.m.

Before:

HON. RICHARD K. EATON,

District Judge,
Sitting by Designation

APPEARANCES

YOEL WEISSHAUS
Pro Se Plaintiff

THE PORT AUTHORITY LAW DEPARTMENT
BY: KATHLEEN MILLER
Attorney for Defendant

THE DEPUTY CLERK: United States District Court for the Southern District of New York is now in session. The Honorable Judge Richard K. Eaton presiding over 11 CV 6616, Yoel Weisshaus v. the Port Authority of New York and New Jersey.

Will the parties please introduce themselves to the Court, starting with the plaintiff's counsel.

MR. WEISSHAUS: Plaintiff Yoel Weisshaus, self represented.

MS. MILLER: Kathleen Miller, attorney for the Port Authority of New York and New Jersey.

THE COURT: Welcome to both of you. I believe you are the only two lawyers on the line, or parties. This is a hearing in open court, and I'm going to make certain findings and holdings throughout the hearing, and the transcript of this hearing is going to serve as the order of the Court.

Mr. Weisshaus, you have sought a 30(b)(6) witness and the Port Authority as offered up Mr. Fabiano, and you are going to depose him. Is that correct?

MR. WEISSHAUS: Yes, but there is an issue here.

THE COURT: Well, tell me what it is.

MR. WEISSHAUS: First, the Port Authority has not identified on what topics, according to the second notice of the deposition demands, Mr. Fabiano's capable of testifying for. And that impairs my preparation for the deposition.

THE COURT: Well, some of these things will become a little more clear. I think Mr. Fabiano satisfies the requirements of 30(b)(6).

MR. WEISSHAUS: I don't oppose that. I agree.

THE COURT: So this is what we are going to do. I have your correspondence, and we're going to decide which of these things you can ask Mr. Fabiano or anybody else about, and which things you can't. And you are going to have Mr. Fabiano as your 30(b)(6) witness, and then after you deposed him, then we'll go on to further discovery and you can make requests to depose other people or to other seek other things.

Which brings me to the documents that the Port Authority's turned over to you. I take it that because we're in COVID times that they sent you the documents on a thumb drive or something like that; is that correct?

MR. WEISSHAUS: Correct.

THE COURT: And were you able to open it and can you read the documents?

MR. WEISSHAUS: Yes.

MS. MILLER: Your Honor, may I interrupt?

THE COURT: Sure.

MS. MILLER: The documents that -- and I am sure Mr. Weisshaus will agree -- the documents that I provided to him on the thumb drive were all the documents produced in the *AAA*. In addition to that, I produced a number of other

documents in other categories in digital format, but not on a thumb drive.

THE COURT: All right. Well --

MR. WEISSHAUS: I object.

THE COURT: You're far beyond me now. Mr. Weisshaus, have you been able to look at all of the things that the Port Authority has been able to --

MR. WEISSHAUS: Yes.

THE COURT: Okay. So you can read them all. How long have you had to look at those? Some time in September; is that right?

MR. WEISSHAUS: I received them I believe September 10, the day after the Court denied my premotion conference letter.

THE COURT: Okay. So, you've had a chance to go over these documents?

MR. WEISSHAUS: Yes.

THE COURT: Fine. So, what I'm going to do now is I'm going to take a look at your two letters. One, let's start with the one that's dated 9/18.

MR. WEISSHAUS: What's the docket entry number?

THE COURT: I don't know. It's your e-mail to Ms. Miller dated 9/18/2020 at 10:35:20 a.m. Amended deposition demands.

MR. WEISSHAUS: I would say that's ECF 92-10.

THE COURT: Beats me. I am afraid I don't have access to the docket.

MR. WEISSHAUS: I would like to object to that being the current deposition demands, because -- oh, no. Yeah, because the Port Authority wrote an objection to that on September 29, so I made a second notice of deposition demands to cure whatever objections the Port Authority had. So, my deposition demands as it currently stands were amended by the second deposition demand, which is ECF 92-12, and that would be the -- attached to an e-mail that I sent to the Port Authority on October 2, 2020.

THE COURT: I am going to start with this one and then we'll get to that one, okay.

MR. WEISSHAUS: Okay.

THE COURT: So on page 1 you say, "This deposition is for discovery and for use at hearings and at trial. The foregoing subjects without limitation will be covered:

"The operation of the Port Authority of New York from 2000 to the present."

As I say, the transcript of this hearing is going to be my order with respect to some of these things.

That request is simply too broad. So, if you are expecting to get anything from that request, the Port Authority doesn't have to answer that.

MR. WEISSHAUS: If I can clarify to the Court.

THE COURT: No, you can't. The way that you are going to clarify -- please, Mr. Weisshaus. You're not clarifying anything. If you want to find out specific things having to do with the operation of the Port Authority, then you can ask for them. You can either ask --

MR. WEISSHAUS: I would like to make the Court's job easier on this particular issue. I don't mean to be disrespectful and interrupt. The list that I provided you was with knowledge. I'm not looking to dig into entire information going to the Port Authority from 2000 and cover every single aspect. No, no, that's not what I am trying to say here.

What I am trying to say is a person with knowledge if we can address, like, let's say what is the ITN, what is included in that ITN.

THE COURT: Please be quiet for a minute, Mr. Weisshaus. I just trying to make clear what's going to happen here.

MR. WEISSHAUS: Right.

THE COURT: Your questions have to be specific, and if you were designing that to be a question, it's too broad. If you weren't designing it to be a question then what I'm saying doesn't matter. "The facts regarding the subject matter of this case," that's too broad. But if you ask a specific question, that's going to be fine.

"The rules and policies of the Port Authority of New

York and New Jersey that is used in the course of its business to manage finances from 2007 to the present." That is also too broad. You can ask specific questions with respect to the subject matter of this case, which as you well know, because you've won twice in the Court of Appeals, is the dormant commerce laws.

"All documents and communications used by the Port Authority of New York and New Jersey in the course of business to manage finances from 2007 to the present." That's too broad. You have to ask specific questions.

"The facts relating to configuring and setting the amount of the toll rates adopted on August 19, 2011." You can ask questions as to what the Port Authority planned to do with the money that they raised by the toll increase, and I think that that's what you meant to do here. But, I'm just going to clarify that's what you can ask about.

"The contracts the Port Authority had with E-ZPass." As you know, E-ZPass is not in the case anymore. Do you understand that, Mr. Weisshaus?

MR. WEISSHAUS: I understand, but if I may clarify on that, okay. E-ZPass also serves the Port Authority on revenues gathered from the airports. Airport parking and other facilities. So the question I'm really looking at is -- what I'm thinking of in the deposition is to say when the money comes in from E-ZPass, how does the Port Authority divide them,

how are they characterized. Just to have a general understanding of how the Port Authority manages the moneys that belong to the ITN.

THE COURT: Okay. So, you can ask that question.

"The payment arrangements between the Port Authority and E-ZPass since January 2000 to the present, involving revenues of the collection of tolls." I don't get that question. "Payment arrangements between Port Authority and E-ZPass since January 2000 to the present, involving revenues of the collection of tolls." What does that one mean?

MR. WEISSHAUS: It is exactly what I just explained to the Court. The E-ZPass is a company that serves the Port Authority, that owns the toll booths and the bridges and tunnels. So whatever relationship E-ZPass has with the Port Authority in terms of the payment arrangements, how, for example, when the E-ZPass collects a toll from a user, how is that money received by the Port Authority, just generally speaking in terms of the structures. So we can develop a framework of how the tolls are managed, how they are calculated, how they become part of the budget, etc.

So the idea is we should be able to have a record of how -- preserve a record of how the tolls are managed from the user endpoint all the way until it's being classified or spent for an ITN facility or for a non-ITN facility in that regard. So the idea is to trace the timeline of how it goes.

Like, let's say user pays E-ZPass, E-ZPass pays the Port Authority, Port Authority receives it in department so-and-so, in the classified so-and-so, and that's when it becomes part of the budget so-and-so.

Not specifics, but I'm saying just generally speaking that would be the idea.

MS. MILLER: Can I respond to that?

THE COURT: Sure.

MS. MILLER: E-ZPass is a logo that is owned by the Port Authority of New York and New Jersey. I don't know what Mr. Weisshaus is talking about, the company that he's talking about.

THE COURT: Well, okay.

MS. MILLER: He never asked --

THE COURT: Please stop, please stop.

So Mr. Weisshaus, you can start out at least trying to figure out whether or not -- I think you are going to find out that they don't really segregate these funds -- but you can ask some questions about how the funds are segregated, which I think is what you are driving at here.

MR. WEISSHAUS: That's correct.

THE COURT: Let's go on to 8. "The capital projects from 2007 to the present such as raising the Bayonne Bridge, building the New Goethals Bridge, rebuilding the Pulaski Skyway, etc."

With respect to the Bayonne Bridge and the Goethals Bridge and the Pulaski Skyway and these projects that are arguably part of the ITN, you can find out how the toll money has been spent from 2007 until the date of the deposition, or some time reasonably close to the date of the deposition.

So, with respect to those things, you can find out how the toll money has been spent. I am assuming that the projects are finished now, but who the heck knows.

I'm sorry?

MR. WEISSHAUS: I'm thinking I may not be understanding, but I'm not allowed to ask how the money is spent? Perhaps the Court is saying I may not ask how the bridge was painted, etc., or like getting into specific items?

THE COURT: You can find out, you can find out whether or not the money that was spent -- how the money was spent. You can find out how the toll money was spent with respect to each of these projects.

9. "What methods of accounting the Port Authority of New York and New Jersey employs to account for ITN expenses and revenues apart from non-ITN expenses from 2007 to the present." I don't understand that question.

MR. WEISSHAUS: The Port Authority represent they commingle all the revenues that come into the Port Authority, they call it pooled or whatever name it is. But Mr. Fabiano in his affidavit to the Court, he's saying that the ITN is

operating in a deficit, and he's going to such extreme that there are times that the ITN needs to be supplemented by other facilities, subsidized by other facilities or other sources to cover that deficit.

So the idea I'm trying to get here is -- and this is the whole thing -- is I want to understand when the user pays the toll, I want to start from the beginning. When the user pays the toll, where does the money go? How is it classified? Okay. And it's okay if they commingle it. But how do they account for it? Okay. I just want to get a picture, an overall picture of how the money is accounted.

Next step is, in terms of the expense, like let's say the Port Authority has hired the Port Authority Police Department. According to the financial records, I don't see how they are divided between facilities. So let's say the Port Authority's using police for the bridges. Well, how do we know what expense from that goes for the bridges or not. Just a general idea of understanding how the Port Authority accounts for money in saying that this is ITN money and that's -- and ITN expense, and something else is not an ITN expense.

That's really the framework to understand where Mr. Fabiano and all other the records that we are dealing here in this case, how they properly account for ITN revenues and claim that there is this infinite deficit that we have been hearing about for the past 10 years.

THE COURT: I think your answer is going to be that they don't account for the ITN as the ITN, because it is a construct of judges. So, you can --

MR. WEISSHAUS: I understand that. What I'm trying to say is, well, how do they classify by line or whatever term they want to use for an ITN expense. Let's say if they --

THE COURT: Sorry. You can ask questions about how they account for their money. If they tell you that they don't account for it separately as an ITN expense, you're going to have to accept that answer. And then you can ask them, well, if you don't, you can find out how they account for their money. So, those questions are going to be okay.

MR. WEISSHAUS: If I can clarify.

THE COURT: No, don't bother. I got it. You can ask questions that get at how they segregate their funds.

"The successful management of revenues to show no deficit from 2007 to the present."

What does that mean?

MR. WEISSHAUS: Okay. So what I am trying to get into is, again, Mr. Fabiano's represented to the Court that there are such deficits for the ITN that they have to get money from other sources so there would be no deficit at the end of the year, etc. So this idea is to get to the truth of his own statements. Get to the bottom of it. Is there a basis for it. Is it just hyper language that he put in an affidavit, or can

we substantiate it with some relevant facts.

THE COURT: Okay. I don't understand the question, but you can find out if the Port Authority in fact didn't have enough money from the increase in revenues to make the improvements, and if they had to get the money from someplace else.

So that's, generally speaking, the 9/18 document. Now -- what?

MR. WEISSHAUS: The Court did not address number 12.

THE COURT: Forgive me. "What method the Port Authority of New York and New Jersey uses to calculate or proclaim a deficit in the ITN."

Ms. Miller, have you already provided that?

MS. MILLER: I believe that we provided the backup documents to the Fabiano affidavit, the cash flow analysis, the exhibits from -- again, this is all back in 2011 at the time the toll increase was made.

The Court has to understand that the intervening 10 years I believe there have been other toll increases. So, there have been changes since the claim that's based on the 2011 increase was made. We have provided him with all of the annual reports, the financial statements, and the schedules showing what money has actually been spent, both for operations and for capital expenditures.

MR. WEISSHAUS: I object to that characterization.

THE COURT: Well, in any case, if you want to, you can ask Mr. Fabiano: You represent that there's been a deficit in the amounts needed to finance the ITN project. Show me.

MR. WEISSHAUS: Exactly. But I want to remind the Court, it's up to Mr. Fabiano's retirement. His retirement is somewhere in 2013 or 2014. So, from that point of his retirement to date, let's say the other toll increases that happened in between, they are relevant to the extent, because according to Mr. Fabiano's affidavit, he presented a projection of up to 2021. So the real question, if he's not going to be able to testify from 2014 or 2013 up to the present, to say how his projections were true or not true or accurate.

So these kind of issues runs into a very fundamental problem I believe that has been the frustration both in my case and the *AAA* case. For example, if I can bring the Court back to the *AAA* case, there was the debate between the rate of return and the cash flow analysis. And in this case there was the issue of the reason for the increase. Because if the Court were to recall, I was trying to amend the complaint further to include the facts that the Second Circuit said that the Court should reconsider its denial. In that decision the Court said that the motives for increase does not matter. What matters is -- if I can read the exact language into the record. The Court said --

THE COURT: Maybe I can just stop this. After you

depose Mr. Fabiano, then we're going to come back, we're going to have another talk, and we're going to find out what else you want to know and how you want to find it out.

MR. WEISSHAUS: Okay.

THE COURT: Let's start with Mr. Fabiano. And then we'll be discussing this again.

MR. WEISSHAUS: I appreciate it.

THE COURT: So let's go on to your 10/2 Exhibit A and your October 2 letter.

MR. WEISSHAUS: Yes.

THE COURT: Some of this is going to be a repetition. I'm just trying to tease out of this what you're really trying to find out.

Under paragraph 1(i), you say, "What facilities and projects falls under the revenues and umbrella of ITN." So, you can ask questions about that, knowing that the ITN is just an invention of judges, it is not how the Port Authority keeps it books and records.

MR. WEISSHAUS: If I may correct. It's true that ITN is a term of the court. But also in the financial or reports, bridges are separate from aviation or port commerce, etc. So, just to clarify, I may use in terms of like the deposition, I may use the term ITN. But, what I would really be looking at is under the umbrella of bridges and tunnels the way the Port Authority is classifying it in its own records.

THE COURT: That's good. I knew you understood.

Let's see. Your paragraph 2, considering our previous discussion, I think you can ask some questions and find out how the tolls, once they're collected, how they're divided up, if at all.

MR. WEISSHAUS: All right.

THE COURT: Now, number 3, "The rules and policies of the Port Authority of New York New Jersey that is used during the business to manage finances from 2007 to the present." What's the idea there?

MR. WEISSHAUS: There are various different accounting methods that government agencies use to account for revenues in -- for example, financial reports, GASB, there is GAS. I don't remember the exact names off the top of my head. There is different structures and they have different policies, which is whatever system the Port Authority used is fine. But at least I want to get a record of what system they are using so when I go and ask questions, when I go and examine records and I'm going to make representations to the Court in opposing summary judgment, it can be consistent with that. So basically, whatever policies the Port Authority employs, whatever system they use, that's what I would like to establish a record of. So let's say what accounting methods they use.

THE COURT: Are you asking whether or not they use GAAP or not?

MR. WEISSHAUS: I believe it's the GASB, which I think is the Government Accounting Standards; something like that. I don't remember the -- I took a course on that stuff. So government accounting is different than regular accounting, that's used for businesses.

THE COURT: So you can ask that question. But I don't know the rules and policies. You have to zero in on what it is you really want to find out.

MR. WEISSHAUS: That's the goal. The goal is to get to how the money is spent and how they accounted for it.

THE COURT: All right. I'm on page 5. You get to the point where you say "to answer and provide specific responses as to how the Port Authority safeguards toll revenues." What does that mean?

MR. WEISSHAUS: Which question?

THE COURT: On page 5. I think I'm in question 3. I'm in the first full sentence, first fragment of a sentence on the top of page 5.

MR. WEISSHAUS: Again, it comes back to the same point. If the money is received, let's say they're all pooled together. We know that by now. But I want to establish a record for it.

The idea is they all -- at least they need to be accounted separately so we can say that the ITN truly operates on a deficit, or they don't operate on a deficit.

The idea is how do we know what is accounted for in terms of expenses? For example, I used the example of policing, how much of the policing, let's say, is it based on a ratio that goes towards the Port Authority and towards the expense of bridges and tunnels, or is it based on, let's say, how much each officer employed for a particular day or whatever.

THE COURT: Okay.

MR. WEISSHAUS: General idea --

THE COURT: We're not getting a general idea here, Mr. Weisshaus. You can ask questions that lead you to the answer of how much of the toll revenue was spent on particular projects.

If you wander off into the police department, I'm afraid that -- by the way, this is what I'm hoping to do. On the day that you depose Mr. Fabiano, I'm going to be available on the phone. And so I'm going to rule on whether or not these questions have traveled off into an area that doesn't have anything to do with the dormant commerce clause.

So I'm letting you know right away that if you wander off into trying to find out how much is spent with respect to the police department, I am afraid that I'm not going to allow you to ask that kind of question.

MR. WEISSHAUS: I was using an example of how --

THE COURT: You're using an example, and so am I, that

if that's your plan, I'm afraid we're not going to go down that path."

All right. So, let's go to the example you have here, "For example, the designee should be able to answer questions of what method of accounting the Port Authority uses to ensure that toll revenues from the ITN are not diverted to fund new fleet for the airports."

You of course get to ask questions with respect to whether or not the money is spent, has been spent on non-ITN projects.

MR. WEISSHAUS: May I ask the Court which number the Court was reading?

THE COURT: I'm still in 3.

MR. WEISSHAUS: Okay. That's what I was trying to allude to.

THE COURT: So now let's go on to 4. "The facts relating to configuring and setting the amount of the tolls adopted in 2019."

Well, as I say, the motivation is not important here. What's important is what they actually did. How they spent the money. So you can ask a little bit of some questions about this, but not much.

Number 5.

MR. WEISSHAUS: If I can explain what kind of questions I am looking to get at. If the Court wants to read

into the record, it's basically sufficient to cover all the expenses related to the ITN causing a deficit for operating the ITN, and capable of being diverted outside the ITN.

So basically, the same that I've been representing to the Court until now, is that we want to get to know of how the budgets are made so that the ITN is properly calculated, so we can know if there is a deficit or there isn't.

THE COURT: You can find that out.

"The system of using E-ZPass to collect tolls." Now I'm on 5. "The designee must be capable of answering with sufficient details as to how all the fines, surcharges and violations charges from commuters who fail to pay with E-ZPass are used to fund the ITN and beyond."

I don't get that.

MR. WEISSHAUS: What I'm trying to do again, what I'm try to bring back how E-ZPass passes on charges that they collect from the user and the Port Authority receives the money. So let's say do they just receive a balance, let's say, is it including the surcharges or everything that a payer is charged for, or is part of that diverted to a different fund, let's say, to fund a different facility or different project. I don't know where it's going. So the idea is to establish where the money coming in from E-ZPass, how it's being used.

THE COURT: I think you can only ask questions with respect to the tolls collected by E-ZPass.

MR. WEISSHAUS: That's the thing. But --

THE COURT: You can't ask any questions related to these other things. We're only talking about the tolls. The tolls that are used to either fund or not fund the proper kinds of projects.

MR. WEISSHAUS: May I ask for clarification?

THE COURT: Tolls.

MR. WEISSHAUS: Let's say someone doesn't pay the toll and they are charged a penalty for not paying the toll, and they pay the penalty and the toll. So, is that supposed to be part of the dormant commerce clause, how the money is spent? Or is it a violation of money that was collected doesn't belong to the ITN. That's going to be basically the idea. Where does that money -- where is that money supposed to go. Is it supposed to go to bridges and tunnels or is it supposed to go in the general revenues to cover other uses outside the ITN.

THE COURT: I don't know the answer to that. So you find out. All right. Ms. Miller?

MS. MILLER: Yes, your Honor.

THE COURT: Will you negotiate with Mr. Weisshaus a definition of tolls and submit it to the Court. Agree on what constitutes a toll. Okay?

MS. MILLER: Yes, your Honor.

THE COURT: If we do this, we might be able to eliminate some of these questions. That's the only reason I'm

doing this.

6. "The payments arrangements between the Port Authority and E-ZPass since January 2000 to the present, involving revenues of the collection of tolls. The designee must be capable of answering --" that's going to be the same. We'll solve that one by figuring out what tolls means.

"Designee must be able to testify how ITN toll revenues funded daily operations from 2007 to the present." You can find out where the toll money went.

"Designee must be able to testify how ITN toll revenues funded capital projects from 2007 to the present." That's okay.

"The designee must be able to testify how the Port Authority administers the allocation of ITN portions of the capital plan for the following years."

Now, if the answer is that the ITN doesn't administer the allocation of ITN portions of the capital plan for the following years, then I don't understand what that question is. If they don't keep track of the ITN as the ITN, what do you want them to tell you, Mr. Weisshaus?

MR. WEISSHAUS: Well, I think that question wouldn't be that hard to answer for the Port Authority, because I've seen some of the exhibits, for example, some of the documents, they do have a way of classifying or they have a code number in each project. And that is part of how they administer it, what

belongs in a capital project and what doesn't belong in a capital project. So we want to go by facility to know what belongs to the ITN, what doesn't belong to the ITN, and how they're calculated to be covered -- just how the money is spent to cover those projects.

THE COURT: That's the whole purpose of half of your case, isn't it?

MR. WEISSHAUS: Yes.

THE COURT: Find out how the money was spent with respect to each these projects.

MR. WEISSHAUS: Exactly.

THE COURT: If those are your questions, that's okay.

MS. MILLER: Can I get some clarification? What projects is Mr. Weisshaus referring to?

THE COURT: Well, he lists them in his complaint. The Bayonne Bridge, the Goethals Bridge, the -- do you have your list anywhere, Mr. Weisshaus?

MR. WEISSHAUS: I don't have the amended complaint open right now.

THE COURT: I have it. I have it. I believe he's referring to paragraph 27 of his amended complaint, and where it lists George Washington Bridge, suspended ropes -- I'm not sure what that is -- Lincoln Tunnel, Bayonne Bridge, New Goethals Bridge. Those projects. Those are the projects that, for want of a better term, would traditionally be considered as

part of the ITN.

MR. WEISSHAUS: No.

THE COURT: And then afterward, he talks about projects that -- correct me if I'm wrong here, Mr. Weisshaus -- projects that would not normally be thought of as part of the ITN, and that's the airport runway, security enhancements at all facilities, port infrastructure improvements, and completion of the World Trade Center.

MR. WEISSHAUS: That's correct, but if I may add. That's based on the press release that the Port Authority represented. What I am thinking is in a deposition I may learn information that was not in the press release, that say a facility that is being covered by the ITN, and a facility that didn't belong in ITN that is also being covered by toll revenues, I don't know where it might lead. But --

MS. MILLER: Can I explain my concern here, your Honor, and I think we raised this as an objection. There are literally thousands of projects throughout the Port Authority. Thousands. They are called capital projects. Every one of them has like separate code numbers. These particular projects that your Honor just listed, that's fine. I understand what that is. I do not understand the general statements about the World Trade Center, of which there are literally thousands of projects just within the World Trade Center, all having their own budget numbers. Albeit ministered by separate people

within the engineering department, the capital projects department, whatever other departments there are that are involved in the particular project.

It becomes -- it is a universe that is impossible to embrace or identify because it's not identified in the complaint. There are general allegations about runway projects. I don't know what airports Mr. Weisshaus is talking about. It is never clarified.

THE COURT: Well, this is not the first lawsuit that the Port Authority has been involved in --

MS. MILLER: No.

THE COURT: -- having to do with the ITN. After the Port Authority have been involved in at least one lawsuit, it thought it was a good idea to put out a press release saying that they were going to raise the tolls, and they were going to spend the money on the World Trade Center.

MS. MILLER: You know, I --

THE COURT: Wait a second, wait a second. Nobody made you do it. Mr. Weisshaus has brought a lawsuit, and he gets to find out whether or not you violated the dormant -- he's won in the court of appeals twice -- and he gets to find out whether or not the toll increases violated the ITN. And so, I'm sorry this is burdensome, but you brought it on yourself. And so, he's going to get to ask quite a few questions here to find out where the money went. Sorry it's hard. But, he's won twice in

the court of appeals. So, he's going to ask these questions, and he's going to get answers to them.

Mr. Weisshaus, I think you understand where we're going here. That you get to ask some questions about how it is they arrived at the amount of the tolls, and you get to find out where the money went. We are, however, going to cut off the date with respect to everything, other than what's arguably the project, the Goethals Bridge and things like that. You can ask questions relating to how that money was spent up until today. With respect to things like the World Trade Center, you can ask questions relating to how the money was spent up until the date of your amended complaint, and that was December 31, 2015 -- no. What's the date of your amend complaint. It is actually 2013. The date of your amended complaint.

MR. WEISSHAUS: Right.

THE COURT: Okay?

MR. WEISSHAUS: All right.

THE COURT: All right. So, the next thing that's going to happen is that, Mr. Weisshaus, you'll notice the date of deposition for Mr. Fabiano.

MR. WEISSHAUS: Well, in the second amended notice, the second notice of deposition, I address the deposition demand directly to him. The question was left is the Port Authority still insisting that I got to serve him or he's produced voluntary. That makes a difference, so the Court

could know what portions of the motion to compel is moot.

THE COURT: What we're going to do now is you're going to depose Mr. Fabiano. And after that, we're going to have another conference call similar to this one. At that time, what I believe is going to happen is if you still have questions with respect to the documents, then you're going to have to state them with specificity, your questions, and you're going to submit them to me first. And then we'll decide what you can and what you can't serve on the Port Authority. I'll also decide if you want to depose somebody else, who it is, and whether or not you can do it.

But let's get Mr. Fabiano out of the way first.

So, let's see. Ms. Miller, are you going to make him available voluntarily?

MS. MILLER: Yes, your Honor.

THE COURT: You two work out the date. I intend to make myself available that day. So if there are objections, we can decide them that day. Okay?

MS. MILLER: Yes, your Honor. I just want to give the Court some indication of my availability. I'm booked solid, literally I have no days left, until March 23. So we're looking at March 23, 25, 26, 29, 30, and then I have a deposition on the 31st.

THE COURT: Okay. Do you have those dates, Mr. Weisshaus?

MR. WEISSHAUS: The week before Passover, it is a hectic week for my family and me. But I would appreciate if we can do it in April.

THE COURT: You two work out the dates in April if you would, please, and let me know.

MR. WEISSHAUS: We have two things to do: Get a definition of the term and a date for deposition.

THE COURT: Yes.

MR. WEISSHAUS: And one more thing. I wanted to get the Court's attention because I'm not sure how it's coming into play. But from reading the transcript before of Mr. Fabiano's deposition in *AAA*, he says that his role in the Port Authority, I mean in the time of the toll hikes, was only as an analyzer of what goes into the overall capital projects. So, I don't know of how much the Port Authority expects me to rely on him or not. I mean, in terms of he's capable of answering, that's why I asked the Port Authority and that was my last letter to the Court is, I would appreciate a list from the Port Authority to what I put in the second deposition notice demands Mr. Fabiano is a designated witness. That would I think eliminate a lot of the friction that may occur, by me asking questions that he may not be capable of answering.

THE COURT: If he can't answer them, he can't answer them. You will note it, and we'll decide whether or not you get to depose somebody else.

MR. WEISSHAUS: Okay. And also, there is another issue in the cross motions pending. There is also the other witnesses that put in affidavits is Karen Eastman and Mark Muriello I believe. Those two witnesses. The Court would hold off now or should we consider them? Or I don't know. Where does the Court currently stand on that because those are --

THE COURT: After the Fabiano deposition, we'll see. If you think you're entitled to more documents, we'll see if you think you are entitled to more depositions.

MR. WEISSHAUS: I appreciate it.

THE COURT: Okay?

MR. WEISSHAUS: Yes.

THE COURT: All right. And then as I say, you guys will work out the Fabiano deposition. Any other documents that you plan on serving on the Port Authority prior to our next conversation, serve them first on the Court.

MR. WEISSHAUS: Okay.

THE COURT: All right.

MR. WEISSHAUS: Okay.

THE COURT: Thank you all very much. Court is adjourned.

MS. MILLER: Thank you, your Honor.

(Adjourned)