UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------------------------------x

YOEL WEISSHAUS,

                              Plaintiff,

                                                          11 Civ. 6616 (RKE)

        -against-

                                                          **<u>ORDER</u>**

PORT AUTHORITY OF NEW YORK
AND NEW JERSEY,

                              Defendant.

------------------------------------------------------------------------x

## <u>ORDER</u>

On June 17, 2021, the Court set a schedule for remaining discovery and summary judgment briefing in this case. *See* ECF No. 122. On July 30, 2021, Plaintiff filed a letter-motion with an attached document demand for a number of spreadsheets to be prepared based on "raw data of the SAP Accounting software, a system used by the Port Authority to manage their financial statements and accounting records." *See* ECF Nos. 123, 123-2. On August 6, 2021, the Port Authority filed a response in opposition. *See* ECF No. 124. Plaintiff then filed a reply and an amended set of document demands on August 8, 2021. *See* ECF Nos. 125, 125-1. The Port Authority responded on September 7, 2021, and Plaintiff filed an additional reply on September 9, 2021. *See* ECF Nos. 127, 130.

Plaintiff's sole remaining claim is that "the setting of tolls to fund projects unconnected to the Port Authority's '[interstate] transportation system' ('ITN')[1]" violates the Dormant

---

[1]        As the Court previously stated,

The Port Authority is a bi-state governmental agency created by compact between

Commerce Clause. *Weisshaus v. Port Auth. of N.Y. & N.J.*, 814 F. App'x 643, 645 (2d Cir. 2020), *cert. denied*, 141 S. Ct. 1061 (2021). Apparently, Plaintiff seeks this "raw data" so that he might prove this sole remaining claim by tracing the collection of toll revenue from the toll box to its expenditures on specific Port Authority projects, including projects unrelated to the ITN.

As a threshold matter, Plaintiff is limited to the issue of whether *toll* revenue (and not any other type of revenue) was misused. Magistrate Judge Pitman summarized the comparison of toll revenue to expenditures warranted by a similar claim in a discovery ruling in *Automobile Club of New York, Inc. v. Port Authority of New York & New Jersey*:

> [T]he relevant inquiry is *income from the tolls, 2007 forward, and the actual expenses of the ITN and the projected expenses of the ITN*. If the toll revenue is equal to or less than the ITN expenses and by ITN expenses I'm referring to all the categories of expenses that [defendant's counsel] described—capital, operating, debt service—it really doesn't matter how the World Trade Center site development is being funded. If, on the other hand, the tolls exceed the ITN expenses, then maybe we have a different situation.

No. 11 CIV. 6746, 2012 WL 4791804, at *2 (S.D.N.Y. Oct. 9, 2012) (emphasis added). Here, Plaintiff's remaining claim alleges that toll revenue was misused "to fund projects unconnected to the [ITN]," and is thus not limited to the World Trade Center. *See Weisshaus*, 814 F. App'x at 645.

---

New York and New Jersey with consent of the United States Congress, and is responsible for construction, maintenance, operation, and control of all vehicular bridges and tunnels connecting New York and New Jersey, including the Bayonne Bridge, the Outer bridge Crossing, the Goethals Bridge, the George Washington Bridge, the Holland Tunnel, and the Lincoln Tunnel. . . . In addition, the Port Authority operates "the interstate Port Authority Trans–Hudson ("PATH") Rail System; three bus terminals (the Port Authority Bus Terminal, George Washington Bridge Bus Station, and Journal Square Transportation Center); two truck terminals; seven marine terminals; four airports; two heliports; and the sixteen-acre World Trade Center site." . . . *The Tunnels, Bridges & Terminals Line Department, the PATH Rail System Line Department, and the ferries program collectively comprise the "Interstate Transportation Network" (the "ITN")*.

*Weisshaus v. Port Auth. of N.Y. & N.J.*, No. 11 CIV. 06616 (RKE), 2018 WL 6619736, at *1 (S.D.N.Y. Dec. 18, 2018), *aff'd in part, vacated in part, remanded*, 814 F. App'x 643 (2d Cir. 2020) (emphasis added) (internal citations omitted).

Nonetheless, the same principle expressed by Judge Pitman applies here: the "relevant inquiry" is whether toll revenue from ITN facilities remains after accounting for ITN expenditures.

The District Court applied this principle when it dismissed the plaintiffs' claims on summary judgment in a later opinion in the *Automobile Club* litigation, *AAA Northeast v. Port Authority of New York & New Jersey*, finding that ITN revenue did not exceed ITN expenditures. *See* 221 F. Supp. 3d 374, 387 (S.D.N.Y. 2016) (emphasis added) ("AAA has not pointed to any record evidence that calls into question the accuracy of the Port Authority's financials, or otherwise undermines the evidence demonstrating that *the revenue collected from the toll and fare increases is insufficient to fund the ITN's operations, capital needs, and debt service*, nor that any such revenue was allocated to the reconstruction of the World Trade Center site.").

The reason Judge Pitman and the District Court framed the "relevant inquiry" as they did is because the Port Authority pools its revenues in common funds. *See, e.g.*, N.J. STAT. ANN. 32:1-142 (West 2021). The General Reserve Fund and the Consolidated Bond Reserve Fund (collectively, the "Funds") are maintained for making expenditures (including operating expenses, debt service payments, and capital expenditures) for the entire agency, including non-ITN facilities. The Port Authority's designated witness Michael Fabiano testified at his May 3, 2021 deposition that its "revenues are pooled for financial expense purposes and revenue purposes, and flow to get down . . . into the Consolidated Bond Reserve Fund and the General Reserve Fund." ECF No. 123-1 at 154:13-19 ("Fabiano Dep."). Mr. Fabiano later clarified that after payments from the General Reserve Fund have been made, the "balance" enters the Consolidated Bond Reserve Fund. Fabiano Dep. at 202:8-16. He also distinguished between the pooled revenues, which are not identified by facility, and direct revenues, earmarked by facility before they enter the Funds. Nonetheless, once they enter the pooled Funds, toll revenues lose their identity and

cannot be distinguished from revenue from other sources. *See* Fabiano Dep. at 152:20-25, 153:1-15 ("[O]ur funds go into one gigantic pot."). Thus, according to Mr. Fabiano, while the amounts spent on ITN projects can be identified, the source of the spent funds cannot be identified.

Put another way, the ITN is not a bookkeeping category[2] on the Port Authority's books and records. Rather, it is a judicial construct. Revenue, including toll revenue, is pooled. Thus, while it is possible to determine the amount of tolls collected at each ITN facility, once the revenues are pooled, it is not possible to follow their use.

In *Automobile Club*, the plaintiffs moved to expand the scope of discovery to "include 'ITN transfers in and ITN transfers out' of the Reserve Funds" because prior discovery[3] showed "that the Port Authority 'has no documents concerning any segregation or accounting of the ITN revenues that have been deposited into the [Reserve Funds].'" *Auto. Club*, 2012 WL 4791804, at *3 (record citation omitted). This motion was ultimately denied because the plaintiffs had failed to support it "with references to specific responses, demonstrating the inadequacy of the current parameters of discovery." *Id.* at *6. Rather, it was "comprised mainly of broad, conceptual arguments relating to the current scope of discovery." *Id.*

The "pooling" or lack of "segregation" of ITN revenues in the Port Authority's Funds can be likened to a bushel of wheat being shipped by a farmer to a grain elevator and mixed with wheat

---

[2]    It is true that attachments to the Port Authority's financials, *i.e.*, Schedule E (Operations) and Schedule F (Capital Program Components), do refer to the "Interstate Transportation Network," listing out the facilities *and* providing a total number for operating revenues (though not tolls specifically) and operating expenses. The consolidated financial statements showing the Port Authority's cash flows, as well as Schedule C (Reserve Funds), *i.e.*, the financials themselves, mention neither the ITN as a whole, nor its individual facilities. Apparently these schedules, constructed from the financials themselves, are for convenience.

[3]    All of the non-privileged documents provided to the plaintiffs by way of discovery in *AAA Northeast* have been provided to Plaintiff in this case, amounting to thousands of pages in electronic form. *See* ECF No. 95.

from other farmers before being shipped to a flour mill. It would simply not be possible to trace that bushel of wheat to a loaf of bread, because the bushel no longer exists as a bushel. The wheat is fungible and so is the toll revenue fungible once it enters the pool.

Accordingly, the comparison described by Judge Pitman in *Automobile Club* is warranted here. By comparing total tolls collected at the ITN facilities to the total expenditures made on behalf of ITN facilities, Plaintiff can determine whether a surplus exists when ITN tolls are subtracted from ITN expenditures. The relevant scope of discovery is therefore limited to what would enable Plaintiff to conduct such a comparison.

For the following reasons, the Court grants, in part, and denies in part, Plaintiff's amended document demands, ECF Nos. 123-2, 125-1. The Court further orders that the deadline by which the parties shall submit a joint definition of "tolls" shall be moved up to October 18, 2021, to assist in the resolution of future disputes.

Plaintiff's Demand #1[4] is granted in part. The Port Authority's designated Rule 30(b)(6) witness, Michael Fabiano, testified at his deposition of May 3, 2021, that "gross operating revenues" reported by ITN facility in the Port Authority's consolidated financial statements included other types of revenue than tolls. Therefore, the Court directs the Port Authority to provide Mr. Weisshaus with information showing the gross toll amounts per fiscal year (*i.e.*, not revenue from all sources), collected per ITN facility, for the relevant years underlying the Port Authority's financial statements. *See* Fabiano Dep. at 95:18-22 ("[Gross operating revenues include] [t]olls, fares, consumer tenant revenues, whatever, from -- as we mentioned at the bus

---

[4]     Plaintiff's first demand requests "[a] spreadsheet showing the gross operating revenues by the day for each facility, the total amount generated for that day, and its date. The relevant raw data would be from January 1, 2007 to December 31, 2020 (The spreadsheet may be divided by year or month)." ECF No. 125-1 at 6.

terminals, and things like that.").

The Court reserves judgment on Plaintiff's Demands #2 and #5,[5] pending clarification by the Port Authority. As a general matter, Plaintiff has failed to demonstrate why the discovery already provided to him is insufficient for making a comparison between toll revenue from the ITN with gross operating and capital expenses for the ITN, which would permit him to prove whether the toll revenue was more than the expenditures. Plaintiff is already in possession of the Port Authority's financial statements showing gross operating expenses (by ITN facility), and capital expenditures (by ITN facility). It bears noting that, to the extent that Plaintiff believes the Port Authority's financial statements are unusable because of the inclusion of a column for "depreciation/amortization," he has failed to show that this column affects the expense amounts separately reported therein.

Pursuant to this order the Port Authority will supply him with relevant toll information. Two additional clarifications are required.

Concerning operating expenses, footnote (a) in Schedule E of the Port Authority's consolidated financial statements states that "[a]mounts include all direct operating expenses and

---

[5]        Plaintiff's second and fifth demands are as follows:

2. A spreadsheet showing the gross operating expenses by the day for each facility, the total amount of expenses that were incurred for that day, and its date. The relevant raw data would be from January 1, 2007 to December 31, 2020 (The spreadsheet may be divided by year or month).

. . .

5. A spreadsheet of the capital investments showing the debit(s) and credit(s) by the day for each facility, the amount incurred for that day, and its date. The relevant raw data would be from January 1, 2007 to December 31, 2020 (The spreadsheet may be divided by year or month).

ECF No. 125-1 at 6-7.

*allocated expenses*." *See, e.g.*, ECF No. 65-14 at 91 (emphasis added). If it is the case that these "allocated expenses" contain expenses allocated to non-ITN facilities, the Port Authority shall provide information showing the gross amounts for operating expenses for each ITN facility, excluding expenses allocated to non-ITN facilities.

As to capital expenditures, from 2014 onward, the Port Authority has included footnote (a) in Schedule F of its financials, stating that "Capital Investments" include "Contributed Capital Amounts and write-offs related to Capital Construction." *See, e.g.*, ECF No. 65-17 at 113. Since Plaintiff seeks to determine how toll revenue was spent, the Court directs the Port Authority to submit a written explanation defining "write-off," and provide an example thereof, so that the Court can determine whether a "write-off" constitutes an expenditure of the Port Authority's revenues.

Plaintiff's Demands #3 and #4[6] are granted in part. Both *Automobile Club* and *AAA Northeast* recognized that certain debt service payments (relating to bonds issued by the Port Authority) were related to the ITN. Mr. Fabiano testified that it was possible to distinguish among bonds issued for ITN projects and those issued for non-ITN projects, on the basis of whether the bond was a "governmental" bond. *See* Fabiano Dep. at 117:11-16 ("Bonds issued for the ITN are,

---

[6]        Plaintiff's third and fourth demands are as follows:

3. A spreadsheet showing the bond expenses showing the debit(s) and credit(s) for each facility, the amount incurred for that day, and its date. The relevant raw data would be from January 1, 2007 to December 31, 2020 (The spreadsheet may be divided by year or month).

4. A spreadsheet showing the bonds issued for each facility, the amount the incurred for that day, and its date. The relevant raw data would be from January 1, 2007 to December 31, 2020 (The spreadsheet may be divided by year or month).

ECF No. 125-1 at 7.

from our perspective, and the way the bonds are issued, they're called governmental bonds. So they're not subject to the alternative minimum tax. Airport, marine, terminal bonds and such are considered alternative minimum tax bonds."). Because the Port Authority does not separately report the different types of bonds in its financial statements, but is apparently capable of distinguishing among bonds (and debt service payments) in its internal records, the Court directs the Port Authority to provide Mr. Weisshaus with information showing the total amount per fiscal year of debt service paid on governmental (ITN) bonds.

Finally, Plaintiff's Demands #6-#9[7] are denied. Plaintiff's requests for information about "debits" and "credits" to the Port Authority's pooled Funds are overbroad and vague. Plaintiff's request seems to ignore the evidence on the record that it is not possible to trace particular sums,

---

[7]        Plaintiff's sixth through ninth demands are as follows:

6. A spreadsheet showing the debit(s) and credit(s) to the General Reserve Fund by the day for each facility, the amount incurred for that day, and the date for the contribution. The relevant raw data would be from January 1, 2007 to December 31, 2020 (The spreadsheet may be divided by year or month).

7. A spreadsheet showing the contributions made to the General Reserve Fund by the day/month/year for each facility, the amount contributed for that day/month/year, and the date for the contribution. The relevant raw data would be from January 1, 2007 to December 31, 2020 (The spreadsheet may be divided by year or month).

8. A spreadsheet showing the debit(s) and credit(s) made to the Consolidated Bond Reserve Fund by the day/month/year for each facility, the amount incurred for that day/month/year, and the date for the transaction. The relevant raw data would be from January 1, 2007 to December 31, 2020 (The spreadsheet may be divided by year or month).

9. A spreadsheet showing the expenses to the Consolidated Bond Reserve Fund made by the day for each facility, the expenditure drawn for that day, and the date for the expenditures. The relevant raw data would be from January 1, 2007 to December 31, 2020 (The spreadsheet may be divided by year or month).

ECF No. 125-1 at 7-8.

collected as toll revenue, through their entry into the Funds, to their eventual expenditure on a particular project or projects, no matter how granular the disclosed information. He has further failed to explain how this information—if it even exists—could assist him in discovering whether the toll revenue is sufficient to create a surplus. The toll revenues are earmarked by ITN facility before they enter the Funds, and ITN expenditures (operating, capital, and debt service) are similarly identifiable. Accordingly, the scope of relevant discovery on Plaintiff's sole remaining claim is limited to documents permitting Plaintiff to make a comparison of toll revenue to operating, capital, and debt service expenditures associated with ITN facilities.

Upon consideration of all papers and proceedings had herein, it is hereby

**ORDERED** that Plaintiff's document demands, ECF Nos. 123-2, 125-1, are granted in part and denied in part, and it is further

**ORDERED** that the Port Authority provide the following data to Plaintiff by October 18, 2021, in spreadsheet (.pdf or .xlsx) form:

1. Gross amounts for toll revenues recorded by fiscal year from 2007-2020 for each ITN facility as defined herein, and

2. Gross amounts for debt service payments recorded by fiscal year from 2007-2020 for all governmental (ITN) bonds, and it is further

**ORDERED** that, by October 4, 2021, the Port Authority shall file a written explanation of whether it is the case that the "allocated expenses" mentioned in the Port Authority's consolidated financial statements as part of the gross operating expenses of the ITN contain expenses allocated to non-ITN facilities; and it is further

**ORDERED** that, if it is the case that these "allocated expenses" contain expenses allocated to non-ITN facilities, the Port Authority shall provide information showing gross amounts isolating

operating expenses for each ITN facility by fiscal year from 2007-2020, in spreadsheet (.pdf or .xlsx) form by October 18, 2021; and it is further

**ORDERED** that, by October 4, 2021, the Port Authority shall file a written explanation of the term "write-off" as it has been included in capital investments in Schedule F of its consolidated financial statements since 2014, and provide an example thereof; and it is further

**ORDERED** that, by October 18, 2021, the parties shall submit a joint definition of "tolls" for reference in future proceedings going forward.

**SO ORDERED**.

    /s/ Richard K. Eaton    
Richard K. Eaton
U.S.D.J., by Designation

Dated: September 17, 2021
       New York, New York