

600 BROADWAY • SUITE A • LYNBROOK • NEW YORK • 11563
516.569.9333 • HEIDI@HFMVALUATION.COM

November 30, 2023

The Honorable Richard K. Eaton
United State District Court Judge
Southern District of New York
500 Pearl Street - New York NY, 10007

    Re: <u>Weisshaus v. Port Authority, et al</u>. 11-cv-6616 (RKE)

To the Honorable Court:

By order dated November 8, 2023, the Court asked us to provide with specificity the reasons why certain records are necessary and relevant to the rebuttal expert report that we offered on July 31, 2023, in support of the claim by Yoel Weisshaus, the plaintiff.

These documents, as we outlined in our opinion, ask for (1) access to the SAP system to maintain the General Ledger of the Port Authority of all its expenses and revenues, (2) General Journal Entries that the accountants made to the raw data of the information reported in the annual reports from 2007 through 2021, (3) work papers for allocations of footnote (a) and (b) for Schedule E in the annual reports, work papers for allocations of footnote (a) and (b) for Schedule F in the annual reports, and (4) the work papers for allocating debt services.

The aforementioned documents were a summary outline of what is necessary to complete the expert rebuttal report. In compliance with the Court's order, we will explain in greater detail the type of records needed. However, we must first describe the ethical duties and accounting principles that would guide an expert report.

We were retained by plaintiff to review and examine an affidavit provided by Elizabeth McCarthy ("affidavit"), the Chief Financial Officer for the Port Authority of New York & New Jersey ("Port Authority"), dated April 11, 2022, and to issue an expert rebuttal report as to whether the Interstate Transportation Network ("ITN") sustained any economic losses, as propounded in the cash flow analysis attached as Exhibit A to the affidavit.

This type of assignment in a rebuttal report calls for the rebuttal expert to first review the financial data presented by the parties, look for the practical scenario to understand the real picture. Only afterwards can the rebuttal expert offer a review and critique of an expert opinion. A rebuttal expert should not offer a rebuttal to an opinion without an examination of all the data.

With this in mind, the assignment looks to determine whether the ITN by itself operates on a deficit or subsidizes the other facilities (non-ITN) facilities. The first step for this analysis requires looking at what *is* the reality of the ITN and non-ITN finances.

The Port Authority is a municipal corporation and political subdivision of the states of New York and New Jersey, to coordinate transportation, ports, and aviation within both states centered on

New York Harbor around New York City. The facilities of the Port Authority are divided between bridges and tunnels (also referred to as ITN), aviation (AVI), commercial ports (PC), local developments (EWD) and real estate (WTC).

The deposition transcript of Ms. McCarthy states that the flow of funds of the Port Authority starts with the operating revenues paying for the operating expenses first by groups of facilities. After that all other revenues are pooled to pay for the debt services. After the debt service of the whole organization is met, there are Special Obligations of the Port Authority subordinate to debt service, which is payment for the Goethals Bridge. The General Reserve Fund is topped up, to the extent it is below the required 10 percent of the outstanding bond obligations. The money is then deposited in the Consolidated Bond Reserve Fund, where it is available for any other obligations of the Port Authority, and then can be used for other permitted purposes, which includes investment in facilities. (McCarthy p. 10).

Ms. McCarthy testified that the "General Ledger" tracks all transactions of the Port Authority, and all financial statements are drawn from the General Ledger. (McCarthy p. 23). SAP is the accounting software used by the Port Authority to maintain the General Ledger and the flow of funds. (McCarthy p. 213).

These answers by Ms. McCarthy informed us of the type of records necessary for the rebuttal expert report. There are several reasons that influenced our request for access to the General Ledger and the records supporting the financial statements.

First, Ms. McCarthy in her affidavit, deposition testimony, and later in her expert reply consistently directed the parties' contentions to the General Ledger. This requires access to the information that Ms. McCarthy is referring to. It is unethical for us to engage in opining on financial information without reviewing its data. This principle is guided by the rules of Association Institute of Certified Public Accountant (AICPA)[1], National Association of Certified Valuators and Analysts (NACVA)[2], and Association of Certified Fraud Examiners (ACFE).[3]

---

[1] Rule 2.100.001.01 of the Code of Conduct, "In the performance of any professional service, a member shall maintain objectivity and integrity, shall be free of conflicts of interest, and shall not knowingly misrepresent facts or subordinate his or her judgment to others."
http://pub.aicpa.org/codeofconduct/resourceseamlesslogin.aspx?prod=ethics&tdoc=et-cod&tptr=et-cod2.100.001

[2] Professional Standards, Rule II.A "A member shall remain objective, maintain professional integrity, shall not knowingly misrepresent facts, or subrogate judgment to others. The member must not act in a manner that is misleading or fraudulent."    http://web.nacva.com/TL-Website/PDF/NACVA_Professional_Standards_Incl_Review_Stnds_Effective_8-1-15_Final.pdf

[3] ACFE Code of Professional Ethics, Rule V. "An ACFE Member, in conducting examinations, will obtain evidence or other documentation to establish a reasonable basis for any opinion rendered." https://www.acfe.com/-/media/files/acfe/pdfs/acfe-code-of-ethics---2020-11-01.pdf

CFE Code of Professional Standards, Section IV.A.1 "The Certified Fraud Examiner's objective shall be to obtain evidence and information that is complete, reliable and relevant." Section V.B.1 "Certified Fraud Examiners' reports shall be based on evidence that is sufficient, reliable and relevant to support the facts, conclusions, opinions and/or recommendations related to the fraud examination. The report shall be confined to subject matter, principles and methodologies within the Member's area of knowledge, skill, experience, training or education."

Second, Ms. McCarthy and the parties made several statements that the financial statements of the annual reports are insufficient to analyze whether the ITN operates on a deficit. It is important to be informed and understand if there are any differences between the General Ledger and the financial statements to inform the Court of them.

Third, as explained above, the professional must first examine the financial figures that are presented by the parties, to look for the practical scenario to understand what *is* realistic. That is, as cited above, the opinion must be objective and unbiased, requiring understanding what *is* the real picture, as opposed to arguments advanced by the parties.

Fourth, we have experience analyzing financial statements and audited financial reports, involving SAP and other accounting software packages. In this particular case, looking at SAP might involve looking at individual streams of revenues and expenses for each year, the ultimate goal would be to arrive at a yearly figure of the ITN revenues or tolls, expenses and overhead.

It is important to emphasize that as independent professionals, the undersigned do not have advanced knowledge of where the records sought will lead and what particular facts will be conclusive of whether the ITN subsidizes non-ITN facilities. Rather, the information sought is basic and elementary and is the type of information that professionals routinely ask when examining the appropriation or misappropriation of corporate funds. Nonetheless, in compliance with the Court's directive to "describe, specifically, just how any of the information [requested] is relevant to the central inquiry underlying Plaintiff's sole remaining claim in this case" (ECF 208) we will provide the following analysis of how general ledger, and work papers with the journal entries accountants made to various schedules in the financial statements could alter the analysis of the rebuttal expert report.

## *Analysis*

**The need for the General Ledger together with the General Journal Entries that the accountants made to the raw data of the information reported in the annual reports from 2007 through 2021.**

Following the flow of funds described by Ms. McCarthy, our rebuttal report began with looking at the revenues. The Court held that for purposes of the dormant Commerce Clause the inquiry looks to how the toll revenues are utilized. (ECF 78 p. 20).

The record shows that the parties quarreled to define the meaning of "tolls." The Court held: "that 'tolls' shall be defined as including fees which are imposed by the Port Authority's Tunnels Bridges and Terminals Department for use by the general public of its bridges and tunnels, along with violation penalties and fees that are included in the operating revenues reported in the Port Authority's annual financial statements." (ECF 140).

Subsequently, the Port Authority informed the Court that the ITN revenues listed in Schedules E include revenues that are outside the Court's definition of tolls. (ECF 143 p. 2). This implies that

---

https://www.acfe.com/-/media/files/acfe/pdfs/acfe-rules-and-regulations/cfe-code-of-professional-standards---2020-11-01.pdf

Yoel Weisshaus
November 30, 2023

Page 4

the amounts of revenues stated in the Schedules E of the annual reports are not useful for this case. The Court acknowledged this distinction and "ordered the Port Authority to isolate ITN toll revenues (as opposed to other kinds of operating revenue), to be compared with operating expenses, capital expenditures, and debt service payments for the entire ITN." (ECF 145 p. 5). The Court directed the Port Authority to "submit by letter its confirmation that the toll revenues spreadsheet, ECF No. 136-1" is limited to tolls. Thereafter, the Comptroller of the Port Authority confirmed that ECF 136-1 is isolated to revenues of tolls as defined by the Court. (ECF 146).

In the affidavit, the expert report, Ms. McCarthy cited figures on the revenues reported in Schedules E of the annual reports; not ECF 136-1. The differences between Schedules E and ECF 136-1 raise the question of whether the amounts in Schedules E or ECF 136-1 are the useful figures of revenues for this case. There can only be one relevant figure, the Schedules E or ECF 136-1, but not both.

For the purpose of addressing the expert opinion provided by Ms. McCarthy, the rebuttal expert report referred to the revenues and expenses of Schedules E. Given the Court's directive in defining tolls, the rebuttal expert opinion only looked to the revenues column in Schedules E and did not look at the grants and other contributions column that the Port Authority received each year.

Yet, Ms. McCarthy came along with a reply criticizing that we should have looked at grants and other income, such as contributions in aid of construction, subsidizing the expenditures of the ITN. (ECF 201 p. 6). This critique by Ms. McCarthy supports our request for additional records.

First, if the Court expects the parties to focus on revenues that are isolated to the definition of tolls, then the undersigned would need to have access to General Ledger in order to properly figure out what revenues and expenses must be included or excluded from the expert calculation.

Second, if we are to isolate tolls from all revenues, this would require reviewing the General Ledger. The purpose would be to determine what revenues are properly excluded from the definition of tolls. Moreover, the General Journal Entries that the accountants made to the raw data of the information reported in the annual reports from 2007 through 2021 would show what revenues were included or excluded in the revenues section of the annual reports. This would allow the undersigned to offer an analysis of what part of the revenues are consistent with how the Court defined tolls.

Third, the annual reports do not distinguish between the grants or contributions of the ITN to allow us to determine what should be categorized as part of revenues or capital investments. For example, there are grants that might be specifically designated for capital investments (*i.e.,* a grant to install solar panels as a green initiative), there might be grants and contributions that are specifically provided to subsidize an ongoing expense (*i.e.,* a grant by Homeland Security providing for x-amount of police as security at the George Washington Bridge). There also might be specific contributions that may fall within the definition of tolls, (*i.e.,* a contribution from a cellphone provider for streaming cellphones services through the tunnels), a contribution that comes from a fee imposed by the Port Authority's Tunnels Bridges and Terminals Department might be considered as related to a service of use by the general public. Then there are contributions of the ITN that may fall within the capital investments or as an offset to debt services

(*i.e.*, a contribution by the State of New Jersey towards the rehabilitation of the Pulaski Skyway (ECF 95-2).

Rather than trying to guess work what constitutes revenues, we followed the same source of revenue provided by Ms. McCarthy, the revenue amounts listed in the Schedules E of the annual reports. Yet, Ms. McCarthy invites us in her reply to look at grants and other income subsidizing the expenditure of the ITN. Meanwhile, although the grants and other contributions are distinguished in Schedules E from revenues, they are not distinguished between the categories of revenue and capital subsidies. Thus, the question persists, requiring access to the General Ledger to distinguish which grants and other contributions are to be paired with revenues or as a subsidy to capital contributions.

There are also other considerations that might affect our analysis to the rebuttal report. Mr. Fabiano in describing the funding of "capital investments" represented that "The Port Authority does not receive tax revenue, making its toll and fare structure the primary means of funding the region's critical ITN." (ECF 39 ¶ 2). In the reply to our rebuttal report, Ms. McCarthy criticizes that "Ms. Muckler's analysis excludes other sources that fund capital expenditures (including operating grants and contributions and grants in aid in construction) …" This raises the point of whether the tolls are the primary means of funding capital investments or whether these investments are subsidized by grants and contributions. The inconsistencies between what were initially represented to the Court in pre-discovery filings as "factual" and what came out after the close of discovery leaves us with no other conclusion that it is not possible to rely on the representations of the parties, without looking at the General Ledger together with the General Journal Entries that the accountants made to the raw data of the information used to prepare the annual reports from 2007 through 2021.

**The need for the Journal Entries that the accountants made to the raw data of the information reported in the annual reports from 2007 through 2021 and the work papers for allocations of footnote (a) and (b) for Schedules E in the annual reports.**

When it comes to the expenses, there is information that is missing that can alter the figures necessary for deciding whether the ITN subsidies non-ITN expenses. Ms. McCarthy cited in the affidavit and her reply the same operating expenses found in the financial statements of the annual reports. The expenses section in Schedule E of the 2014 financial statements show two footnotes, "(a) Amounts include all direct operating expenses and allocated expenses. (b) Amounts include allocated net interest expense (interest expense less financial income), 4 WTC associated payments, pass-through grant program payments, grants and gain or loss generated by the disposition of assets, if any."

The footnotes in Schedules E raises a number of questions that can only be resolved by looking at the Journal Entries that the accountants made to the raw data of the information reported in the annual reports from 2007 through 2021 and the work papers for allocations of footnote (a) and (b) for Schedule E in the annual reports.

First question, what method of "allocation" does the Port Authority use for its annual reports to allocate expenses? This is necessary to assess whether the allocation conducted by Ms. McCarthy is consistent or inconsistent with the actual practices of the Port Authority.

Second, as shown in Figures 1-3 of our rebuttal report (ECF 194-1), the ITN revenues have historically exceeded the expenses, whereas the WTC the revenues were far below the expenses between 2007-2021. This raises the question what expenses of the ITN might subsidize non-ITN facilities at the expenses level. For instance, there are many expenses of the Port Authority that are at the corporate level and are allocated between the various departments (*i.e.*, overhead of administration, salaries of personnel, and shared services between the various departments). Since the WTC did not generate sufficient revenues between 2007 and 2021, a fact acknowledged by Ms. McCarthy in her Reply Affidavit[4], the allocation of expenses at the expenses level implies that expenses that should have been allocated to the WTC were subsidized by other facilities including the ITN.

Third, since there is the contention of Ms. McCarthy to include grants and contributions as part of the revenues and capital investments of the ITN, there is the question of what grants and contributions are pass-through grants, and gain or loss generated by the disposition of assets, as referred to in footnote (b) of Schedule E. For instance, a pass-through grant might affect the expenses analysis of the ITN. Similarly, a grant for replacing a building that would otherwise not be replaced, such capital investment might need to be excluded from the capital investments paid or funded with cash generated from tolls.

**The Journal Entries that the accountants made to the raw data of the information reported in the annual reports from 2007 through 2021 and the work papers for allocations of footnote (a) and (b) for Schedule F in the annual reports.**

The capital investment section in Schedule F of the 2014 financial statements show two footnotes, "(a) Capital investment includes contributed capital amounts and write-offs related to capital construction. (b) Facility capital investment amounts include projects that were funded with Passenger Facility Charges."

There are two ways the Journal Entries that the accountants made to the raw data of the information reported in the annual reports from 2007 through 2021 and the work papers for allocations of footnote (a) and (b) for Schedule F in the annual reports can change the analysis of the expert rebuttal report.

First, these records will inform us of the amounts of the write offs, if any, that affect the analysis of the finances of the ITN in relation to the definition of tolls. For instance, there are write offs that involve depreciation of the asset, while the asset is still in full operation. This asset, might need to be excluded in the allocation of debt services, as represented by Ms. McCarthy that debt services should be analyzed by looking at the amount invested in a facility,[5] not the actual amount paid for debt services. There are also write-offs that address total losses where the capital investment replaces an existing facility prior to paying off its preceding capital investment. Both

---

[4] "the World Trade Center, a business segment that was not operational for much of her analysis period" (ECF 201 p. 6).

[5] "the cost driver behind the amount of debt service it incurs is the amount of investment it is making in its infrastructure assets". (ECF 201 p. 2).

debts, the new and prior capital investments might need to be included in the cost driver of debt services.

Secondly, the records we are requesting will inform us of the exact amounts of money coming from the Passenger Facility Charges, also known as tolls, that paid for the capital investments. These records are necessary for the rebuttal expert report since the contentions between the parties' focuses on whether the capital investments of the ITN that are paid with cash (aka Passenger Facility Charges) create a deficit to the ITN.

**The General Ledger and the General Journal Entries that the accountants made to the raw data of the information reported in Schedules A of the annual reports from 2007 through 2021 and the work papers for allocating debt services.**

In her Reply Affidavit, Ms. McCarthy states that "While net revenues on a consolidated basis do provide the credit support for the bonds, they are not the driver behind the issuance of debt and the incurrence of debt service cost. Capital investment in the Port Authority's infrastructure assets is the cost driver, and therefore, the use of this methodology by the Port Authority is consistent with sound cost allocation principles." (ECF p. 3). Ms. McCarthy insists that "Schedule A actually tracks the changes in the reserves and includes total debt service and direct investment in facilities" to identify the figures of capital investments paid with cash. (ECF 201 p. 4).

In her deposition, Ms. McCarthy stated that Schedule A of the annual reports does not show a breakdown by facilities where capital investments are paid with cash. That information comes from the General Ledger. (Deposition p. 22).

In order to offer a professional opinion on Ms. McCarthy's calculation of debt services, we would need access to the data that informed the calculation. As shown above, it is unprofessional to offer an opinion without obtaining evidence or other documentation to establish a reasonable basis for any opinion rendered.

The General Ledger and the General Journal Entries that the accountants made to the raw data of the information reported in Schedules A of the annual reports from 2007 through 2021 and the work papers for allocating debt services fits several needs. First, there is the need to identify the capital investments paid in cash from tolls. Secondly, there is a need to identify the amount of cash derived from tolls to distinguish investments paid with grants and contributions. Thirdly, Ms. McCarthy represented in her deposition testimony that the debts, bond offerings, are made based on the entirety of the Port Authority and not be the needs of an individual facility or group of facilities.

There seems to be a difference of professional opinion between Ms. McCarthy and us over the calculation for debt services. Ms. McCarthy takes the view that the amount of debt invested in a facility is the cost driver of debt, and thus the cost of debt services should be analyzed from the point of view of the costs invested. We took the view that the yearly premiums paid for debt services is directly deducted from tolls, with the understanding that the premiums of debt services already absorb all the debts and all its related costs on a yearly payment plan.

The difference in professional opinion calls for reviewing how the Port Authority accounts for debt services. The data, of the General Ledger and the General Journal Entries that the accountants made to the raw data of the information reported in Schedules A of the annual reports from 2007 through 2021 and the work papers for allocating debt services, would tell us whether the position taken by Ms. McCarthy is consistent or inconsistent with standard business practice of the Port Authority. If for instance, the method of Ms. McCarthy's allocation of debt services is inconsistent with Port Authority standard business practices, the data would also tell us whether the inconsistency is relevant for determining whether the ITN operates on a deficit.

## Conclusion

Our original rebuttal expert opinion has provided examples of how the ITN subsidizes non-ITN expenses. There are records that the Port Authority has not yet disclosed that can reshape our rebuttal expert opinion and allow us to reach more definitive answers as to how the ITN subsidizes non-ITN facilities. In this analysis we offer the Court an overview describing the evidence and records needed to complete our rebuttal expert report. A rebuttal expert should have access to the same records and data by Ms. McCarthy that are to be rebutted.

It is respectfully submitted that granting (1) access to the SAP system reports of the General Ledger of the Port Authority of all its expenses, revenues, capital investments, debt services, grants, contributions, and any other expenses and revenues that ought to be included in the calculation of whether the ITN subsidies non-ITN facilities, (2) General Journal Entries that the accountants made to the raw data of the information reported in the annual reports from 2007 through 2021, (3) work papers for allocations of footnote (a) and (b) for Schedule E in the annual reports, work papers for allocations of footnote (a) and (b) for Schedule F in the annual reports, and (4) the work papers for allocating debt services. These records will ultimately allow the undersigned to complete its rebuttal expert report.

Respectfully submitted,

Heidi F. Muckler, CPA/ABV/CFF, CFE, CVA