UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

|  |  |  |
|---|---|---|
| YOEL WEISSHAUS, | : | |
| | : | |
| Plaintiff, | : | |
| | : | Before: Richard K. Eaton, Judge[*] |
| v. | : | |
| | : | Court No. 11 Civ. 06616 (RKE) |
| PORT AUTHORITY OF NEW YORK | : | |
| AND NEW JERSEY, | : | |
| | : | |
| Defendant. | : | |
| | : | |

---

**OPINION**

Eaton, Judge: Yoel Weisshaus ("Plaintiff" or "Weisshaus"), proceeding *pro se*, brought

this lawsuit to challenge the constitutionality of a 2011 increase in the toll that is charged for the

use of bridges and tunnels that span the Hudson River between New York and New Jersey. The

bridges and tunnels that were subject to the toll increase are part of the "interstate transportation

network," or "ITN," which is a network of "vehicular bridges and tunnels connecting New York

and New Jersey," including "[t]he Tunnels, Bridges & Terminals Line Department, the PATH Rail

System Line Department, and the ferries program." *Weisshaus v. Port Auth. of N.Y. & N.J.*, 2018

WL 6619736, at *1 (S.D.N.Y. Dec. 18, 2018), *aff'd in part, vacated in part*, *remanded*, 814 F.

App'x 643 (2d Cir. 2020).

After more than fourteen years of litigation, including two appeals,[1] Plaintiff's sole

remaining claim is that the Port Authority of New York and New Jersey ("Defendant" or the "Port

---

[*]    Richard K. Eaton, Judge of the United States Court of International Trade, sitting
by designation.

[1]    For clarity, the court adopts short form references for the various decisions in this
case. *Weisshaus v. Port Auth. of N.Y. & N.J.*, 2011 WL 13175959 (S.D.N.Y. Oct. 24, 2011)

Authority") violated the dormant Commerce Clause by "the setting of tolls to fund projects unconnected to the Port Authority's [ITN]." *See Weisshaus IV*, 814 F. App'x at 645 (affirming dismissal of Plaintiff's claims except for dormant Commerce Clause claim and remanding to permit discovery on that claim). In other words, Plaintiff claims that the toll increases are unconstitutional because ITN toll revenue was used to fund non-ITN projects.

There are two issues before the court.

The first is whether to grant summary judgment in favor of the Port Authority or in favor of Weisshaus. There are three motions for summary judgment before the court: the Port Authority's converted motion for summary judgment, and cross-motions for summary judgment filed by both parties. ECF Nos. 35, 152, 153.[2] After discovery ended, the parties filed supplemental papers in support of their respective motions. ECF Nos. 253, 254.

The second issue before the court is whether to grant Weisshaus's motion for leave to amend his complaint a second time. ECF No. 65. Weisshaus seeks to amend his complaint so that he can incorporate information that the Port Authority produced in discovery. ECF No. 65-1 ¶¶ 17-19. The Port Authority opposes the motion "because of undue delay, bad faith and futility."

---

("*Weisshaus I*"); *Weishauss v. Port Auth. of N.Y. & N.J.*, 497 F. App'x 102 (2d Cir. 2012) ("*Weisshaus II*"); *Weisshaus v. Port Auth. of N.Y. & N.J.*, 2018 WL 6619736 (S.D.N.Y. Dec. 18, 2018) ("*Weisshaus III*"); *Weisshaus v. Port Auth. of N.Y. & N.J.*, 814 F. App'x 643 (2d Cir. 2020) ("*Weisshaus IV*").

Additionally, for ease of reference, the court cites to docket entries using solely their associated Electronic Case Filing ("ECF") numbers.

[2]     Pursuant to the Second Circuit's decision in *Weisshaus IV*, the Port Authority's motion to dismiss was converted to a motion for summary judgment. ECF No. 82; *Weisshaus IV*, 814 F. App'x at 647 ("[T]he matter is remanded for the district court to convert the motion [to dismiss] to one for summary judgment."). The Port Authority later filed a separate motion for summary judgment based on expert testimony that was subsequently added to the record. ECF No. 153. Although styled as a cross-motion for summary judgment, Weisshaus's motion opposes summary judgment and seeks additional discovery. *See* ECF No. 152 at 1-2.

ECF No. 66 at 3. Weisshaus has asked the court to "[d]efer considering the motion" to amend, but the court sees no reason to do so. ECF No. 152 at 1.

For the following reasons, the court grants summary judgment in favor of the Port Authority and denies Weisshaus's motion for leave to file a second amended complaint.

## BACKGROUND

### I.    The Port Authority

"The Port Authority is a bi-state governmental agency created by compact between New York and New Jersey with consent of the United States Congress, and is responsible for construction, maintenance, operation, and control of all vehicular bridges and tunnels connecting New York and New Jersey." *See Weisshaus III*, 2018 WL 6619736, at *1 (citing N.Y. UNCONSOL. LAW § 6401 *et seq.* (McKinney 2018)); N.J. STAT. ANN. § 32:1-118 (West 2018)). The tunnels and bridges include the "Goethals Bridge, the George Washington Bridge, the Holland Tunnel, and the Lincoln Tunnel." *Id.* The Port Authority also "operates 'the interstate Port Authority Trans-Hudson ("PATH") Rail System; three bus terminals . . . ; two truck terminals; seven marine terminals; four airports; two heliports; and the sixteen-acre World Trade Center site.'" *Id.* (quoting *AAA Northeast v. Port Auth. of N.Y & N.J.*, 221 F. Supp. 3d 374, 376 (S.D.N.Y. 2016) ("*AAA Northeast*")).

"The Tunnels, Bridges & Terminals Line Department, the PATH Rail System Line Department, and the ferries program collectively comprise what has been termed the 'Interstate Transportation Network,'" or "ITN." *AAA Northeast*, 221 F. Supp. 3d at 376. First coined in 1989 by Judge Pollack, the ITN is a judicial construct which refers to those facilities in the Port Authority that share a "functional relationship" such that they make up the same "rate base" for

the purposes of tolls.[3] *See id.* at 376, 388-89; *see also Auto. Club of N.Y, Inc. v. Port Auth. of N.Y & N.J.*, 706 F. Supp. 264, 271 (S.D.N.Y. 1989) ("*Auto. Club I*"), *aff'd*, 887 F.2d 417 (2d Cir. 1989) ("*Auto. Club II*").

"On August 5, 2011, the Port Authority announced, in a press release, a proposal to increase the tolls on its tunnels and bridges." *Weisshaus III*, 2018 WL 6619736, at *2. In this case, "toll" or "tolls" means "fees which are imposed by the Port Authority's Tunnels Bridges and Terminals Department for use by the general public of its bridges and tunnels, along with violation penalties and fees that are included in the operating revenues reported in the Port Authority's annual financial statements." ECF No. 140 at 1-2.

The purpose of the toll increase was to "restore fiscal health to the agency" and to fund "[t]he $25.1 billion immediate 10-year capital plan . . . giving critical attention to safety, security and state-of-good-repair projects." *Weisshaus III*, 2018 WL 6619736, at *2 (quoting ECF No. 26-1). The immediate projects funded by the capital plan included:

- George Washington Bridge suspender ropes

- Lincoln Tunnel Helix rehabilitation

- Bayonne Bridge roadway raising

- New Goethals Bridge with both Port Authority and private investment

- PATH Car, signal, and station modernizations

- Airport runway and taxiway modernizations

---

[3]    Following Judge Pollack's decision, courts have referred to the ITN in slightly varying ways. *See, e.g.*, *AAA Northeast*, 221 F. Supp. 3d at 376 (defining ITN as the "Interstate Transportation Network"); *Weisshaus IV*, 814 F. App'x at 645 (defining ITN as the "Interdependent Transportation System"); *Auto Club. of N.Y., Inc. v. Port Auth. of N.Y. & N.J.*, 2014 WL 2518959, at *1 (S.D.N.Y. June 4, 2014) (defining ITN as the "Integrated Transportation Network"). In all of these instances, the ITN refers to the same thing.

- Security enhancements at all facilities

- Port infrastructure improvements to rail and roads in the port

- Completion of the World Trade Center

*Id.* (quoting ECF No. 26-1). The toll increase—approved on August 19, 2011, and effective on September 18, 2011—included a "$1.50 increase for all users, and an additional $2 penalty for users paying with cash . . . . From December 2012 through December 2015, the tolls increased an additional $0.75 each year. In addition, fares on the PATH train increased $0.25 per year from 2011 to 2014." *Id.* (citing ECF No. 26-1).[4]

## II.    Procedural History

On September 19, 2011, Weisshaus filed his original complaint against the Port Authority, challenging the constitutionality of the Port Authority's 2011 toll increase. *See generally* ECF No. 2. On October 24, 2011, the Court[5] dismissed the complaint *sua sponte*. *See Weisshaus I*, 2011 WL 13175959, at *1. On December 8, 2011, the Court denied Plaintiff's motion for reconsideration. ECF No. 9.

Plaintiff appealed the dismissal, and, on September 20, 2012, the Second Circuit affirmed in part and remanded. *Weishauss II*, 497 F. App'x at 102. The *Weisshaus II* decision affirmed the dismissal of Plaintiff's right to travel claims and remanded for this Court to "determine in the first instance whether Weisshaus has adequately pleaded [a dormant Commerce Clause claim] or

---

[4]    The toll rates were adjusted again in September 2019, increasing some rates and eliminating certain discounts. ECF No. 152-8 at 97-98.

[5]    This case was first assigned to Judge Deborah A. Batts. On October 24, 2011, the case was reassigned to Judge Loretta A. Preska. On June 10, 2013, following remand, this case was reassigned to Judge George B. Daniels until June 19, 2013, when the case was reassigned to the undersigned judge.

Court No. 11 Civ. 06616                                                           Page 6

should be granted leave to amend the claim." *Id.* at 105. The Second Circuit also indicated that

"the district court may, in its discretion, consider staying the action pending a decision in [*AAA*

*Northeast*]." *Id.*

Following the Second Circuit's remand order, the case was reopened on February 15, 2013.

ECF No. 15. On August 21, 2013, Plaintiff filed a letter with the court asking for leave to file an

amended complaint in accordance with the Second Circuit's decision. *See* ECF No. 19. The court

granted Plaintiff's request, and Plaintiff filed his Amended Complaint on December 20, 2013. *See*

ECF No. 23; ECF No. 26.

Subsequently, the Port Authority filed a motion to dismiss, which included an application

to stay proceedings pending the decision in *AAA Northeast*, because of the substantial similarities

between the cases.[6] ECF No. 35 at 1. On June 8, 2015, the court stayed the case pending the

resolution of *AAA Northeast*. ECF No. 56.

On November 18, 2016, the *AAA Northeast* Court granted the Port Authority's motion for

summary judgment. There, the Court determined that

> AAA has not pointed to any record evidence that calls into question the accuracy
> of the Port Authority's financials, or otherwise undermines the evidence
> demonstrating that the revenue collected from the toll and fare increases is
> insufficient to fund the ITN's operations, capital needs, and debt service, nor that
> any such revenue was allocated to the reconstruction of the World Trade Center
> site.

*AAA Northeast*, 221 F. Supp. 3d at 387.

---

[6]    Like Weisshaus, the *AAA Northeast* plaintiffs argued that the toll increase was
unconstitutional under the dormant Commerce Clause because Port Authority was diverting ITN
toll revenue to pay for non-ITN projects, namely the construction of the World Trade Center. *AAA
Northeast*, 221 F. Supp. 3d at 377.

Following the *AAA Northeast* decision, on March 20, 2017, the court held a status and scheduling conference in this case, lifted the stay, and granted the parties an opportunity to submit supplemental briefing. ECF No. 62.

Plaintiff asked the court to deny the Port Authority's motion to dismiss and sought to amend his complaint for a second time "to flesh out further the facts that would aid in reviewing this case on its merits." ECF No. 64 ¶ 24. Plaintiff thereafter made a motion to further amend his complaint. ECF No. 65 at 1. The Port Authority opposed Plaintiff's motion for leave to amend as futile, and argued that, following *AAA Northeast*, the case should be dismissed in its entirety for failure to state a claim. ECF No. 66 at 3.

On December 18, 2018, the court denied Plaintiff's motion to amend his complaint a second time and granted the Port Authority's motion to dismiss. *See Weisshaus III*, 2018 WL 6619736, at *10. Plaintiff appealed the court's dismissal, and, on May 28, 2020, the Second Circuit affirmed in part, vacated in part, and remanded. *Weisshaus IV*, 814 F. App'x at 649.

Specifically, the Second Circuit affirmed the court's dismissal of all Plaintiff's claims except for one, i.e., the claim alleging a violation of the dormant Commerce Clause based on the setting of tolls at the ITN to fund non-ITN projects—the sole remaining claim now before the court. Accordingly, the Second Circuit remanded the matter with directions to convert the Port Authority's motion to dismiss into one for summary judgment and to "permit Weisshaus an opportunity to submit evidence in opposition to the motion." *Id.* at 647.

Additionally, because the court's "denial of Weisshaus's motion to amend the complaint was based, at least in part, on the factfinding it drew from [*AAA Northeast*]," the *Weisshaus IV* decision directed the court to "reconsider its denial" of Plaintiff's motion for leave to amend the

complaint. *Id.* at 648-49. The Second Circuit "express[ed] no opinion as to the merits of Weisshaus's [sole remaining] claim." *Id.* at 647.

After the Second Circuit's decision in *Weisshaus IV*, the court converted the Port Authority's motion to dismiss into one for summary judgment and granted Plaintiff's request for discovery. ECF No. 82; ECF No. 85. In 2022, the parties, as explained *supra* note 2, filed additional cross-motions for summary judgment. ECF No. 152; ECF No. 157; ECF No. 162; ECF No. 165.

By way of its cross-motion, the Port Authority seeks summary judgment because "the actual financial records of the Port Authority show that there was no surplus in the ITN to divert to projects outside the ITN during 2011-2020." ECF No. 157 at 1. Weisshaus, in his cross-motion, asks the court (1) to "hold[] that the Port Authority has not supported and has not advanced a defense that the ITN is operating on a deficit," (2) to continue discovery "so the parties can establish whether and how the surpluses of the ITN subsidize non-ITN facilities," and (3) to "[d]efer considering the motion for leave to file the second amended complaint." ECF No. 152-1 at 21.

Following the parties' cross-motions, the court permitted additional expert discovery. *See, e.g.*, ECF No. 188. Thereafter, the Port Authority filed a motion requesting leave for both parties to file supplemental briefs in support of their respective motions for summary judgment. ECF No. 249 The court granted the motion on January 10, 2025, and the parties filed their supplemental papers simultaneously on February 10, 2025. ECF No. 251; ECF No. 253; ECF No. 254.

Thus, before the court are the Port Authority's converted motion for summary judgment, the Port Authority's renewed motion for summary judgment, Weisshaus's cross-motion for summary judgment, and Weisshaus's motion to file a second amended complaint.

### III.    Discovery

Plaintiff has sought, and obtained, ample discovery. As evidence of this, Weisshaus has attached 2,278 pages of exhibits to his motions now before the court. *See, e.g.*, ECF No. 152; ECF No. 254; ECF No. 65. In all, the discovery process involved twenty-one letter motions—and their accompanying responses and replies—along with fifty orders by the court. Moreover, the court granted in part both of Plaintiff's motions to compel. *See* ECF No. 101; ECF No. 223.

Discovery formally commenced on July 16, 2020, and, following many extensions, closed on November 12, 2024. *See* ECF No. 85; ECF No. 246. Discovery was overseen by the court. "[T]hrough its voluntary production," the Port Authority provided Plaintiff with "thousands of relevant documents a[s] well as depositions and affidavits." ECF No. 95 at 5. This production included the Port Authority's audited financial statements, the Program Management Agreement Between The New Jersey State Department of Transportation and the Port Authority of New York and New Jersey, the Application of the Port Authority's Reserve Fund 2007-2011, the Engineering Contract for the Bayonne Bridge, and invoices and letters that certified the Lincoln Tunnel Access Project. *Id.* at 4-5. The Port Authority also provided all the non-privileged documents discovered in the parallel case, *AAA Northeast*, including deposition transcripts and affidavits. *See id.*; *AAA Northeast*, 221 F. Supp. 3d at 387.

Additionally, Weisshaus deposed the Port Authority's former Chief Financial Officer ("CFO"), Michael Fabiano and its current CFO Elizabeth McCarthy.[7] ECF No. 123-1; ECF No. 197-2. Both CFOs produced affidavits as well. *See* ECF No. 252-5; ECF No. 154.

---

[7]    The Port Authority designated Mr. Fabiano as a Rule 30(b)(6) witness. ECF No. 101; ECF No. 104-2. The court designated Ms. McCarthy as a hybrid fact/expert witness prior to her deposition. ECF No. 175. The Port Authority filed a motion to limit the scope of Ms. McCarthy's deposition, which the court denied. ECF No. 183.

Subsequent to Mr. Fabiano's deposition, the court directed the Port Authority to provide information based on its annual reports/financial statements (which Plaintiff had already obtained) via spreadsheets showing (1) "gross toll amounts per fiscal year ([i.e.], not revenue from all sources), collected per ITN facility, for the relevant years underlying the Port Authority's financial statements"; (2) "gross amounts for operating expenses, less any allocated expenses that are connected with non-ITN facilities, recorded by fiscal year from 2007-2020 for each ITN facility"; (3) "gross amounts of capital expenditures, excluding write-offs,[8] for each ITN facility by fiscal year from 2007-2020"; and (4) "[g]ross amounts for debt service payments recorded by fiscal year from 2007-2020 for all governmental (ITN) bonds." ECF No. 133; ECF No. 135; ECF No. 140. The Port Authority submitted spreadsheets showing the requested information in the requested format. *See* ECF No. 134; ECF No. 136; ECF No. 139; ECF No. 141.

Similarly, following Ms. McCarthy's deposition, Plaintiff sought "access to certain information relied on by Ms. McCarthy in her expert report." ECF No. 223 at 2. Specifically, Plaintiff requested access to the Port Authority's General Ledger, which is "a record of the accounting of all transactions of the Port Authority that's used for the preparation of . . . financial statements." ECF No. 197-2 at 23. The court compelled production of the General Ledger to the extent that it served as the sole factual basis for Ms. McCarthy's testimony. ECF No. 223.

Finally, Plaintiff also was granted the opportunity to produce his own expert to rebut Ms. McCarthy's affidavit. The expert, Heidi Muckler, holds a number of certifications including as a Certified Public Accountant, a Certified Valuation Analyst, and as a Certified Fraud Examiner. ECF No. 194-1 at 1. Ms. Muckler provided the court with two reports discussing the ITN's

---

[8]    "Write-offs" are a bookkeeping entry and have nothing to do with cash-flow whatsoever. This is consistent with the definition of "write-offs" provided by Defendant's counsel. ECF Nos. 134, 134-1.

finances and a letter explaining the need for certain records in discovery. ECF No. 194-1; ECF No. 247; ECF No. 211.

## LEGAL FRAMEWORK

The Commerce Clause empowers Congress "[t]o regulate Commerce with foreign Nations, and among the several States." U.S. CONST. art. I, § 8, cl. 3. The dormant Commerce Clause is the "negative or dormant implication of the Commerce Clause [which] prohibits state taxation . . . or regulation . . . that discriminates against or unduly burdens interstate commerce." *General Motors Corp v. Tracy*, 519 U.S. 278, 287 (1997) (citing *Quill Corp. v. North Dakota*, 504 U.S. 298, 312-13 (1992); *Brown-Forman Distillers Corp. v. N.Y. State Liquor Auth.*, 476 U.S. 573, 578-79 (1986)); *see also Selevan v. N.Y. Thruway Auth.*, 584 F.3d 82, 90 (2d Cir. 2009).

In *Evansville-Vanderburgh Airport Authority District v. Delta Airlines, Inc.* ("*Evansville*"), the Supreme Court considered it "settled" under dormant Commerce Clause jurisprudence "that a charge designed only to make the user of state-provided facilities pay a reasonable fee to help defray the costs of their construction and maintenance may constitutionally be imposed on interstate and domestic users alike." 405 U.S. 707, 714 (1972). More specifically, the court stated that

> [a]t least so long as the toll is based on some fair approximation of use or privilege for use . . . and is neither discriminatory against interstate commerce nor excessive in comparison with the governmental benefit conferred, it will pass constitutional muster, even though some other formula might reflect more exactly the relative use of the state facilities by individual users.

*Id.* at 716-17.

Later, in *Northwest Airlines, Inc. v. County of Kent, Michigan*, the Court restated this rule as a three-part test: "To recapitulate, a levy is reasonable under *Evansville* if it (1) is based on some fair approximation of use of the facilities, (2) is not excessive in relation to the benefits conferred,

and (3) does not discriminate against interstate commerce." 510 U.S. 355, 369 (1994) (citing

*Evansville*, 405 U.S. at 716-17).

Notably, the third prong is undisputed here.[9] Instead, Weisshaus challenges the first and

second prongs, arguing that "[t]he increase in the Toll Rate was not achieved by a fair

approximation of use of the facilities or in relation to the benefits conferred to commuters" **because**

**ITN toll revenue was "misuse[d] . . . to fund Non-ITN facilities."** ECF No. 254 ¶¶ 8, 29.

Under the dormant Commerce Clause, "[a] user fee . . . may reasonably support the budget

of a governmental unit that operates facilities that bear at least a 'functional relationship' to

facilities used by the fee payers." *See Bridgeport & Port Jefferson Steamboat Co. v. Bridgeport

Port Auth.*, 567 F.3d 79, 87 (2d Cir. 2009) (quoting *Auto. Club II*, 887 F.2d at 421). By contrast,

"[t]he limits of both a fair approximation of use and excessiveness are plainly exceeded when the

fees support a . . . budget that includes" projects with no functional relationship to the fees

themselves. *See id.* at 86-88 (holding that a fee charged to ferry passengers was unconstitutional

when its revenue was used to fund the Bridgeport Port Authority's entire budget, including

"expenses [that] confer no benefit on the ferry passengers").

Here, Weisshaus contends that the Port Authority "misused the toll revenues from the ITN

to subsidize the development and cost of operating the" World Trade Center. ECF No. 254 ¶ 29.

The Port Authority responds by arguing that the ITN "operated at a significant deficit," and

"[t]herefore, there were no funds to divert from the ITN to non-ITN operations, such as the [World

Trade Center]." ECF No. 253 at 9. Weisshaus, in turn, disputes the existence of a deficit at the

---

    [9]       The court notes that "whether a toll discriminates against interstate commerce, is
a 'threshold inquiry' and if a policy survives this prong it will 'have a comparatively easier time
passing constitutional muster.'" *Angus Partners LLC v. Walder*, 52 F. Supp. 3d 546, 560 (S.D.N.Y.
2014) (quoting *Selevan*, 584 F.3d at 94).

ITN. ECF No. 254 ¶ 79 ("It is thus entirely speculative that the ITN operates on a deficit . . . ."). Both parties agree that the World Trade Center is not functionally related to the ITN. *See id.* ¶ 29; ECF No. 253 at 9.

Whether the ITN had a surplus of funds that could have been diverted to fund non-ITN projects is a threshold question in Weisshaus's sole remaining claim. It is not that "a positive revenue number necessarily means the toll and fare increases are violative of the [d]ormant Commerce Clause. Indeed, the cases indicate that tolls are permitted to generate 'a fair profit or rate of return.'" *AAA Northeast*, 221 F. Supp. 3d at 387 (quoting *Angus Partners LLC v. Walder*, 52 F. Supp. 3d 546, 565 (S.D.N.Y. 2014)) (cleaned up). But the absence of positive revenue—that is, the existence of a deficit at the ITN—would mean that there was no leftover toll revenue for the Port Authority to spend on non-ITN projects. In other words, the existence of a deficit within the ITN would mean that, contrary to Weisshaus's sole remaining claim, the tolls did not fund non-ITN projects.

The *AAA Northeast* decision involved a nearly identical issue.[10] The complaint in *AAA Northeast* "contain[ed] the single claim that the toll fare increases were unlawful [under the dormant Commerce Clause] because a portion of the proceeds would be diverted for reconstruction of the World Trade Center site which, would cause an apparent, but sham, deficit for the ITN." *AAA Northeast*, 221 F. Supp. 3d at 378. As it does here, the Port Authority sought summary judgment arguing that "[t]here is no excess ITN revenue that could be diverted to non-ITN work." *Id.* at 382 (alteration in original) (citations omitted); ECF No. 253 at 1.

---

[10]    As mentioned earlier, the present case was stayed pending the resolution of *AAA Northeast*. ECF No. 56.

The plaintiffs in *AAA Northeast* challenged the ITN's deficit with two arguments. First, the plaintiffs argued that the Port Authority improperly calculated the deficit using a cashflow analysis and should have instead used a rate of return analysis. *AAA Northeast*, 221 F. Supp. 3d at 383-84. Second, the plaintiffs disputed whether certain expenditures were properly considered part of the ITN.[11] *Id.* at 387-88.

The *AAA Northeast* Court rejected both of the plaintiffs' arguments and concluded that there was "no record evidence that the increased toll revenues would generate a surplus." *Id.* at 386. The plaintiffs had "not pointed to any record evidence that call[ed] into question the accuracy of the Port Authority's financials" and offered nothing "from the record showing that revenue from the toll and fare increases was put to uses that bore no 'functional relationship' to the Port Authority's operations." *Id.* at 387, 392. The Court therefore held that the plaintiffs failed "to show the [toll] increases were not a fair approximation of the use of the ITN by its users, or were excessive in relation to the benefits conferred on them," and granted summary judgment to the Port Authority. *See id.* at 392.[12]

---

[11] The expenditures at issue were the improvement of bridges and roads owned by the state of New Jersey, the "raising of the Bayonne Bridge roadway," and allocations to the "capital infrastructure fund." *AAA Northeast*, 221 F. Supp. 3d at 384-85 (citations omitted).

[12] The plaintiffs in *AAA Northeast* brought their case pursuant to both the dormant Commerce Clause and the Surface Transportation and Uniform Relocation Assistance Act of 1987 (the "Highway Act"), 33 U.S.C. § 508 (2006). *AAA Northeast*, 221 F. Supp. 3d at 375-76. The court held that the tolls were "just and reasonable" under the Highway Act for the same reasons that the tolls were constitutional under the dormant Commerce Clause. *See id.* at 396 ("In sum, because AAA raises the same arguments with regard to its claims under the Highway Act that it raised with respect to the [d]ormant Commerce Clause, those claims must also be dismissed.").

## DISCUSSION

As in *AAA Northeast*, Weisshaus's sole remaining claim alleges that the Port Authority violated the dormant Commerce Clause by "the setting of tolls to fund projects unconnected to the Port Authority's [ITN]." *See Weisshaus IV*, 814 F. App'x at 645; ECF No. 254 ¶ 29. The Port Authority refutes Weisshaus's claim by arguing that the ITN maintains a deficit and, therefore, does not have surplus funds to spend on non-ITN projects. ECF No. 253 at 6-7. Weisshaus, in turn, disputes the accuracy of the ITN's deficit as calculated by the Port Authority. *See, e.g.*, ECF No. 254 ¶ 82.

For the following reasons, the court grants summary judgment to the Port Authority and denies Plaintiff's motion for leave to file a second amended complaint.

## I.      Summary Judgment

Summary judgment is appropriate if "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a). A factual dispute is genuine if the evidence would allow "a rational trier of fact to find for the non-moving party." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). A fact is material if it "might affect the outcome of the suit under the governing law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). The burden of establishing that no genuine dispute exists lies with the party moving for summary judgment. *See id.* at 256. A moving party does this by showing that "there is an absence of evidence to support the nonmoving party's case." *Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986).

Summary judgment is meant "to isolate and dispose of factually unsupported claims or defenses." *Id.* at 323-24. The court must construe "the evidence in the light most favorable to the nonmoving party and draw[ ] all reasonable inferences in [the nonmovant's] favor." *Sledge v. Kooi*,

564 F.3d 105, 108 (2d Cir. 2009) (citations omitted). "When the moving party has carried its burden under Rule 56(c), its opponent must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita*, 475 U.S. at 586 (footnote omitted) (citations omitted). That is, the non-movant must identify specific facts on the record showing that there is a genuine issue for trial. *See Anderson*, 477 U.S. at 256-57.

Whether there is a deficit at the ITN is central to the parties' positions on summary judgment. Therefore, before turning to the constitutionality of the Port Authority's 2011 toll increase, the court first discusses the deficit question.

### A.    The ITN's Deficit

According to the Port Authority's former CFO, Mr. Fabiano, in the years leading up to the Port Authority's 2011 toll increase the ITN maintained an operating deficit of $636,000,000. ECF No. 252-5 ¶ 21. In 2011, the Port Authority sought to raise tolls to increase operating revenue for use in financing its capital plan. *See* ECF No. 65-34. "The preliminary capital plan[13] for the period 2011-2020 called for $10.786 billion in projects for the ITN." ECF No. 157 at 5. These projects included

> rebuilding the Bayonne Bridge to widen the roads and build a bike lane while raising it to accommodate the super tankers bound for Port Newark/Elizabeth. There was also the Lincoln Tunnel Access Project to improve the roadway and flow of traffic to the Lincoln Tunnel, as well as the rebuilding of the Goethals Bridge and replacement of the suspenders on the George Washington Bridge.

*Id.* The Port Authority considered these to be "critical infrastructure projects" necessary "in order to safely support future transportation needs on the ITN." ECF No. 252-5 ¶ 4. Furthermore, the

---

[13]    The Preliminary Capital Plan of 2011, which estimated roughly $10.8 billion in ITN expenditures, is what the Port Authority used the calculate its expected capital needs between the years 2011-2020. The court notes, however, that the Preliminary Capital Plan of 2011 was eventually replaced by the Capital Plan for 2014-2023, which included roughly $11.307 billion in ITN capital expenditures. ECF No. 37 at 5-6.

Port Authority actually completed each of the above listed capital projects. ECF No. 157 at 5 ("These projects were all completed during the period 2011-2020.").

Ms. McCarthy, who succeeded Mr. Fabiano as the CFO of the Port Authority, prepared a cashflow analysis during discovery, showing the ITN's finances following the 2011 toll increase and during the implementation of the capital plan. ECF No. 154 at 1.

Ms. McCarthy's cashflow analysis begins with the ITN's *operating revenues* which consist of the ITN's income from tolls, fares, and penalty fees among other similar sources. *Id.* at 2. The analysis then subtracts operating expenses from operating revenues; *operating expenses* are the direct expenses incurred by each ITN facility such as staffing and utilities, as well "the allocation of indirect costs related to centralized services." *Id.* The amount left after the subtraction of the operating expenses from the operating revenues is called the *net operating revenue*. ECF No. 154 at 2. Grant money, capital paid with cash reserves, and other contributions are then added to the net revenue to calculate the *cash balance*. *Id.* From the cash balance, debt service and payments to the General Reserve Fund[14] are subtracted to calculate the final ITN *cash flow*. *Id.* "The cashflow analysis . . . based on the actual data and methodology used by the Port Authority to report its finances to prospective bond holders and the public shows a $75 million . . . loss in the ITN at the end of 2020." ECF No. 253 at 6-7.[15]

---

[14]    "The General Reserve Fund is pledged in support of Consolidated Bonds and Notes pursuant to the [s]tatutes, which require the Port Authority to create and maintain the General Reserve Fund." ECF No. 154 at 3. According to Ms. McCarthy, the Port Authority is required to "apply surplus revenues from all of its existing facilities to maintain the General Reserve fund in an amount equal to at least 10% of the par value of outstanding bonds legal for investment." *Id.* at 3-4. Since the ITN ran a cash deficit it can be assumed that none of the toll increases were deposited in the fund.

[15]    The court notes that Ms. McCarthy's cashflow analysis shows the ITN having a deficit on a cumulative basis between 2011-2020, though not necessarily on an annual basis. For example, during the years 2011, 2012, 2013, 2014, 2016, and 2017, the ITN had a surplus to

Weisshaus, for his part, disputes the evidence of a deficit at the ITN by challenging the Port Authority's underlying accounting methods. First, Weisshaus objects to Ms. McCarthy's allocations of debt service payments to the various ITN facilities. ECF No. 254 ¶ 91. Second, Weisshaus disputes the Port Authority's allocation of centralized, indirect expenses (such as the Executive Director or Human Resources costs) to the Port Authority's facilities including those that make up the ITN. ECF No. 254 ¶ 37. He also claims that he is "deprived of the evidence to address the veracity" of these allocations, and he seeks further discovery based on the "plausible ability to show that the operating expenses of the ITN, as reported in the annual reports and the affidavit of Ms. McCarthy, include the portion of expenses where the ITN subsidized the staffing levels of the [World Trade Center]." *See, e.g.*, *id.* at ¶¶ 37, 83.

The court discusses each of Plaintiff's arguments in turn.

> **i.      Allocation of Debt Service and General Reserve Fund Allocations Based on Unamortized Investment In Use**

Plaintiff's first accounting argument has to do with the Port Authority's allocation of debt service payments to ITN facilities. Debt service refers to the "payments of interest and principal on Port Authority obligations issued to finance its capital projects." ECF No. 154 at 3. The Port Authority generally seeks to fund its capital projects using 50% cash reserves and 50% through debt. ECF No. 252-5 ¶ 12. That debt is taken on by the issuance of consolidated bonds, and they are paid off using all Port Authority Revenues. *Id.*; *see also* ECF No. 197-2 at 56. Thus, bonds are not issued for the sole purpose of raising money for the ITN projects themselves; rather bonds are

---

varying degrees. ECF No. 154-1. During 2015 and 2018-2020, however, the ITN functioned at a deficit, the largest being in 2020 when the ITN had a deficit of $570,061,000. *Id.* When each annual surplus and deficit is added together, the ITN is shown to have an overall deficit of $74,978,000 between the years 2011-2020. Weisshaus has not taken issue with the fluctuations in the ITN's annual budget, as compared to its cumulative deficit.

issued to raise funds for the entire Port Authority enterprise. ECF No. 197-2 at 55-56. These bonds

are "offered and secured by the total revenues of the Port Authority." *Id.* at 58. As a result, the net

revenue[16] from each Port Authority facility is pooled for the benefit of bondholders. *Id.* at 50. The

funds raised are used for all Port Authority projects not just for the ITN. *See id.* at 58. Because of

this and because the revenues are pooled, the Port Authority allocates the cost of debt service

among its facilities for accounting and financial reporting purposes. *Id.*; ECF No. 154 at 3. The

allocation is done based on each facility's "Unamortized Investment in Use" ("UIIU").[17]

ECF No. 154 at 3.

"UIIU is equal to the cumulative amount of capital investment that has been placed into

service, less cumulative depreciation." *Id.* In other words, UIIU refers to the amount of capital that

was invested into a facility. Thus, the allocation of debt service obligations to ITN facilities is

based on the amount of capital that was invested in each facility. *See id.* ("Each facility's pro-rated

share of UIIU is based on the ratio of the facility's UIIU to the total Port Authority UIIU.").

Plaintiff, and his expert Ms. Muckler, view this allocation as an accounting fiction. Ms.

Muckler asserts that allocations based on UIIU "include[] debt[s] that aren't necessarily related to

the ITN nor paid approportionate to the revenues of the ITN." ECF No. 194-1 at 4. Ms. Muckler

contrasts allocating debt service based on UIIU with her own accounting strategy which, in her

---

[16]    Net revenue refers to the remaining revenue after each facility's operating expenses
are paid.

[17]    To "amortize" means "to provide for the gradual extinguishment of (an obligation,
as a mortgage or bond issue) by payment of a part of the principal or by contribution to a sinking
fund." WEBSTER'S THIRD NEW INTERNATIONAL DICTIONARY OF THE ENGLISH LANGUAGE
UNABRIDGED 72 (eds. Philip Babcock Gove & Meriam Webster Editorial Staff 1993).
"Unamortized" simply means "not amortized," i.e., an investment that has not been paid off. *Id.* at
2482. Thus, "unamortized investment in use" refers to the unamortized investment that was placed
into a particular facility. *See Auto. Club I*, 706 F. Supp. at 269 n.3.

words, "reconstruct[s] what *is* the reality of the ITN obligations and revenues." *Id.* (emphasis in original).

To conduct this "reconstruction," Ms. Muckler compared each facility's net revenue (i.e. operating revenue minus the facility's operating expenses) to the total net revenue of the Port Authority as a whole. *See* ECF No. 247 at 13. Then, Ms. Muckler assigned each facility a portion of the Port Authority's total debt service obligation based on that facility's share of net revenue. *Id.* at 14-15.

The court observes that the accounting methods used by the Port Authority and Ms. Muckler both allocate debt service, albeit on different bases. Whereas the Port Authority allocates debt service and General Reserve Fund contributions based on UIIU, Ms. Muckler allocates those expenses based on the facility's proportion of net revenue. Plaintiff's proposed allocation, however, based on net revenue, or the amount brought in by each ITN component, bears no necessary relationship to the purposes for which the amounts raised by debt were put to use. In other words, Ms. Muckler's allocation does not take into account the amount of debt that was incurred to fund the capital projects at each ITN facility. It is debt service on this amount that the Port Authority allocates to each facility.

The Port Authority's allocation, by contrast, is based on the "cost driver for the issuance of debt." ECF No. 253 at 14. As noted, UIIU represents the amount of capital invested in a particular facility. Thus, an allocation based on UIIU makes each ITN facility responsible for debt service on the amount of debt that the Port Authority would invest in that ITN facility's capital program. Had the Port Authority issued bonds to finance the capital costs of each ITN component individually, it would distribute the cost of servicing the debt on each bond to the ITN component for which it was issued. Given that the Port Authority's finances are pooled, the allocation of debt

service based on UIIU is designed to achieve a similar result. *See id.* at 17 ("Since the cost driver for the issuance of debt is the need to finance capital investment . . . the UIIU methodology makes more sense.").

Nothing in the record leads the court to believe that allocating debt service based on the income of each ITN facility achieves the goal of equitably allocating debt service. The dormant Commerce Clause directs that "the user of state-provided facilities pay [only] a reasonable fee to help defray the costs of their construction and maintenance." *Evansville*, 405 U.S. at 714. Charging each ITN facility an amount roughly equal to the cost needed to service debt taken on to pay for construction of that facility fits squarely within this framework. The allocation of debt service as an expense based on a facility's share of UIIU accomplishes this goal because it ties each facility's debt service obligations to the amount of debt entered into for the benefit of that facility. It is therefore reasonable to allocate debt service using UIIU.

### ii.   The Allocation of Indirect Labor Costs Based on Each Facility's Share of Direct Labor Costs

The second allocation that Plaintiff challenges concerns the ITN's indirect administrative costs. The specific costs at issue here "relate[] to centralized services, such as the [Port Authority] Executive Director, central police command, Engineering, Law, Procurement, Finance, and Human Resources." ECF No. 154 at 2. These centralized services benefit the entire Port Authority and each of its components, and their associated costs are therefore shared by all its facilities. *See id*; ECF No. 123-1 at 62. In the Port Authority's financial statements, the indirect costs are not separately reported but are instead included in each facility's operating expenses as an "allocated expense[]." *See, e.g.*, ECF No. 65-20 at 124 note (b). Ms. McCarthy explained that these "indirect costs are allocated to facilities based on the ratio of the facility's direct labor costs to total Port Authority direct labor costs." *Id.*

In its summary judgment papers, the Port Authority does not discuss the allocation of indirect labor. Because of a simultaneous filing deadline, the Port Authority did not have the opportunity to review Weisshaus's supplemental brief before filing its own. Moreover, Weisshaus's supplemental filing is the first summary judgment brief in which he has raised this issue. That said, in a letter to the court during discovery, the Port Authority described its allocation method as "a widely accepted and reasonable cost allocation principle." ECF No. 222 at 3.

Weisshaus's challenge to the Port Authority's allocation of these indirect costs is both factual and methodological. Factually, he doubts the "veracity" of the Port Authority's reported operational expenses and, as a result, seeks more discovery on the issue. *See, e.g.*, ECF No. 254 ¶¶ 34, 37. Methodologically, he seems to assume that the Port Authority's method for allocating inherently permits the ITN to subsidize non-ITN facilities, such as the World Trade Center. *See id.* ¶¶ 36-37 ("Defendant has stonewalled Plaintiff's efforts to ascertain which portions of the ITN's operating expenses consist of subsidizing the [World Trade Center].").

Weisshaus's factual concerns are without merit. Weisshaus gives the court no reason to think that the reported figures are not accurate. *Id.* ¶ 37. He simply claims not to have "the evidence to address the veracity of employing the figures for operating expenses as reported in Schedule E[] of the annual reports." *Id.*

There is, on the other hand, evidence supporting the veracity of the Port Authority's reported finances. They are certified by the Port Authority's Executive Director, Chief Financial Officer, and Comptroller. *See, e.g.*, ECF No. 65-18 at 44. They are also reviewed and approved by independent auditors. *See, e.g.*, ECF No. 65-19 at 51. For example, the auditors wrote of the 2015 financial statement: "In our opinion, the financial statements referred to above present fairly, in all material respects, the assets and liabilities of the Port Authority as of December 31, 2015, and its

revenues and reserves for the year then ended in accordance with the requirements of the Port Authority's bond resolutions." *Id.* at 54.

Further, because Weisshaus claims only the "plausible ability" to uncover documents supporting his claims—even after several years of discovery—his alleged need for further discovery cannot be credited. ECF No. 254 ¶ 83. He seeks further discovery of the Port Authority's annual staffing statistics, seemingly to test the Port Authority's calculated allocations. He asserts that the Port Authority, in its Annual Reports, reported these labor statistics from 2007-2010, but then stopped reporting labor statistics in 2011.[18] *Id.* ¶ 80.[19] As a result he asserts that he has been "deprived of the evidence" he needs to "address the veracity of employing . . . figures" after 2011. *Id.* ¶ 37.

Weisshaus does not reference the Port Authority's April 15, 2024, letter to the court explaining that the direct labor statistics are publicly available in the Port Authority's Annual Budget Report. ECF No. 222 at 3 n.1. In that letter, the Port Authority explained that it stopped including the direct labor statistics in its Annual Reports after 2014 because it was deemed "duplicative" as the same statistics were listed in the Annual Budget Report that is publicly available. *Id.* Thus, Weisshaus is apparently seeking further discovery before having reviewed what is already available to him. The court sees no reason to grant his request.

Weisshaus's challenge to the Port Authority's method for allocating indirect administrative costs is no more convincing. The Port Authority is right when it asserts that its method for

---

[18]      Plaintiff notes that he filed the present lawsuit in 2011, apparently implying that the lawsuit influenced Port Authority's decision to not include labor statistics in the Annual Report. *See* ECF No. 254 ¶ 80.

[19]      With this claim, Plaintiff contradicts one of his earlier motions before the court that alleged the Port Authority included labor statistics in in its Annual Report until 2015. ECF No. 219 at 6.

allocating indirect expenses—on the basis of direct labor costs—is both reasonable and commonly used. ECF No. 222 at 3 (pointing out that this allocation method "is a widely accepted and reasonable cost allocation principle").

Government contractors, for example, may allocate indirect costs on a "direct labor hour base or direct labor cost base." *See* 48 C.F.R. § 9904.418-50(d)(2)(i). Courts have upheld the cost allocation method in similar contexts. *See, e.g.*, *Simmonds Precision Prods., Inc. v. United States*, 640 F.2d 292, 306 (Ct. Cl. 1980) ("[U]nder these circumstances, the allocation on the basis of labor costs . . . appears reasonable."); *Sikorsky Aircraft Corp. v. United States*, 773 F.3d 1315, 1318 (Fed. Cir. 2014) ("For example, direct cost may be used as an allocation base if the amount of direct costs consumed by a cost objective is correlated to the indirect costs consumed by that cost objective."). Also, taxpayers "allocate service costs to particular departments or activities *based on a factor or relationship that reasonably relates the service costs* to the benefits received from the service departments or activities." 26 C.F.R. § 1.263A-1(g)(4)(i) (emphasis added); *see also Softel, Inc. v. Dragon Med. & Sci. Commc'ns Ltd.*, 891 F. Supp. 935, 939 (S.D.N.Y. 1995) (allocating indirect labor costs and overhead expenses based on direct labor hours when calculating defendant's profit in copyright infringement lawsuit).

As a bi-state governmental agency, the Port Authority creates its financial reports "using the Generally Accepted Accounting Principles ["GAAP"], as promulgated by the Government Accounting Standards Board ["GASB"], and on the basis of [the Port Authority's] bond requirements." ECF No. 197-2 at 68. The GAAP clearly contemplates the allocation of indirect and administrative expenses:

> Some functions, such as general government, support services, or administration, include expenses that are, in essence, *indirect* expenses of other functions. Governments are not required to allocate those indirect expenses to other functions.

However, some governments may prefer to allocate some indirect expenses or use a full-cost allocation approach among functions.

GOVERNMENT ACCOUNTING STANDARDS SERIES 34, ¶ 42 (emphasis in original) (footnote omitted). Moreover, the GASB seems to view such allocations based on direct labor, or "personnel count," as a "standard allocation formula." GOVERNMENT ACCOUNTING STANDARDS IMPLEMENTATION GUIDE NO. 2015-1, 7.47.3. ("A state's Division of Human Resources . . . allocates the entire cost of its operations to other state agencies based upon agency 'full-time equivalent' personnel count."). The allocation method is thus well-known and reasonable. The court therefore sees no merit in Plaintiff's challenge to the Port Authority's allocation of indirect costs among its facilities or to the veracity of the Port Authority's records.

So, as in *AAA Northeast*, there is nothing in the discovery material to indicate that the Port Authority's records, used to show a deficit in the ITN, were inaccurately kept or were incorrectly used to show the deficit. 221 F. Supp. 3d at 391. Seeing no genuine dispute over the existence of a deficit at the ITN, the court turns to the constitutionality of the 2011 toll increase under the dormant Commerce Clause and *Northwest Airlines* test.

**B.      *Northwest Airlines* Test**

"It is worth repeating that the court's task . . . is to determine whether the toll and fare increases were (1) 'based on some fair approximation of use of the facilities'; (2) 'not excessive in relation to the benefits conferred'; and (3) not discriminatory 'against interstate commerce.'" *AAA Northeast*, 221 F. Supp. 3d at 392 (quoting *Nw. Airlines*, 510 U.S. at 369).

The fair approximation prong is "essentially a question of allocation; we ask whether the government is charging each individual entity a fee that is reasonably proportional to the entity's use, and whether the government has reasonably drawn a line between those it is charging and those it is not." *Am. Trucking Ass'ns, Inc. v. R.I. Tpk. & Bridge Auth.*, 123 F.4th 27, 46 (1st Cir.

2024) ("*Am. Trucking*") (quoting *Industria y Distribucion de Alimentos v. Trailer Bridge*, 797 F.3d 141, 145 (1st Cir. 2015)); *see also Selevan*, 584 F.3d at 98 (calling for consideration of whether the "policy at issue reflects 'rational distinctions among different classes of' motorists using the Bridge . . . so that each user, on the whole, pays some approximation of his or her fair share of the state's cost for maintaining the Bridge" (quoting *Evansville*, 405 U.S. at 718)).

"[T]he excessiveness prong . . . asks whether the fee imposed on users of a public facility is reasonable compared to the costs incurred by the state to improve or maintain that public facility." *Am. Trucking*, 123 F.4th at 46. **"'[T]here need not be a perfect fit between the use of the [facility] and the support of [the facility] by' the toll. The *Northwest Airlines* test is not inflexible; it simply requires 'reasonableness.'"** *Selevan*, 584 F.3d at 98 (quoting *Bridgeport*, 567 F.3d at 86); *see also United States v. Sperry Corp.*, 493 U.S. 52, 60 (1989) ("This Court has never held that the amount of a user fee must be precisely calibrated to the use that a party makes of Government services.").

In his summary judgment papers, Weisshaus does not argue that the tolls in question discriminate against interstate commerce.[20] Instead, by way of his sole remaining claim, Weisshaus argues that the Port Authority's 2011 toll increase was "excessive in relation to the benefits conferred," and was not "based on some fair approximation of use of the facilities," **because the toll revenue was used to "fund projects unconnected to the Port Authority's" ITN**. *Nw. Airlines*, 510 U.S. at 369; *Weisshaus IV*, 814 F. App'x at 645; ECF No. 254 ¶ 8 ("The increase in

---

[20]     The court notes again that "whether a toll discriminates against interstate commerce, is a 'threshold inquiry' and if a policy survives this prong it will 'have a comparatively easier time passing constitutional muster.'" *Angus Partners*, 52 F. Supp. 3d at 560 (quoting *Selevan*, 584 F.3d at 94).

the Toll Rate was not achieved by a fair approximation of use of the facilities or in relation to the benefits conferred to commuters.").

In response, the Port Authority argues that the toll increases were a fair approximation of use of the facilities because "[t]he methodology used by the Port Authority in 2011 to determine the need for the toll increases was based on losses incurred in the ITN during 2007-2011," and based on "[t]he projected deficits set forth in the Fabiano affidavits," which "proved accurate." ECF No. 253 at 6. Additionally, the Port Authority argues the toll increase was not "excessive in relation to the benefits conferred" because the toll revenue was used to invest in $11.72 billion worth of capital projects at the ITN. *Nw. Airlines*, 510 U.S. at 369; ECF No. 253 at 8. "The toll increases were needed to cover not only these capital costs, but the daily maintenance and operation of the ITN facilities through seasonal storms, heavy usage and occasional damage caused by vehicular accidents." ECF No. 253 at 8-9. The Port Authority points to the ITN's deficit to further support its case. *Id.* at 9.

As discussed above, even viewing "the evidence in the light most favorable to the nonmoving party," Weisshaus's attempts to contest the existence of a deficit at the ITN, and to question the Port Authority's accounting methods, are without merit. *Sledge*, 564 F.3d at 108. Thus, there were no leftover ITN funds to spend on non-ITN projects.

Furthermore, after several years of extensive discovery, Weisshaus has presented "no evidence tending to show that revenue from the toll and fare increases was, or would be, used in a manner that violated the [d]ormant Commerce Clause." *See AAA Northeast*, 221 F. Supp. 3d at 391. He simply raises "metaphysical doubt" as to the accuracy of the Port Authority's finances and stated uses of the ITN toll revenue. *Matsushita*, 475 U.S. at 586 (footnote omitted). Moreover, Weisshaus requests further discovery based only on "the plausible ability" to find supporting

evidence. ECF No. 254 ¶ 83. Contrary to Weisshaus's assertions, however, the evidence already on the record in this case permits the court to analyze the constitutionality of the 2011 toll increase under the dormant Commerce Clause.

In 2011, when the Port Authority first proposed the toll increase, the ITN was faced with a large deficit and a need to invest in capital projects. *See* ECF No. 252-5 ¶ 21. Despite their initial opposition to the toll increase, the governors of New York and New Jersey agreed that the Port Authority needed greater revenue. *See* ECF No. 47-1. At first, the governors "jointly indicated both publicly and privately that such a significant toll hike was unacceptable and [that they] would not approve of it." *Id.* at 1. The governors directed the Port Authority's commissioners to conduct "a review of the current financial situation as well as the obligations under the proposed long-term capital plan." *Id.* Following that review, the governors concluded that "[w]hile we did not want to see any toll increase, given the crisis facing the Port Authority and its finances, and the potential safety and economic risks to commuters and businesses, an increase [in toll rates] cannot be avoided." *Id.* Thus, the toll increase was implemented, and Port Authority's capital projects were completed.

After having increased tolls and spent the toll revenue on ITN operating expenses and capital investments, the ITN did not have any surplus toll revenue, and instead maintained a deficit of $75 million. ECF No. 154 at 4. There is no genuine dispute over this deficit. *See supra* Section I.A.

Absent any evidence to the contrary, and any reason to doubt the Port Authority's finances, it is evident that the 2011 toll increases fall within the bounds of reasonableness set by the dormant Commerce Clause and *Northwest Airlines* test. Because the additional revenue was "needed to cover not only [the ITN's] capital costs, but [also] the daily maintenance and operation of the ITN

facilities," the toll increase cannot be deemed excessive or not fairly approximate to commuters' use of the facilities. ECF No. 253 at 8-9. This is especially true because the ITN maintained a deficit despite increased revenue from the toll increase. "A user fee . . . may reasonably support the budget of a governmental unit that operates facilities that bear at least a 'functional relationship' to the facilities used by the fee payers." *Bridgeport*, 567 F.3d at 87 (quoting *Auto. Club II*, 887 F.2d at 421). In increasing toll rates on ITN facilities to fund the operation and maintenance of ITN facilities, this is precisely what the Port Authority did.

Because there is no triable issue of fact, and because the facts when viewed in the light most favorable to Weisshaus demonstrate that the 2011 toll increase satisfies the *Northwest Airlines* test—and is thus constitutional under the dormant Commerce Clause—the court grants summary judgment in favor of the Port Authority.

## II.     Leave to Amend

Weisshaus amended his complaint the first time on December 20, 2013. ECF No. 26. On May 5, 2017, he filed a motion seeking leave to amend his complaint a second time. ECF No. 65; ECF No. 65-1.

In his affirmation supporting the motion for leave to amend the complaint a second time, Weisshaus discussed "[t]he revelation of the affordability envelope." ECF No. 65-1 ¶ 19. He described the affordability envelope as "a figure that sets the maximum price of tolls the public can be asked to bear. Then later the Port Authority went digging for capital projects that would overshadow the need for the increase in the toll price." *Id.* ¶ 18. Thus, Weisshaus's Proposed Second Amended Complaint, filed alongside the motion to amend, alleges that the Port Authority "concoct[ed] an [a]ffordability [e]nvelope as the maximum price the public will bear" and

proceeded "by first setting toll prices and later finding ways to spend that money." ECF No. 65-3 ¶ 171. Plaintiff's theory in the Proposed Second Amended Complaint is that this alleged method of setting tolls "is not based on a fair approximation of facilities or the benefits conferred on commuters" and thus violates the *Northwest Airlines* test and the dormant Commerce Clause. *See id.*

While the facts alleged in the Proposed Second Amended Complaint offer a different theory of the case, the counts are largely the same as those in the Amended Complaint. The Proposed Second Amended Complaint includes three counts: (1) that the additional $2 charge for paying tolls with cash rather than an E-ZPass "is an immediate harm that [P]laintiff continues to sustain with a chilling effect by causing the Toll  Rate to exceed the hourly local wage"; (2) that the 2011 toll increase violates the dormant Commerce Clause because it "exceeds the fair approximate use of facilities, and is excessive to the benefit conferred, and discriminate[s] . . . [against] interstate []commerce"; and (3) that the toll increase "burdens interstate commerce by placing a burden on the local and state practice and exceeding the benefit conferred." *Id.* ¶¶ 165, 170, 195.

> By way of comparison, the first count in the Amended Complaint asserts that
>
> Defendant's Toll Rate with a penalty for payment in cash is an immediate harm that [P]laintiff continues to sustain with a chilling effect by exceeding twofold the hourly local wage; thus making it impossible for [P]laintiff, or a similarly situated commuter from New Jersey, to earn wages as income in [the] City of New York.

ECF No. 26 ¶ 84.

The second count states: "This claim for relief arises under the dormant Commerce Clause . . . of the United States Constitution . . . where the Toll Rate enacted August 19, 2011[,] exceeds the fair approximate use of facilities, and is excessive to the benefit conferred, and discriminate[s] . . . [against] interstate []commerce." *Id.* ¶ 89. And the third count alleges that "the

Toll Rate enacted August 19, 2011[,] burdens interstate commerce by placing a burden on the local and state practice and exceeding the benefit conferred." *Id.* ¶ 104. Thus, the first count in both the Amended and Proposed Second Amended Complaint, practically, make the same claim. The second and third counts of the Amended and Proposed Second Amended Complaint are identical.

In *Weisshaus III*, this Court denied Plaintiff's motion for leave to amend his complaint a second time. There the court held:

> [T]o the extent that [P]laintiff's Proposed Second Amended Complaint claims that the affordability envelope theory "will show the reasons to raise . . . tolls prices [were] motivated by an ulterior motive of setting the tolls at its highest level and then inventing an excessive capital plan to excuse the excessive increase in the toll rate," it fails to state a legally cognizable claim because it looks only to the subjective intention of the Port Authority, and not to how the toll operates in practice. To the extent that [P]laintiff's Proposed Second Amended Complaint claims that the ITN was operating at a profit, and therefore, the need for the 2011 Toll Increase was motivated by an "ulterior motive of setting the tolls at its highest level," the court notes that it has previously addressed the issue in *AAA Northeast*, and therefore, for the reasons discussed above, the Proposed Second Amended Complaint does not satisfy the pleading standard. Any remaining claims in [P]laintiff's Proposed Second Amended Complaint are identical or nearly identical to those addressed above regarding [P]laintiff's Amended Complaint, and therefore the court will not address them again here, as the same rational must lead to their dismissal.

*Weisshaus III*, 2018 WL 6619736, at *10 (footnote omitted) (citations omitted).

In *Weisshaus IV*, the Second Circuit stated that this Court's "denial of Weisshaus's motion to amend the complaint was based, at least in part, on the factfinding it drew from [*AAA Northeast*], which Weisshaus disputed." *Weisshaus IV*, 814 F. App'x at 648. As a result, the Second Circuit stated that this court "should reconsider its denial" of Weisshaus's motion to amend. *Id.* at 649. The court does so here.

As noted above Weisshaus has more recently requested that the court "[d]efer considering the motion for leave to file the second amended complaint." ECF No. 152 at 1. Weisshaus makes this request because "part of the proposed second amended complaint would need to be amended

further" and because "Plaintiff was not afforded discovery as to which non-ITN facilities are subsidized by the ITN." ECF No. 152-1 ¶ 59.

The complaint, however, is what determines the scope of discovery, and not the other way around. *See* FED. R. CIV. P. 26(b)(1) ("Parties may obtain discovery regarding any nonprivileged matter that is relevant to any party's claim or defense and proportional to the needs of the case . . . ."). The court thus sees no reason to delay its consideration of the Proposed Second Amended Complaint.

"The rule in [this] circuit is to allow a party to amend its complaint unless the nonmovant demonstrates prejudice or bad faith." *City of New York v. Grp. Health Inc.*, 649 F.3d 151, 157 (2d Cir. 2011) (citing *AEP Energy Servs. Gas Holding Co. v. Bank of Am., N.A.*, 626 F.3d 699, 725 (2d Cir. 2010) (citing *Block v. First Blood Assocs.*, 988 F.2d 344, 350 (2d Cir. 1993))); *see also* FED. R. CIV. P. 15(a)(2) (directing the court to "freely give leave when justice so requires"). "Leave to amend may be denied on grounds of futility if the proposed amendment fails to state a legally cognizable claim or fails to raise triable issues of fact." *AEP Energy Servs.*, 626 F.3d at 726 (citing *Milanese v. Rust-Oleum Corp.*, 244 F.3d 104, 110-11 (2d Cir. 2001)); *see also Reeves v. City of New York*, 2025 WL 2778348, at *2 (E.D.N.Y. Sept. 26, 2025).

The court again denies Weisshaus's motion to amend his complaint because his attempt to replead remains "futile." *AEP Energy Servs.*, 626 F.3d at 726. The first count in the Proposed Second Amended Complaint, concerning the cheaper toll rate for those paying with E-ZPass, is a claim that was already dismissed by the court. *Weisshaus III*, 2018 WL 6619736, at *5. That dismissal was affirmed by the Second Circuit. *Weisshaus IV*, 814 F. App'x at 647. It is therefore futile to replead this claim.

Weisshaus's theory of an affordability envelope is similarly futile because the argument focuses entirely on the Port Authority's subjective motivations for the 2011 toll increase and not on the toll increase itself. Weisshaus claims that the toll increase was "not based on a fair approximation of facilities or the benefits conferred on commuters" because the Port Authority "concoct[ed] an [a]ffordability [e]nvelope as the maximum price the public will bear . . . and later f[ound] ways to spend that money." ECF No. 65-3 ¶ 171. But even if Weisshaus's factual allegations are taken as true, the Port Authority's subjective intent for increasing tolls has nothing to do with whether the toll increase "(1) is based on some fair approximation of use of the facilities, (2) is not excessive in relation to the benefits conferred, and (3) does not discriminate against interstate commerce." *Nw. Airlines*, 510 U.S. at 369 (citing *Evansville*, 405 U.S. at 716-17).

"[F]air approximation and excessiveness are evaluated by objective factors—how a toll operates in practice—and not the internally stated reasons for its enactment." *Auto. Club of N.Y., Inc. v. Port Auth. of N.Y. & N.J.*, 2014 WL 2518959, at *10 (S.D.N.Y. June 4, 2014); *see also Janes v. Triborough Bridge & Tunnel Auth.*, 977 F. Supp. 2d 320, 340 (S.D.N.Y. 2013) ("[T]he requirement of a 'fair approximation' seeks reasonableness and broad proportionality. It does not require precise tailoring, *or a pre-enactment administrative record*, for toll amounts to be justified." (emphasis added)).

In *Weisshaus III*, the court rejected the affordability envelope theory because the Port Authority's "motive does not matter. The *Northwest Airlines* test is entirely objective, [i.e.], it is concerned with whether the governmental unit is using its toll proceeds on facilities or projects that are functionally related to facilities used by toll payers, or whether any profit realized is too high." *Weisshaus III*, 2018 WL 6619736, at *9. The Second Circuit's decision in *Weisshaus IV* did

not alter this aspect of the court's holding. *See Weisshaus IV*, 814 F. App'x at 648. The court therefore continues to view Weisshaus's affordability envelope argument as futile.

Finally, Weisshaus's attempt to replead is also futile to the extent that he continues to allege that the Port Authority violated the dormant Commerce Clause by spending ITN toll revenue on non-ITN projects. ECF No. 65-3 ¶ 116 ("[T]he Port Authority increased the Toll Rate in 2011 . . . to finance capital projects of the [ITN], to finance capital projects outside the [ITN]; including . . . Completion of the World Trade Center."). The evidence on the record in this case demonstrates that the ITN did not have any surplus funds to spend on non-ITN projects. *Supra* Section I. Further, as the court holds here, because of the ITN's deficit at the time of the 2011 toll increase and the ITN's need to invest in capital projects, it is evident that the toll increase was designed to "reasonably support the budget of [the] governmental unit that operates facilities that bear at least a 'functional relationship' to facilities used by the fee payers." *Bridgeport*, 567 F.3d at 87. The filing of a second amended complaint will not alter the evidence already on the record and, as a result, Weisshaus's motion for leave to amend is futile. The court therefore denies Weisshaus's motion to file a second amended complaint.

## CONCLUSION

The court holds that the Port Authority's 2011 toll increase was not excessive in relation to the benefits conferred on users and was a fair approximation of the fee payers' use of facilities. Moreover, the ITN maintained a deficit both before and after the 2011 toll increase. As a result, Weisshaus's sole remaining claim that ITN toll revenue was spent on non-ITN projects, such as the development of the World Trade Center, has no factual basis. The court therefore grants the Port Authority's motion for summary judgment.

Court No. 11 Civ. 06616                                                          Page 35

The court also denies Weisshaus's motion for leave to file a second amended complaint because his attempt to replead is futile.

Judgment will be entered accordingly.

/s/ Richard K. Eaton

U.S.D.J., by Designation

Dated: March 27, 2026
       New York, New York